UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AL-HAROON HUSAIN, | ) | CASE NO. 14 MP 90007 |
| | ) | |
| RESPONDENT. | ) | HON. JACQUELINE P. COX |

**UNITED STATES TRUSTEE'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW[1]**

Now comes Patrick S. Layng, the United States Trustee for Region 11, appointed to

prosecute the above-captioned disciplinary proceeding pursuant to LBR 9029-4B(B)(8), by and

through his attorneys, Jeffrey S. Snell and M. Gretchen Silver, hereby submits the following

proposed findings of fact and conclusions of law:

**I. Procedural Background**

1.      On June 18, 2014, this Court issued its Statement of Charges pursuant to Local

Bankruptcy Rule 9029-4B(B)(4) alleging that Respondent Al-Haroon Husain (hereinafter "Mr.

Husain" or "Respondent") violated Rules 3.1, 3.3(a)(1), 3.3(a)(3), 8.4(c) and 8.4(d) of the

American Bar Association's Model Rules of Professional Conduct. On August 7, 2014, Mr.

Husain filed his Answer, and the United States Trustee was thereafter appointed to prosecute the

Statement of Charges.

2.      On October 14, 2014, following a status hearing, a Final Pretrial Order was

entered [Docket No. 12]. The Final Pretrial Order contained, *inter alia*, deadlines for the parties

to exchange witnesses and exhibits, and specified the potential consequences for noncompliance.

---

[1] To the extent a proposed conclusion of law is improperly categorized as a proposed finding of
fact, it should be considered a proposed conclusion of law. To the extent a proposed finding of
fact is improperly categorized as a proposed conclusion of law, it should be considered a
proposed finding of fact.

3.      Pursuant to the Final Pretrial Order, the U.S. Trustee timely submitted 238 hard copy and electronic exhibits, labeled 1-15 and 19(a)-73(z).[2] Respondent submitted no exhibits.

4.      On January 20, 2015, a final pretrial hearing was held. At the hearing, the U.S. Trustee offered a copy of the Proposed Findings of Fact and Conclusions of Law he had submitted January 16, 2015, pursuant to the Final Pretrial Order, and Respondent's Answer to same, as Exhibits 16(b) and 16(a), respectively. Respondent expressed no objection and U.S. Trustee Exhibits 16(a) and 16(b) were admitted into evidence.

5.      Trial in this matter commenced January 28, 2015, and thereafter continued over the course of five days. At the outset of the trial, U.S. Trustee Exhibits 1-15 and 19(a)-73(z) were admitted into evidence.

6.      During the course of trial, Respondent's Exhibits 1 and 2 were offered and admitted into evidence, and U.S. Trustee Exhibits 17(a), 17(b), 17(c), and 17(d) were offered and admitted into evidence.

## II. Preliminary Findings

7.      During trial, the Court heard live testimony from twelve witnesses.

   a.  Marilyn Kaghan;

   b.  Al-Haroon Husain;

   c.  Patricia Brasier;

   d.  Stephen Wolfe;

   e.  Jennifer Toth;

   f.  Mariya Manavska;

---

[2] The U.S. Trustee's January 16, 2015, Exhibit List, submitted as part of his pretrial materials, reserved the designations of Exhibits 16, 17 and 18. The majority of the U.S. Trustee's Exhibits had separately designated subparts, each of which is counted in arriving at the 238 exhibits originally submitted.

    g.  Shahid Ahmed;

    h.  Farooq Sultan;

    i.  Baligh Abutaleb;

    j.  Mirza Baig;

    k.  Sakeena Baig; and

    l.  Erum Ahmed.

With the exceptions of Mr. Husain and Ms. Marilyn Kaghan, all witnesses were generally credible.

8.    Mr. Husain and Ms. Kaghan were not credible witnesses. In multiple instances, their testimony was inconsistent with their own prior deposition and trial testimony, contradicted by the evidentiary record, and generally not believable.

9.    In addition to live testimony, transcripts of the deposition testimony of thirteen additional witnesses were received into evidence. These individuals, all former or current clients of Mr. Husain, included:

    a.  Ashout Ibraheem;

    b.  Rina Ibraheem;

    c.  Tamara Kako;

    d.  Saghir Badani;

    e.  Istiyak Patel;

    f.  Azra Patel;

    g.  Saima Khalid;

    h.  Mohammad Khan;

    i.  Aaron Rodriguez;

    j.    Kauser Banu;

    k.    Nazra Begum;

    l.    Ghulum Haider; and

    m.    Ghoshia Iqbal.

The depositions of the above individuals were all conducted during this disciplinary proceeding, and, with the exceptions of Ashout Ibraheem and Rina Ibraheem, Mr. Husain (and in some instances, his counsel, Mr. George Panagoulias) attended each of the depositions and asked questions of the witnesses.

### III. General Findings

10.    For the reasons detailed below, the evidentiary record in this proceeding clearly and convincingly demonstrates that Mr. Husain violated Rules 3.1, 3.3(a)(1), 3.3(a)(3), 8.4(c) and 8.4(d) as set forth in the Statement of Charges.

11.    The evidentiary record further supports a finding that Mr. Husain testified untruthfully in an attempt to evade responsibility for his misconduct. The record also supports a finding that Ms. Kaghan testified untruthfully, in an attempt to conceal Mr. Husain's misconduct.

## IV. Al-Haroon Husain's Bankruptcy Background

12.     Mr. Husain is an attorney licensed to practice in the State of Illinois. (UST Ex.

16(a), ¶ 1.)[3]

13.     Mr. Husain graduated with his Juris Doctor from Illinois Institute of Technology,

Chicago-Kent College of Law in 1999. In addition to his Juris Doctor and undergraduate degree,

Mr. Husain has completed several certificate programs, including a program in financial decision

making from the University of Chicago, a program in international relations from the University

of Rochester, a program in international legal studies from the University of Santa Clara, and a

program in international law from Chicago-Kent College of Law. (UST Ex. 16(a), ¶ 2.)

14.     Mr. Husain started practicing law as an assistant corporation counsel for the City

of Chicago in approximately 1999. Mr. Husain entered private practice in 2002. Mr. Husain's

practice consists mainly of bankruptcy and real estate transactions. Mr. Husain represents

Chapter 7 debtors in bankruptcy in the Northern District of Illinois. (UST Ex. 16(a), ¶ 3.)

15.     By his own estimation, Mr. Husain has filed almost 300 bankruptcy cases. (Trial

Tr., at 433:13.) A CM-ECF search of "Al-Haroon Husain" returns 216 cases where he has made

an appearance as an attorney.

16.     At all times relevant to this proceeding, Marilyn Kaghan was an employee

operating under Mr. Husain's sole direction and control. (Answer, ¶ 2.) During the course of her

employment, Ms. Kaghan was Mr. Husain's only employee. (Trial Tr., at 29:3-6.)

---

[3] U.S. Trustee's Exhibit 16(a) is a document titled "Respondent's Response to Trustee's
Proposed Findings of Fact and Conclusions of Law," that specifically admitted or denied the
paragraphs in the U.S. Trustee's Proposed Findings of Fact and Conclusions of Law submitted
January 16, 2015, pursuant to the Final Pretrial Order (the "January 16, 2015, Proposed
Findings"). The January 16, 2015, Proposed Findings, admitted as Exhibit 16(b), provide citation
to specific exhibits now a part of the record. In an effort to save space, those citations are omitted
*in some instances* herein, with respect to certain proposed findings *admitted* by Mr. Husain in
Exhibit 16(a).

17.    Ms. Kaghan began working for Mr. Husain in or around December of 2010. (UST Ex. 65, at 67:21-23.) According to Ms. Kaghan's testimony at trial, she resigned from her position in February 2015 to pursue full-time employment elsewhere. (Trial Tr., at 943:16-24; 946:24-947:5.)

18.    Prior to her position with Mr. Husain, Ms. Kaghan had never worked in a legal position. (Trial Tr., at 947:25-948:2.)  Ms. Kaghan has had no formal legal training. (Id., at 948:3-15.) Ms. Kaghan's legal training has been provided primarily, if not exclusively, by Mr. Husain.[4] (Id., at 30:21-31:7; 948:7-15.)

19.    Ms. Kaghan assisted Mr. Husain in the preparation of petitions and other bankruptcy documents. (UST Ex. 16(a), ¶ 6.) Ms. Kaghan also conducted client consultations and meetings. (Id.)

### V. Process Used by Al-Haroon Husain to Prepare Bankruptcy Documents

20.    Mr. Husain and Ms. Kaghan testified concerning the general process in place at Mr. Husain's office for the preparation and filing of bankruptcy cases. While their descriptions were not precisely consistent as to all aspects, their testimony was in agreement on some basic points. (*See* Trial Tr., at 32:10-41:3; 54:14-57:25; 948:22-954:3.)

21.    The process involved at least two meetings with the client. (*See generally*, Trial Tr., at 32:10-41:3; 948:20-949:25)

22.    At an initial meeting, Ms. Kaghan, the client, and Mr. Husain, would sit down and discuss the client's debts. (Trial Tr., at 32:10-34:19; UST Ex. 64, at 12:9-13:14.) Although the

---

[4] At trial, Mr. Husain testified that Ms. Kaghan had completed online training early in her employment. (Trial Tr., at 29:12-30:20.) In her trial testimony, Ms. Kaghan specifically denied ever completing an online course relating to bankruptcy. (Id., at 1052:6-11.) During a deposition conducted just a few months before trial, Ms. Kaghan testified that she had completed an online course when she first started her position with Mr. Husain, but that she could not recall the details or duration of the course. (UST Ex. 65, at 53:24-54:24.)

bankruptcy documents (*e.g.*, the petition, schedules, Statement of Financial Affairs, etc.) were not completed at the initial meeting, it was routine practice to obtain the client's signatures on **all** documents, including the Declaration of Electronic Filing for Documents filed after Petition. (Trial Tr., at 34:20-37:15, 948:22-949:1, 949:12-14, 958:16-959:13, 1001:17-21; UST Ex. 64, at 18:14-19, 19:7-24.)

23.    Ms. Kaghan and Mr. Husain's testimony was inconsistent as to how long the practice of obtaining clients' signatures at the initial meeting was in use. Ms. Kaghan's testimony indicates the practice was in place throughout her entire time with the firm (*see* Trial Tr., at 948:16-949:14; 959:8-13), while Mr. Husain testified that the practice began in 2012, and concluded sometime in the late summer of 2013. (*See* Trial Tr., at 57:2-25.) Whether the practice was in existence for one year as Mr. Husain says, or four years as Ms. Kaghan's testimony indicates, it clearly led to clients signing their names to numerous declarations – attesting under penalty of perjury to the truthfulness and completeness of documents – that had not yet been completed.

24.    Following the initial meeting, Ms. Kaghan would complete the bankruptcy petition, schedules and other required documents and then contact the client to schedule a subsequent meeting. (Trial Tr., at 949:15-25; UST Ex. 64, at 16:5-17:4.) At the subsequent meeting, Ms. Kaghan and Mr. Husain[5] would review the (already signed) bankruptcy documents with the client to make sure that nothing was missed. (Trial Tr., at 949:23-25, 950:11-13; UST Ex. 64, at 6 16:16-18:2, 20: 24-21:7).

---

[5] Ms. Kaghan's testimony at her August 28, 2013, deposition indicates that she generally handled the second meeting herself, regardless of whether Mr. Husain attended. (*See* UST Ex. 64, at 17:12-18:2.) In her trial testimony, Ms. Kaghan walked this assertion back, and testified that both she and Mr. Husain would review documents with the clients at the second meetings. (Trial Tr., at 950:11-13.)

25.     Following the subsequent meeting, Ms. Kaghan would upload the documents into the CM/ECF System. (UST Ex. 64 at 18:3-10, 21:9-10.)

26.     Ms. Kaghan testified that during the initial meeting with the client, Mr. Husain would discuss the client's assets (and their values) for inclusion in the bankruptcy schedules (Trial Tr., at 1013:20-1014:25.) At this meeting, Ms. Kaghan and Mr. Husain would take notes, and from these notes Ms. Kaghan would thereafter create a typed Schedule B (among other documents). (Id., at 1014:14-25; UST Ex. 65, at 59:23-60-9.) Ms. Kaghan testified that she never discussed the valuation of any personal property to be included on Schedule B with a client *outside of* the presence of Mr. Husain. (Trial Tr., at 1015:8-12.)

27.     Ms. Kaghan testified that Mr. Husain reviews **all** bankruptcy documents, including amended documents, before they are filed with the Court. (Trial Tr., at 953:24-954:3.) Mr. Husain testified that he reviews all initial schedules before they are filed, but that he does not review amended documents prepared by Ms. Kaghan unless "it's a complicated one…" (Trial Tr. 39:16-40:10.)

28.     From at least March of 2011, in the case of Mirza and Sakeena Baig, Case No. 10-57570, through at least November of 2012, in the case of Ashout and Rina Ibraheem, Case No. 12-28290, Mr. Husain signed certain of his clients' names to sworn bankruptcy documents on their behalf. (Answer, ¶ 12; UST Exs. 66 and 67, *passim*; UST Exs. 31(c), 31(d), 37(f), 37(h), and 37(j).)

29.     Mr. Husain has testified that he ceased signing his clients' names to documents on their behalf after being confronted by Stephen Wolfe, a Trial Attorney with the U.S. Trustee's Office, following a Rule 2004 examination in *In re Syed Faisal Hussaini* conducted August 9, 2012. (Trial Tr., at 54:14-55:4; Answer, ¶ 12; UST Ex. 67, at 78:6-79:10; UST Ex. 69.) The

evidence demonstrates that the practice persisted after this date, however. Mr. Husain signed

Ashout Ibraheem's name to certain documents dated and filed November 1, 2012. (UST Ex.

16(a), ¶ 95; UST Exs. 37(f), 37(h), and 37(j)).

30.     Mr. Husain testified that following the August 9, 2012, Rule 2004 examination in

*Hussaini*, he went to Ms. Kaghan and said: "Find some way to make sure these people sign these

documents. I don't want to be signing for them." (Trial Tr., at 57:11-13.)

31.     Around the time he ceased signing clients' names to documents on their behalf,

Mr. Husain testified that he started the practice of having his clients sign documents at the outset

of the representation, before the documents were completed. (Trial Tr., at 57:2-5; Answer, ¶ 14;

UST Ex. 66, at 13:10-17.) In his Answer, Mr. Husain explained that this practice was "to insure

all signatures were authentic, and to prevent clients from forgetting to sign [the documents]."

(Answer, ¶ 14.)

32.     Following the August 9, 2012, Rule 2004 Examination in *Hussaini*, and persisting

through at least May of 2014, Mr. Husain filed documents in a number of cases where clients'

signatures were photocopied and used across multiple documents, or reused from previously

filed documents with altered dates appearing next to the preexisting signatures. (Answer, ¶¶ 9-

11; UST Ex. 40(b).) The first such documents were filed in the *Hussaini* case on August 17,

2012. (UST Exs. 33(f), 33(g), and 33(h).)

33.     Mr. Husain admits that photocopied and reused signatures were filed, but says that Ms. Kaghan created and filed such documents without his knowledge or approval. (Answer, ¶¶ 9-11.) Mr. Husain's testimony concerning his purported ignorance of the practice is not credible for multiple reasons, including:

a.  During his November 6, 2014, deposition in this proceeding, Mr. Husain testified that he did not learn of the photocopy/reuse practice until reviewing a motion filed by the U.S. Trustee in January 2014. (UST Ex. 67, at 63:11-13.) As pointed out in the U.S. Trustee's pretrial materials, this assertion is squarely refuted by the record, including the transcript of Mr. Husain's November 2013 deposition testimony in the *Manavski II* case.[6] (*See* UST Ex. 16(b), ¶ 214.)

b.  At trial, Mr. Husain changed his story, and testified during direct and cross-examination that he first learned of the photocopy/reuse practice at Ms. Kaghan's August 28, 2013, deposition. (Trial Tr., at 277:7-283:17, 708:10-710:1.) During his direct examination testimony, Mr. Husain attempted to explain away the change to his story by testifying that he believed Ms. Kaghan's deposition occurred *after* the January 6, 2014, Amended Motion for Sanctions was filed in *Manavski II*.[7] (Trial Tr., at 280:24-281:2.)

---

[6] *Manavski II* refers to the second bankruptcy case Mr. Husain filed on behalf of Hristo Manavski, Case No. 13-11728.

[7] It is not apparent how Mr. Husain's professed confusion about the sequence of the deposition and motion resulted in his confusion about when he first learned of the photocopy/reuse practice. If Mr. Husain learned at a deposition, why would he have initially claimed to have learned from a motion? If he thought the deposition occurred after the motion (which alleged the photocopy/reuse practice in detail), how did he slowly learn of the practice in the hours following the deposition as he now indicates?

c.  Mr. Husain continued with a similar narrative in response to his counsel's

questions on cross-examination:

Q.      Okay. Now, at some point during your practice, you became aware that
        your assistant, Marilyn Kaghan, was photocopying your clients' signatures
        for the purposes of filing amended schedules; is that correct?

A.      That's correct, yes.

Q.      Okay. When did you first become aware of that?

A.      At her initial deposition. I think it was -- I thought it was the second
        motion for sanctions of the trustee, but it was actually the first motion for
        sanctions.

Q.      Okay.

A.      So somewhere in August, I think, of 2013.

Q.      Well, that's important now because at that deposition, you were
        representing Mrs. Kaghan; is that correct?

A.      Right.

Q.      Okay. Now, had you known that Mrs. Kaghan was actually writing -- or
        signing on behalf of your clients, would you have represented her?

A.      No, I wouldn't. No.

Q.      Okay. So that was a surprise to you; is that correct?

A.      Right. And actually I didn't even get it until the next day when it clicked
        into my head the trustees kept saying these are photocopies, I never -- I
        did not understand what that meant because, to me, when I look at it,
        they're my clients' signatures. So I never -- it didn't register to me until the
        next day.

Q.      Okay. So when you finally realized what actually had transpired, what, if
        anything, did you do?

A.      Well, I called Marilyn, my assistant, and I told her just to confirm what the
        trustee said. And I told her, by the way, what the trustee is saying that
        you're photocopying signatures, are you basically taking the old signatures
        and photocopying them? And she said yes.

Q.      Okay. And then what did you say in response to that, if anything?

A.      I said please don't do that. The trustee's office does not like that. Neither do I, for that matter.

(Trial Tr., 708:10-710:6.)

d.   A review of the transcript and exhibits from the August 28, 2013, deposition casts very serious doubt on Mr. Husain's claim that he first learned Ms. Kaghan was reusing signatures at that deposition. (*See* UST Exs. 64 and 73(v).) Only Mr. Manavski's cases were addressed at that deposition. (*See* UST Ex. 64.) There were no other specific cases, or documents from any other cases, addressed during the deposition. (Id.) Mr. Husain was well aware that Hristo Manavski's signatures were reused far in advance of the August 28, 2013, deposition, as demonstrated by his June 26, 2013, Response of the Original Motion for Sanctions in *Manavski II*. (*See* UST Ex. 11(b).) Moreover, Ms. Kaghan did not ever admit in her testimony to reusing signatures in other cases, although she could have easily done so in response to several of the more general questions placed. (UST Ex. 64, at 73:8-11, 75:4-16.). If Mr. Husain did not know signatures were being reused prior to the August 28, 2013, deposition, there is nothing apparent from the deposition transcript or exhibits that would have alerted him to the practice.

e.   On redirect examination during trial, Mr. Husain was unable to explain how reviewing documents from Hristo Manavski's bankruptcy cases alerted him to the fact that reused signatures were being filed in other cases:

Q.      Now, Mr. Husain, you've indicated in your testimony that you learned that Ms. Kaghan was photocopying signatures during her deposition on August 28th, 2013?

A.      Yes.

Q.      And what was it during that deposition that alerted you to the fact that this was occurring?

A.      I believe you or Mr. Wolfe were showing these documents to her, and you – you indicated that these were exactly the same – the signatures were exactly the same.

Q.      In what case were those documents from?

A.      I don't know.

Q.      Well, weren't the only documents that were referred to as exhibits during that deposition, documents from Mr. Manavski's case?

MR. PANAGOULIAS: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: I don't recall. I assume, but I don't recall.

THE COURT: He said he doesn't recall.

BY MR. SNELL:
Q.      And, Mr. Husain, you did not learn that Ms. Kaghan was reusing signatures from the reused signatures in the Manavski case, did you?

MR. PANAGOULIAS: Objection. That's contradictive of the testimony.

MR. SNELL: It is. It is contradicted by the testimony, Your Honor, which is why I'm asking the question.

THE COURT: Contradictory of what testimony?

MR. SNELL: Mr. Husain's testimony.

MR. PANAGOULIAS: And the party's testimony -- or the witness's testimony.

THE COURT: Overruled.

THE WITNESS: No. It was that time when you or Steve were showing documents to her. And, again, I don't remember the exact dates, but I think it was just showing the photocopies of signatures. And I do recall that the day after asking her, is that correct, what you're doing? And she said, yes, I do that. And that's when I told her, don't do that.

BY MR. SNELL:

Q.      Mr. Husain, if you could turn to U.S. Trustee Exhibit 67, page 53. And that is your deposition transcript from November 6th of 2014.And I'm going to begin and read you a passage from line 10.

A.      Page?

Q.      53.

THE COURT: Exhibit 67, you said?

MR. SNELL: Yes, Your Honor. Exhibit 67, page 53, beginning at line 10.

THE COURT: I'm sorry. The page again?

MR. SNELL: 53.

THE COURT: Go ahead.

MR. SNELL: Page 53, line 10. And I will go through page 54, line 4.

THE COURT: Go ahead.

BY MR. SNELL:

Q.      Mr. Husain, I would like you to explain this testimony to me after I read it to you. Beginning on line 10.

Question: Quote, yes, what did you mean by Kaghan had done so without attorney's knowledge? What exactly had she done without your knowledge?

Answer: I believe she -- when you said reuse debtor's signatures and cause debtor to sign the declaration a blank.

Question: You're saying you didn't have knowledge that Ms. Kaghan was doing that?

Answer: No. Reusing debtors' signatures, no.

Question: What about Exhibits 2 and 3 that we just went over?

Answer: What do you mean?

Question: Mr. Manavski's bankruptcy filing where the dates were changed to reuse Mr. Manavski's signature.

> Answer: Well, this is when we gave it to Manavski, and he okayed it. You're referring to his question nine. It's referring not to Manavski, it's referring to different bankruptcy cases, end quote. (As read.)

> So, Mr. Husain, is it now your testimony that you learned that Ms. Kaghan was altering -- or reusing signatures in other cases from the Manavski documents at her deposition in August of 2013?

> A.   No. It was when you actually showed me the different documents. Like I testified before, I don't know which one. I think it was when you showed me she used different documents from different BKs, and she said -- and then afterwards, I asked her about that.
>       On this particular one, this is where -- it wasn't a photocopy of the signature. We were using Manavski's old bankruptcy, and updating it and having him okay it.

> (Trial Tr., at 802:3-806:9.)

34.   The deposition testimony of Mr. Husain's friends and clients, including Shahid Ahmed, Saghir Badani and Baligh Abutaleb, also contradicts Mr. Husain's professed ignorance of the practice. These individuals have testified that they gave permission directly to Mr. Husain (not Ms. Kaghan) to reuse their signatures. (UST Ex. 57, at 106:2-107:1; UST Ex. 45, at 29:23-31:19, 33:10-15; UST Ex. 46, at 10:6-11, 11:6-24) While certain inconsistencies in these individuals' testimony suggest they may have testified inaccurately in an attempt to protect their friend, Mr. Husain, there is no reason to believe that they authorized Ms. Kaghan to alter dates and reuse their signatures without Mr. Husain's knowledge.

35.   The multiple shifts and contradictions in Mr. Husain's own testimony concerning his knowledge of the reuse of signatures, coupled with the balance of the evidentiary record, leads to the conclusion that his testimony on the subject was not only inaccurate – it was deliberately false.

## VI. The Hristo Manavski Bankruptcy Cases

36.     Mr. Husain filed two bankruptcy cases for Hristo Manavski, an individual whom

he has never seen or met. (UST Ex. 16(a), ¶ 13; UST Ex. 66, at 67:8-15; UST Exs. 2 and 6.)

37.     Mr. Husain was first approached to file a bankruptcy case for Mr. Manavski by

his sister, Mariya Manavska. (UST Ex. 16(a), ¶ 13; UST Ex. 66, at 64:7-8.)

38.     Mr. Husain filed a petition initiating Case No. 12-29534 (“*Manavski I*”) on July

26, 2012. (UST Ex. 6.) At the time of the filing, Mr. Husain knew Mr. Manavski was in Bulgaria

and was encountering difficulties in his attempts to obtain a visa to travel to the United States.

(Trial Tr., at 75:11-15; UST Ex. 67, at 34:24-35:2; UST Ex. 63, at 14:4-13.)

39.     Mr. Husain did not believe that Mr. Manavski’s absence from the United States

posed a problem with respect to a bankruptcy filing, and testified at a deposition on November

14, 2013, about a pre-petition conversation he had with Ms. Manavska, where she told him:

> There's one issue, he's in Bulgaria. I said, okay, well, when is he coming back? And then
> she's, like, he's trying to. He's applying for a visa. So I'm, like, okay. Fine. She did ask us,
> can we do a bankruptcy while he's in Bulgaria? In my experiences with -- at least with I
> know trustee Lefkowitz [sic] I've done that before with people overseas and we've done
> Skype.

(UST Ex. 66, at 64:14-21.)

40.     Mr. Husain did not meet or speak with Mr. Manavski prior to filing *Manavski I*.

(Trial Tr., at 75:21.) All of Mr. Husain’s communications with Mr. Manavski were channeled

through Ms. Manavska. (Trial Tr., at 76:3; UST Ex. 63, at 13:7-14:3; UST Ex. 66, at 64:14-68:4,

67:11-68:10; UST Ex. 11(d), ¶ 26.) During a deposition conducted November 14, 2013, Mr.

Husain explained the process that led to the filing of *Manavski I*:

> I asked [Ms. Manavska] about him. She said he’s a young guy. I think he was in his late
> 20's. He's -- I asked them what debts does he have. Is it serious? And she showed me his
> credit -- I think it was his credit report we pulled. Just a bunch of credit cards really. I
> think the whole thing maybe was 40- something thousand dollars, you know. He didn't

really even have to file a bankruptcy considering if he doesn't come back from Bulgaria, what are the creditors going to do. But he's, like, no, I want to clear it up. All right. Fine.

I told her it's very simple. He had a very, very simple bankruptcy. I gave her all the forms. I said this is all his debts. He doesn't speak that good of an English -- of English, anyways. I said just explain to him this. And she -- gave her the documents. We forwarded it on to her. I assume she forwarded it on to him. Got them back. Went over it again with her. It's, like, did you explain everything? Yeah. Okay. Fine. And then we just went ahead and filed.

(UST Ex. 66, at 65:17-66:12.)

41.    At trial, in response to questions from his counsel, Mr. Husain testified at length

as to the closeness of his relationship with Ms. Manavska. (Trial Tr., at 388:22-390:14, 394:6-

396:11.) Mr. Husain testified that Ms. Manavska is "the wife of a really good friend and client of

mine" and was someone that he had known her for three or four years when she approached him

to file a bankruptcy case for her brother in 2012. (Trial Tr., at 388:22-389:20.) Mr. Husain

testified that back in 2012, he used to see Ms. Manavska "more often" than he does now, which

he believes is due to her "taking care of kids." (Trial Tr., at 390:1-3.) The purpose of Mr.

Husain's testimony appears to have been to convince the Court that he was not reckless in filing

a bankruptcy case for a foreign national that he had never met nor spoken with. As Ms.

Manavska's subsequent testimony demonstrated, this was not true.

42.    Mr. Husain's testimony concerning the closeness of his relationship with Ms.

Manavska was squarely contradicted by Ms. Manavska's credible testimony. Ms. Manavska

testified that she first met Mr. Husain in 2012, when he filed *Manavski I* for her brother. (Trial

Tr., at 612:3-12.) Ms. Manavska is not married and was referred to Mr. Husain by an

acquaintance that she was unable to readily recall. (Trial Tr., at 611:13-612:14.)

43.    Mr. Manavski was born in Bulgaria and is a citizen of that country. (Trial Tr., at

610:22-23.)

17

44.     Mr. Manavski was in the United States for several years, arriving sometime in or around 2006, and departing in 2008. (*See* Trial Tr. 636:4 (2006 or 2007) and UST Ex. 63, at 10:11-14 (2005 or 2006).)

45.     Mr. Manavski returned to Bulgaria in 2008 and has continuously resided in his father's apartment at 406 Kapitan Raicho, Plovdiv, Bulgaria 4000, ever since. (Trial Tr., at 606:17-607:25; UST Ex. 63, at 6:14-7:12.)

46.     Mr. Manavski has not reentered the United States since 2008. (UST Ex. 63, at 9:24-10:5, 49:4-10.)

47.     Mr. Husain has only spoken to Mr. Manavski once, in a telephone call that lasted fewer than 15 minutes. (UST Ex. 63, at 21:20-22:8; UST Ex. 67, at 6:3-6; Trial Tr., at 76:20.) Ms. Manavska, who was at Mr. Husain's office and participated in the call, believes it occurred shortly after her November 26, 2013, deposition. (Trial Tr., at 651:19-652:15; UST Ex. 63, at 13:11-22.) At his November 6, 2014, deposition, Mr. Husain testified that the call occurred in April or May of 2014 and lasted about 5 minutes. (UST Ex. 67, at 5:16-6:6, 9:14-16.)

48.     In the *Manavski I* Petition, Mr. Husain listed Mr. Manavski's address as 128 Forest Glen Road, Wood Dale, IL 60191 (the "DuPage County Address") and his county of residence as DuPage County. (UST Ex. 6, p. 1.)

49.     The DuPage County Address is the home of Ms. Manavska. Ms. Manavska leases that premises and has resided there since 2009. (Trial Tr., at 605:10-18.) Mr. Manavski has never lived at – or even visited – the DuPage County Address. (Trial Tr., at 608:4-6; UST Ex. 63, at 18:6-15; UST Ex. 62, at 9:20-10:5.)

50.     After filing the *Manavski I* Petition, Mr. Husain contacted the Chapter 7 Trustee, Ms. Brenda Helms, and requested that the meeting of creditors be conducted by Skype. (UST Ex.

16(a), ¶ 22.) When Trustee Helms declined, Mr. Husain was "kind of surprised."  (UST Ex. 66, at 66:24-25; UST Ex. 16(a), ¶ 22.) Mr. Husain then inquired (presumably of Ms. Manavska) how Mr. Manavski's visa application was progressing and learned it was not. (Id., at 66:25-67:1; UST Ex. 16(a), ¶ 22.)

51.     After learning that Mr. Manavski was not having success in his attempts to obtain a visa, Mr. Husain filed a Motion to Waive Appearance seeking an order requiring Trustee Helms to permit Mr. Manavski to testify at his meeting of creditors by Skype in *Manavski I*. (UST Ex. 10.) The Motion made no mention of the fact that Mr. Manavski could not secure a visa to enter the United States; rather, it cited the cost of an airplane ticket and indicated Mr. Manavski was caring for a family member and that his physical appearance at a meeting of creditors would "cause great emotional harm." (UST Ex. 10, ¶¶ 13-15.) After the Motion was denied, *Manavski I* was dismissed on December 21, 2012, for Mr. Manavski's failure to appear at a meeting of creditors. (Case No. 12-29534, Dkt. Nos. 16 and 23.)

52.     After *Manavski I* was dismissed, Mr. Husain told Ms. Manavska that the only way he would refile the case was if her brother had a residence in Cook County. (UST Ex. 16(a), ¶ 22; UST Ex. 67, at 19:12-22.) Mr. Husain testified that Ms. Manavska thereafter told him that her brother "lives in Cook County." (UST Ex. 67, at 19:24.)

53.     On March 22, 2013, Mr. Husain filed a second bankruptcy case for Mr. Manavski, Case No. 13-11728 ("*Manavski II*"). (UST Ex. 2.) The *Manavski II* Petition indicates that Mr. Manavski resides in Cook County at 1285 E. Washington Street, Unit 9, Des Plaines, Illinois 60016 (the "Cook County Address"). (Id.)

54.     Mr. Husain testified at his November 6, 2014, deposition, that prior to filing *Manavski II*, he looked at Mr. Manavski's "background and…at what he did for a living and his

status," and determined that "yeah, okay, this [Cook County residency] makes sense." (UST Ex. 67, at 20:6-16.) In his Answer, Mr. Husain further explained:

> Manavski, being young, single and with no significant assets (real estate, vehicle, etc.), would reside, on any given day, at either location, depending on where he had to report to work. Manavski, a truck driver, would either reside in Cook County when he had to start driving near O'Hare airport [sic], and would reside in DuPage County when he had to drive trucks originating from Westmont.

(Answer, ¶ 8.) In his trial testimony, Mr. Husain repeated these assertions. (Trial Tr., at 107:1-108:16.)

55.     The Schedule I that Mr. Husain filed in both *Manavski I* and *Manavski II*, state that Mr. Manavski's occupation is "UNEMPLOYED." (UST Ex. 4, p. 20; UST Ex. 8, p. 20.) The Statements of Financial Affairs Mr. Husain filed in both *Manavski I* and *Manavski II* indicate, in response to Question 1, that Mr. Manavski was unemployed in 2010 and 2011. (UST Exs. 5 and 9.)

56.     Mr. Husain used the Cook County Address in the *Manavski II* Petition because he believed that a Cook County Chapter 7 Trustee would allow Mr. Manavski to appear for a meeting of creditors via Skype. (Answer, ¶ 7.) In his Answer, Mr. Husain indicates he "could do so because [Mr.] Manavski could adequately claim two (2) residences." (Id.) Mr. Husain further informs that he "has performed 341 meetings via Skype in the past without objection in Cook County." (Id.)

57.     At trial, Mr. Husain attempted to explain his representation in the December 20, 2012, Motion to Waive, that "[t]he Debtor currently resides in Bulgaria" (UST Ex. 10, ¶ 3) and asserted that Mr. Manavski is a resident of Cook and DuPage Counties, who lives in Bulgaria.

Q.     So you say right here that he resides in Bulgaria. This is filed December 20, 2012.

A.     Yes. He's living there. I think what you're referring to is that you're saying that's his residency. No. He's residing, meaning that he's living there right now.

> Q.     Then where is his residency, Mr. Husain?
>
> A.     Well, he intends to come back to the United States is what I'm told, and he had
>        two residences. One in DuPage, and one in Cook County.
>
> Q.     But he resided in Bulgaria?
>
> A.     He lived in Bulgaria, and he has an intention -- and he was in the United States,
>        went back to Bulgaria and has intention of returning to the United States.
>
> Q.     Does he have the capability of returning to the United States?
>
> A.     He's been here before. I'm sure he can get here again.
>
> Q.     Is he having trouble getting a Visa?
>
> A.     Yes. Well, his sister told me he had problems getting a Visa.
>
> Q.     But that did not change your belief that you believe he resides in Cook and
>        DuPage County?
>
> A.     He's got -- in my belief, he had residency in Cook and DuPage County.
>
> Q.     And in your belief, does he still have that residency today?
>
> A.     If he's making an attempt to come back to the United States, which he is
>        according to discussions with me, yes.

(Trial Tr., at 81:11-82:17.)

58.     Prior to filing *Manavski II*, Mr. Husain did not ask Ms. Manavska when Mr.

Manavski had last lived in Cook County. (UST Ex. 67, at 49:12-19.)

59.     Mr. Husain knew that Mr. Manavski's residence in Bulgaria had not changed

prior to filing the *Manavski II* Petition on March 22, 2013, as confirmed by his November 14,

2013, deposition testimony:

> So we filed -- I gave -- I told her [Ms. Manavska] it's like -- well, has anything -- *nothing
> has changed*. *He's not been in the U.S.* He hasn't ordered any new credits cards. *He has
> no property*. *He has no car*. *He has nothing except his debts*. So I told her, okay, we're
> going to have to just update this. Update this and let him know, and I need authorization
> that I can refile this with updated dates and if he wants to give me a new address, that's

fine. I said, yeah, everything is fine. She actually came back and said, yeah, do what you want - I mean, don't do what you want. Do what you have to do to get this refiled. That's no problem. Dates, new address, that's fine. File it. And we did.

(UST Ex. 66, at 69:21-70:9) (emphasis added.) The above portion of Mr. Husain's November 14, 2013, testimony is notable not just for his knowledge that Mr. Manavski was in Bulgaria, but also his statement concerning the absence of any property.

60.     Although Mr. Husain represented Mr. Manavski in *Manavski I*, the *Manavski II* Petition fails to disclose the existence of the prior case where called for on page 2. (UST Ex. 2.)

61.     Page 1 of the *Manavski I* Petition and *Manavski II* Petition are distinct, each reciting a different address and county of residence. (UST Exs. 2 and 6.) Pages 2 and 3 of the *Manavski II* Petition, however, are the *same pages* from the *Manavski I* Petition, with the dates next to Mr. Manavski's and Mr. Husain's signatures altered to recite a new date. (Answer, ¶ 6; UST Ex. 11(d), ¶ 14.)

62.     At trial, Mr. Husain denied that he signed his name to the Petitions[8] in *Manavski I* and *Manavski II*, and testified that he directed Ms. Kaghan to sign for him. (Trial Tr., at 129:18-130:2.) Mr. Husain's testimony was directly contradicted by Ms. Kaghan, who identified the signature as Mr. Husain's (Trial Tr., at 1005:5-1006:9), and further testified that she has never signed Mr. Husain's name to a document. (Trial Tr., at 1009:1-6.)

63.     The *Manavski II* Declaration (UST Ex. 3) is the *Manavski I* Declaration (UST Ex. 7) with the date under Mr. Manavski's signature modified from July 23, 2012, to March 22, 2013. (Answer, ¶ 6; UST Ex. 11(d), ¶ 15.)

---

[8] The signatures on the *Manavski II* Petition are photocopies of the signatures from the *Manavski I* Petition.

64.     Accompanying the *Manavski II* Petition filed March 22, 2013, Mr. Husain electronically filed a complete set of schedules (the "*Manavski II* Schedules"). (UST Ex. 11(d), ¶ 16; UST Ex. 4.)

65.     The *Manavski II* Schedules are, with limited exceptions, identical to those filed in *Manavski I* (the "*Manavski I* Schedules"). (*Compare* UST Exs. 4 and 8; *see also*, UST Ex. 11(d), ¶ 17.) The Declaration Concerning Debtor's Schedules filed with the *Manavski II* Schedules is the *same document* filed with the *Manavski I* Schedules with the date changed to March 22, 2013. (*Compare* UST Exs. 4 and 8; *see also*, UST Ex. 11(d), ¶ 18.)

66.     Accompanying the *Manavski II* Petition filed March 22, 2013, Mr. Husain electronically filed a Statement of Financial Affairs (the "*Manavski II* SOFA").  (UST Ex. 11(d), ¶ 19; UST Ex. 5.) The *Manavski II* SOFA is precisely the *same document* that was filed in *Manavski I*, with the date next to Mr. Manavski's signature changed to March 22, 2013. (*Compare* UST Exs. 5 and 9; *see also*, UST Ex. 11(d), ¶ 20.)

67.     The *Manavski II* Petition, *Manavski II* Declaration, *Manavski II* Schedules and *Manavski II* SOFA were filed electronically using Mr. Husain's CM/ECF account. (UST Ex. 11(d), ¶ 21.)

68.     The *Manavski II* Schedule B indicates that, as of March 22, 2013, Mr. Manavski had cash totaling $200, household goods worth $600, and wearing apparel valued at $200. (UST Ex. 4, p. 2.) The *Manavski II* Schedule B indicates that this personal property was located at the Cook County Address on March 22, 2013. (Id.) The *Manavski I* Schedule B recites precisely the same property, with precisely the same values as of July 22, 2012, but indicates the property was located at the DuPage County Address at that time. (UST Ex. 8, p. 2.)

69.     At trial, Mr. Husain testified that the personal property listed on the *Manavski I*

Schedule B is distinct from the personal property listed on the *Manavski II* Schedule B.

A.      That's not the same property. You're saying that this property is the exact same
        property in Du Page as in Cook County. The answer is no. He had two distinct
        properties.

Q.      Two distinct properties?

A.      Two distinct sets of properties.

Q.      You're talking about personal property?

A.      Yes.

Q.      He has this personal property listed on Schedule B on Exhibit 6, Page 2, and then
        he also has -- if you turn to Exhibit 4, Page 2, --

A.      Yes.

Q.      -- he also has these three categories of personal property --

A.      Yes.

Q.      -- in Cook County?

A.      Yes. Yes.

Q.      So his personal property holdings are symmetrical between Du Page and Cook
        County?

A.      Approximately the same. What I should have done is I should have aggregated the
        two in the second one. It should have been 400, 1,200, 400. But I forgot to add
        those two up, the two properties together.

(Trial Tr., at 94:19-95:17.)

70.     Mr. Husain's trial testimony cannot be reconciled with a representation he made

in his June 26, 2013, Response to the Original Motion for Sanctions in *Manavski II*:

At all times, the [*Manavski I* and *Manavski II*] filings were identical (save for the filing
date signed). No debts were removed or added. *No assets were removed or added.*

(UST Ex. 11(b), ¶ 7) (emphasis added).

71.     Neither the *Manavski I* Schedule B, nor the *Manavski II* Schedule B, disclose any

personal property in Bulgaria. Mr. Husain testified that he "forgot" to ask Mr. Manavski about

any property he might own in Bulgaria, as he "was too busy concentrating on what he had in the

U.S." (Trial Tr., at 101:22-24, 127:5-7.)

72.     Mr. Husain admitted in his trial testimony that he has not seen any of the personal

property attributed to Mr. Manavski in the *Manavski I* and *Manavski II* Schedule Bs. (Trial Tr.,

at 133:17-19.)

73.     Ms. Manavska's testimony establishes that the Schedule Bs Mr. Husain filed

*Manavski I* and *Manavski II* are not accurate. Ms. Manavska testified that her brother has no cash

in the United States. (Trial Tr., at 617:6-17.) Ms. Manavska testified that her brother left some

inexpensive household items, such as an iron, kitchen pots, clothing, and perhaps a "very cheap

television" at his friends' house when he left in 2008, but she does not know if those items are

still there and she indicated that the items may have been discarded (Trial Tr., at 618:1-620:15;

*see also*, UST Ex. 63, at 19:3-19.) The items that were left behind were not left in a storage box

with Mr. Manavski's name on it, but were just left at his friends' house. (Trial Tr., at 620:18-22.)

74.     Further establishing the falsity of the information contained in the *Manavski I* and

*Manavski II* Schedule Bs is the pattern that pervades Mr. Husain's filings, as demonstrated by

U.S. Trustee Exhibit 19(a).

> a.   In 106 of the 110 Schedule Bs Mr. Husain has filed in consumer bankruptcy cases
>
> since January 1, 2011, his clients have reported precisely $200 cash – the same
>
> amount of cash Mr. Manavski purportedly possessed in both Cook and DuPage
>
> County. (*See* UST Ex. 19(a).)

b.   Moreover, the three categories of personal property that Mr. Manavski

purportedly possessed in both Cook and DuPage County (cash, household goods,

and wearing apparel) share identical valuations with those same categories of

personal property recited in 93 of the 110 Schedule Bs filed by Mr. Husain since

January 1, 2011.

c.   The consistency of the Schedule B valuations across numerous cases was not

credibly explained by Mr. Husain at trial. To the contrary, he unconvincingly

testified that the valuation numbers in each Schedule B originated with the clients.

(*See generally*, Trial Tr., at 58:1-69:20.)

75.     The evidentiary record, including Exhibit 19(a), the various Schedule Bs, the

testimony of Mr. Husain, and the testimony of Mr. Husain's clients, leads to a conclusion that

Mr. Husain systematically fabricated information contained in Schedule Bs he filed with the

Court.

76.     The evidence clearly and convincingly shows that the *Manavski II* Schedule B

contained inaccurate information at the time it was filed and that Mr. Husain knew of this fact.

Mr. Husain's trial testimony that the *Manavski II* Schedule B reported personal property distinct

from that disclosed in the *Manavski I* Schedule B is not credible. Mr. Husain's prior,

contradictory assertion on this same point in his Response to the Original Motion for Sanctions

filed in *Manavski II*, leads to a finding that Mr. Husain's testimony was not only inaccurate, but

was deliberately false.

77.     The evidence clearly and convincingly shows that the *Manavski II* Schedule F

contained inaccurate information at the time it was filed and that Mr. Husain knew, or was

willfully ignorant, of these inaccuracies. The Schedule Fs in both *Manavski I* and *Manavski II*

26

are precisely the same. Even if additional debts were not incurred between the filing of *Manavski I* on July 26, 2012, and the filing of *Manavski II* on March 22, 2013, the amounts of the debts would almost certainly have changed due to interest and other charges.

78.     Although the information in the *Manavski II* Schedule F is precisely the same as the information in the *Manavski I* Schedule F, Mr. Husain insisted at trial that he "redid" the schedules (Trial Tr., at 138:14), purportedly with a credit report obtained before the *Manavski I* case, some eight months before the filing of *Manavski II*. (Trial Tr., at 137:10-15.) When asked how he determined there had been no change in the intervening eight months, Mr. Husain testified:

> A.     That's why I reviewed it with him, and the change in debts would not occur I don't believe. The change in debts, these debts, would not be different.

> Q.     Well, now, let's take that in two parts. The first part is you reviewed it with him?

> A.     Correct.

> Q.     I thought you hadn't spoken with him?

> A.     I know. I said her.

> Q.     Oh, her. You reviewed it with Ms. Manavska?

> A.     Yes, through him through the credit report that she gave me.

> Q.     This is from July of 2012?

> A.     Yes.

> Q.     So then what? In March or when --

> A.     March.

> Q.     March of 2013 you reviewed the July 2012 credit report with Ms. Manavska?

> A.     No, no, no. I redid his schedules, and we reviewed it again. I told her to give it to Mr. Manavski to review one more time to make sure everything is copacetic and

clear. And it came back and said, yes, everything is fine. This is what it is. And we filed it.

(Trial Tr., at 137:19-138:19.) Mr. Husain then went on to assert that there is a "certain cap" when a debt is in collections and interest is not charged, and hence Mr. Manavski's debts would not have changed from July 2012 through March 2013. (*See* Trial Tr., at 139:23-146:25.) Mr. Husain's testimony regarding the interest, fee and credit reporting practices of unsecured creditors is not credible.

79.     The evidence clearly and convincingly shows that the *Manavski II* Petition contained inaccurate information at the time it was filed and that Mr. Husain knew, or was willfully ignorant, of its inaccuracy. Mr. Husain knew that Mr. Manavski had filed at least one prior case, *Manavski I*, and failed to list it as required on the *Manavski II* Petition. Mr. Husain attempts to attribute this inaccuracy to an "error" by his assistant, Ms. Kaghan. (Answer, ¶ 8.) This excuse is not credible, however. The evidence shows that Mr. Husain habitually fails to disclose prior cases (in which he was debtors' counsel) on subsequent petitions, and did so in every repeat filing case at issue in this disciplinary proceeding. *See In re Ahmed*, UST Ex. 22(a); *In re Sultan*, UST Ex. 30(a); *In re Ibraheem*, UST Ex. 38(a), and *In re Ansari*, UST Ex. 40(a).

**VII. Al-Haroon Husain's Practice of Signing Clients' Names to Documents on Their Behalf**

80.     The evidence shows that between 2010 and 2012, Mr. Husain signed clients' names to documents on their behalf. In his Answer, Mr. Husain does not dispute that he did this, but indicates that he "does not recall nor have sufficient knowledge to admit or deny Court's statement on specific cases." (Answer, ¶ 12.)

81.     In the instances where Mr. Husain signed clients' names to documents, there is no notation next to the signature to indicate that someone other than the client signed the document. (Answer, ¶ 13.)

82.     Mr. Husain states in his Answer that "in general" he only signed clients' names to documents on their behalf with the clients' express consent, after they had reviewed the document. (Answer, ¶ 12.) As detailed below, this representation is contradicted by the evidence, including the sworn testimony of former clients, and is not credible.

### A. *In re Mirza and Sakeena Baig*, Case No. 10-57570

83.     Mr. Husain represented Mirza and Sakeena Baig in the above bankruptcy case filed December 30, 2010. (UST Ex. 31(a).)

84.     Mr. and Mrs. Baig testified at the trial in this proceeding. (*See generally*, Trial Tr., pp. 504-550 (Mr. Mirza Baig); Trial Tr., pp. 550-603 (Mrs. Sakeena Baig)). Mr. and Mrs. Baig appeared for depositions in this proceeding on December 5, 2014. Transcripts of their deposition testimony are in evidence as U.S. Trustee Exhibits 52 and 53.

85.     Mrs. Baig testified that it is not her signature that appears on the schedules filed in their bankruptcy case, and she does not know who signed her name to the document. (Trial Tr., at 562:25-564:2; UST Ex. 53, at 13:19-14:7; UST Ex. 31(c).)

86.     Mr. Baig testified that it is not his signature that appears on the schedules, and he does not know who signed his name to the document. (Trial Tr., at 511:11-512:14; UST Ex. 52, at 11:16-12:1; UST Ex. 31(c).)

87.     Mrs. Baig's name was also signed to the Statement of Financial Affairs, and she does not know who signed that document on her behalf. (Trial Tr., at 566:22-567:15; UST Ex. 53, at 14:10-19; UST Ex. 31(d).)

88.     Similarly, Mr. Baig does not know who signed his name to the Statement of Financial Affairs. (Trial Tr., at 515:2-22; UST Ex. 52, at 12:4-14; UST Ex. 31(d).)

89.     Mrs. Baig was not aware that anyone would be signing her name to these bankruptcy documents. (Trial Tr., at 561:5-12; UST Ex. 53, at 11:23-12:4.)

90.     Mr. Baig was not aware that anyone would be signing his name to bankruptcy documents. (Trial Tr., at 509:13-20; UST Ex. 52, at 9:24-10:11.) Mr. Baig testified that, in his one and only visit to Mr. Husain's office, Mr. Husain gave him papers to sign but did not review the substance of the documents with him. (Trial Tr., at 508:12-19; UST Ex. 52, at 9:1-20.)

91.     Mr. Husain admits that he signed Mr. and Mrs. Baigs' names to the Statement of Financial Affairs, but says that he did so with their permission. Mr. Husain testified that there was an exigency (a contemplated foreclosure) that required him to sign the Statement of Financial Affairs for the Baigs, and that he spoke with both of them during one telephone call to obtain their authorization. (*See generally*, Trial Tr., at 44:6-54:13; *see also*, Trial Tr., at 223:3-233:4.) Mr. Husain's testimony concerning his signing of Mr. and Mrs. Baig's signatures was not at all credible, and the evidentiary record indicates that he did so without their knowledge or authorization.

92.     The material inaccuracies in the schedules Mr. Husain filed on behalf of Mr. and Mrs. Baig strongly belie Mr. Husain's assertion that he only signed documents on behalf of clients after reviewing the document with the client. These inaccuracies include, but are not limited to:

      a.  the omission of two pieces of real property from Schedule A;

      b.  the omission of three motor vehicles from Schedule B,

      c.  the omission of a Bank of America account from Schedule B,

      d.  the omission of an Individual Retirement Account from Schedule B,

      e.  the omission of a whole life insurance policy from Schedule B, and

     f.   the omission of jewelry from Schedule B.

(Trial Tr., at 226:17-227:5; UST Ex. 53, at 17:6-22:6; *see generally*, Trial Tr., at 554:16-572:16)

93.     Mrs. Baig's testimony indicates that she told Mr. Husain of most, if not all, of the

above assets. (Trial Tr., at 555:1-556:10; 557:2-558:12; 564:3-566:21; 571:25-572:13; UST Ex.

53, at 17:6-22:6.) Mrs. Baig testified that during her second meeting with Mr. Husain prior to the

filing of her bankruptcy case:

> I gave him my account -- you know, statements from my account and for my IRA and life
> insurance. He say we don't need it. Because I ask him, because we have life insurance
> and IRA. And he said we don't need that.

(UST Ex. 53, at 9:16-20.)

94.     Mr. and Mrs. Baig were both credible witnesses in all respects.

95.     The evidence, including that summarized in the preceding paragraphs, leads to the

conclusion that Mirza and Sakeena Baig were not aware that Mr. Husain signed their names to

the schedules and Statement of Financial Affairs, and that Mr. Husain did not review those

documents with them prior to filing the documents with the Court.

### B. In re Kauser Banu, Case No. 12-28112

96.     Mr. Husain represented Kauser Banu in the above bankruptcy case filed July 18,

2012. (UST Ex. 32(a); UST Ex. 54, at 10:7.)

97.     Ms. Banu did not testify at trial. Ms. Banu appeared for a deposition in this

proceeding on December 5, 2014, and a transcript of her deposition testimony is in evidence as

U.S. Trustee Exhibit 54.

98.     Ms. Banu testified that she did not execute the signatures that purport to be hers

on the following documents:  (1) the petition filed July 16, 2012 (UST Ex. 32(a)); (2) the

Statement of Social Security Number dated July 13, 2012 (UST Ex. 32(b)); (3) the Declaration

of Electronic Filing filed July 16, 2012 (UST Ex. 32(c)); and (4) the Statement of Financial

Affairs filed July 16, 2012 (UST Ex. 32(d)). (*See* UST Ex. 54, at 12:8-14:19.)

99.     Ms. Banu testified that around the time of the bankruptcy filing, Mr. Husain:

called me and he said I missed two of the papers. So that's what I remember. Because the
signature where he told me to sign it, I didn't look at all of the papers. And then I said like
is there anything that I can Xerox a letter or anything, he said I can write your name, I
said go ahead.

(UST Ex. 54, at 11:13-18.)

100.     Ms. Banu testified several times that she gave Mr. Husain authority to sign **two**

documents. (UST Ex. 54, at 6:23-24, 11:13, 12:7.)

101.     Ms. Banu testified that she was in contact with Mr. Husain two times between her

receipt of the deposition subpoena and her appearance at the deposition. (UST Ex. 54, at 9:8.)

The second of these contacts involved Ms. Banu traveling to Mr. Husain's office on or around

November 26, 2014, to provide him with an affidavit concerning her authorization for him to

sign her name to bankruptcy documents. (Id., at 6:15-9:8.)

102.     The evidence, including that summarized in the preceding paragraphs, leads to the

conclusion that Mr. Husain did not have a knowing authorization Kauser Banu to sign her name

to four documents. The evidence further indicates that Mr. Husain did not thoroughly review the

documents with Ms. Banu prior to filing them with the Court. *See*, *e.g.*, UST Ex. 54, at 16:24-17-

11, 18:17-16 (Ms. Banu's testimony indicates that her 2006 Toyota Highlander may have been in

the possession of her ex-husband on the petition date, but the vehicle is disclosed on neither

Schedule B nor the Statement of Financial Affairs.)

### C. *In re Syed Faisal Hussaini*, Case No. 12-10086

103.    Mr. Husain represented Syed Faisal Hussaini in the above bankruptcy case filed

March 14, 2012. (UST Ex. 33(a).)

104.    Mr. Hussaini did not testify at trial. Mr. Hussaini appeared for a deposition in this

proceeding on December 9, 2014. A transcript of his deposition testimony is in evidence as U.S.

Trustee Exhibit 58.

105.    Mr. Hussaini testified that he did not execute the signatures that purport to be his

on the Declarations of Electronic Filing filed March 15, 2012 (UST Ex. 33(b)) and March 19,

2012 (UST Ex. 33(e)). (UST Ex. 58, at 16:12-22, 17:13-24.) It appears that these Declarations

may be the same document, filed twice. (*Compare* UST Exs. 33(b) and 33(e).)

106.    Mr. Hussaini recalls that during his bankruptcy case, Mr. Husain called him by

telephone to discuss signing his name to a document.

> We had one instant [sic], there was one document, and it needs a signature. And Mr.
> Husain asked me for an authorization to sign on behalf, you know, of me because I was
> tied up on something. So he did sign a document on my behalf.

(UST Ex. 58, at 13:12-17.)

107.    The Declarations signed by Mr. Husain on behalf of Mr. Hussaini, are sworn

attestations to, among other things, the accuracy of the petition, statements, schedules and other

documents filed with the petition. (*See* UST Ex. 33(b).)

108.    A Rule 2004 examination of Mr. Hussaini conducted August 9, 2012, revealed

that the schedules filed in his bankruptcy case were materially inaccurate. (UST Ex. 69, *passim*;

UST Ex. 33(c).) For example, Schedule B omitted his 1998 Cadillac Seville and retirement

account (UST Ex. 69, at 9:13-12:10), and Schedule J showed that he had a monthly surplus of

$3,331.75. (Id., at 69:16-23.) Mr. Hussaini testified that he did not know why his schedules contained these inaccuracies. (Id., at 11:1, 12:10, 16:23.)

109.    The evidence, including that summarized in the preceding paragraphs, leads to the conclusion that Mr. Husain signed Mr. Hussaini's name to the Declaration, attesting to the accuracy of schedules that were materially inaccurate. The material inaccuracies in the schedules, and Mr. Hussaini's openness about those inaccuracies during the August 9, 2012, Rule 2004 examination, lead to the conclusion that Mr. Husain did not appropriately review the schedules with his client, Mr. Hussaini, prior to filing those documents with the Court.

### D. In re Ghulam Haider and Nazra Begum, Case No. 12-17531

110.    Mr. Husain represented Ghulam Haider and Nazra Begum in the above bankruptcy case filed April 30, 2012. (UST Ex. 35(a).)

111.    Ghulam Haider and Nazra Begum did not testify at trial. Mr. Haider and Mrs. Begum appeared for depositions in this proceeding on December 9, 2014. Transcripts of their deposition testimony are in evidence as U.S. Trustee Exhibits 60 and 59, respectively.

112.    Someone other than Mr. Haider signed his name to the Declaration of Electronic Filing filed May 1, 2012 (UST Ex. 35(d).) (UST Ex. 60, at 11:2.)

113.    Mr. Haider testified that he told Mr. Husain he could sign his name to documents, explaining: "Since I was far away, so I did permit him to do – do the signatures, and any missed – whatever required." (UST Ex. 60, at 10:9-11.)

114.    Mr. Haider testified that he remembered seeing the schedules before they were filed, but his testimony is unclear as to the actual depth of the review performed with Mr. Husain. (UST Ex. 60, at 11:12-12:6.) The fact that Mr. Haider's automobile, a 2005 Honda

Accord, was omitted from the Schedule B, demonstrates that any review that Mr. Husain may have conducted with Mr. Haider was inadequate. (UST Ex. 60, at 12:10-21; UST Ex. 35(c), p. 4.)

115.    The evidence leads to the conclusion that Mr. Husain signed Mr. Haider's name to the Declaration attesting to the accuracy of schedules that were not accurate. The inaccuracy of the Schedule B, and Mr. Haider's openness about his 2005 Honda Accord during the deposition, lead to the conclusion that Mr. Husain did not appropriately review the schedules with his client, Mr. Haider, prior to filing those documents with the Court.

### E. Farooq Sultan and Sara Sultan, Case Nos. 12-01209 and 12-42041

116.    Mr. Husain represented Farooq and Sara Sultan in the above two bankruptcy cases. (UST Exs. 29 and 30(a).) Mr. Husain also represented several of Mr. Sultan's businesses, including OF&A Retailers, Inc., in bankruptcy and other legal proceedings. (Trial Tr., at 907:11-909:2.)

117.    At the time of trial, Mr. Husain represented Mr. Sultan in foreclosure and tax proceedings. (Trial Tr., at 908:9-12.) Mr. Sultan met Mr. Husain through Mr. Sultan's father-in-law. (Id., 932:16-933:2.)

118.    The petition filed in Case No. 12-42041 does not disclose the existence of Case No. 12-01209. (See UST Ex. 30(a), p. 2.)

119.    The signature of Sara Sultan appearing on the petition in Case No. 12-01209 is markedly different in appearance from the signature of Sara Sultan on the petition in case No. 12-42041. (Compare UST Exs. 29 and 30(a).) At trial, Mr. Sultan identified both signatures as being signed by his wife, Sara Sultan. (Trial Tr., at 913:12-14, 915:8-10.)

120.    The signature of Sara Sultan on the Declaration of Electronic Filing filed October 24, 2012, in Case No. 12-42041 at Docket No. 10, admitted into evidence as UST Exhibit 30(e),

is markedly different in appearance from the signature of Sara Sultan on other documents filed

that same day (*Compare* UST Ex. 30(e) *with* UST Exs. 30(c), 30(d), 30(f), 30(g), 30(i).) At trial,

Mr. Sultan testified that the signature on UST Exhibit 30(e) is his wife's signature, and that "she

scribbled, that's what it appears to be." (Trial Tr., at 920:5-6.)

### F. *In re Fadi Freij*, Case No. 12-17865

121.    Mr. Husain filed the above bankruptcy case for Fadi Freij on April 30, 2012.

(UST Ex. 36(a).)

122.    The appearance of Mr. Freij's signature varies markedly among the different,

purportedly sworn, documents filed in his bankruptcy case. (*Compare* UST Exs. 36(a) *with* 36(b)

*with* 36(d) *with* 36(e).)

123.    The amended Statement of Financial Affairs that Mr. Husain filed on Mr. Freij's

behalf on July 12, 2012, reused the signature from the original Statement of Financial Affairs

filed May 14, 2012. (*Compare* UST Exs. 36(f) and 36(g).)

124.    The evidence demonstrates that Mr. Husain filed documents in Mr. Freij's

bankruptcy case that purported to bear Mr. Freij's signature but were in fact signed by someone

else, as well as documents with reused signatures. (UST Exs. 36(a)-(g).)

### G. *In re Ashout and Rina Ibraheem*, Case Nos. 12-28290 and 12-37673

125.    Mr. Husain represented Ashout and Rina Ibraheem in two bankruptcy cases.

(UST Exs. 37(a) and 38(a).)

126.    Mr. and Mrs. Ibraheem did not testify at trial. Mr. and Mrs. Ibraheem appeared

for depositions in this proceeding on November 13, 2014. Transcripts of their deposition

testimony are in evidence as U.S. Trustee Exhibits 42 and 43, respectively.

127.    The Ibraheems' primary language is Aremenian, and they speak only limited English. The Ibraheems' communications with Mr. Husain were conducted through their daughter, Tamara Kako. (UST Ex. 42, at 9:20-24; UST Ex. 44, at 5:1-13.)

128.    The Ibraheems' first case was filed July 17, 2012. (UST Ex. 37(a).) While that case was pending, on September 24, 2012, Mr. Husain filed a second petition on their behalf. (*See* UST Ex. 38(a).) According to the Affidavit of Mr. Husain filed in the second case, his erroneous belief that the first case had been dismissed led to the filing of the second case. (UST Ex. 38(b).)

129.    The Petition initiating the second case did not disclose the existence of the first case. (*See* UST Ex. 38(a).)

130.    Mr. Ibraheem testified at his deposition that he was not aware that Mr. Husain filed the second case on his behalf. (UST Ex. 42, at 26:2-20.) Ms. Kako, who attended her father's deposition, testified at her subsequent deposition that she believes her father was confused about his second bankruptcy case, and believed "that he filed bankruptcy twice and was discharged twice." (UST Ex. 44, at 22:10-14.)

131.    Mr. Ibraheem testified that the signature purported to be his on the petition filed in Case No. 12-28290 (UST Ex. 37(a)) was not signed by him. (UST Ex. 42, at 7:19-24.) At trial, Mr. Husain denied signing Mr. Ibraheem's name to UST Exhibit 37(a), and asserted that he had signed the petition in Mr. Ibraheem's second bankruptcy case, Case No. 12-37673, in evidence as UST Exhibit 38(a). (Trial Tr., at 55:11-56:6.)

132.    Mrs. Ibraheem testified that she did sign the petition filed in Case No. 12-28290 (UST Ex. 37(a)). (UST Ex. 43, at 6:12.)

133.   Mr. Ibraheem testified that Mr. Husain told him that it was not necessary that he

sign the petition. (UST Ex. 42, at 8:4-9:24.) Mr. Ibraheem explained:

> So when I went to file the petition for the bankruptcy papers, there was only one missing
> paper. I did not sign it. The attorney -- and when we left the office, he called, and he told
> my daughter about that paper that we forgot to sign it.
>
> So I told him if it's not necessary for me to come all the way over there, because I don't
> have time to come to you, so can you help me do it? Like submit the papers, and you put
> your, I mean, your signature or you put your -- you sign it instead of me? It's not going to
> be affected?
>
> He told me that's okay. I will help you in this matter.

(Id. at 10:1-14.) Mr. Ibraheem believed that Mr. Husain would be signing his name to one, and

only one, document. (Id., at 11:8-14.)

134.   Mr. Husain thereafter filed additional documents purporting to bear Mr. and Mrs.

Ibraheem's signatures that were not actually signed by them, including a declaration pertaining

to an amended Schedule B filed November 1, 2012 (UST Ex. 37(f)); a declaration pertaining to

an amended Schedule C filed November 1, 2012 (UST Ex. 37(h)); and a declaration pertaining to

an amended Schedule I filed November 1, 2012 (UST Ex. 37(j)). (UST Ex. 42, at 15:5-13, 15:18-

16:7; UST Ex. 43, at 7:21-8:10.) Upon reviewing these Declarations at his deposition, Mr.

Ibraheem speculated that perhaps Mr. Husain had signed them, and went on to state:

> As I told you earlier, that when he called me once, and he told me that I'm missing -- he's
> missing my signature on the paper, and I told him if it's not necessary for me to come in
> over there and sign this paper, he can sign it on my behalf, that was the only time I told
> him to sign my name on these papers.
>
> I don't know if he had other papers he signed them or he talked to my kids about other
> papers, and he signed them on my behalf. I don't know about that.

(UST Ex. 42, at 16:17-17:3.)

135.   Ms. Kako testified at a deposition conducted December 12, 2014, that she had

multiple conversations with both Ms. Kaghan and Mr. Husain during which she communicated

to them that Mr. Husain could sign documents on her parents' behalf. (UST Ex. 44, at 6:4-7:18.) Ms. Kako was not sure which specific documents Mr. Husain would be signing on her parents' behalf. (Id., at 7:21-22.)

136.   Ms. Kako testified that she attended a meeting at Mr. Husain's office with her parents where the information for the schedules was provided. (UST Ex. 44, at 10:3-13.) Ms. Kako indicates that the meeting was with Mr. Husain, and Ms. Kaghan did not attend. (Id. at 10:14-15.)

137.   The deposition testimony of Mr. Ibraheem and Ms. Kako makes clear that there are inaccuracies in the schedules Mr. Husain filed. For example, Mr. Ibraheem testified that he had two bank accounts on the petition date. (UST Ex. 42, at 19:9-20:15.) Ms. Kako testified that she believes Mr. Husain was told of these accounts when she and her parents met with him concerning the schedules. (UST Ex. 44, at 11:10-18.)

138.   The original Schedule B indicated that the Ibraheems had no bank accounts and that their personal property consisted of:  $200 cash; "Furniture, TV [and] Computer" valued at $600; wearing apparel valued at $200; a retirement account and two motor vehicles. (UST Ex. 37(c), pp. 2-4.) On November 1, 2014, Mr. Husain signed the Ibraheems' names to a declaration for an amended Schedule B that disclosed one of the two accounts, and filed it on their behalf. (UST Ex. 37(e).)

139.   The evidence shows that Mr. Husain signed the Ibraheems' names to documents on their behalf and filed those documents in their case. The evidence further shows that Mr. Husain failed to adequately review the original and amended Schedule Bs, as well as the Petition initiating the second case, with the Ibraheems prior to filing those documents with the Court.

### H. *In re Ghousia Iqbal*, Case No. 12-18911

140.    It was alleged in the Statement of Charges that someone other than Ghousia Iqbal had signed her name to certain documents filed in her bankruptcy case. (Statement of Charges, ¶ 12.) Ms. Iqbal's deposition testimony indicates that she did in fact sign the documents, albeit with a spelling of her name that is different from the spelling used in the petition. (UST Ex. 61, at 20:1-4.)

141.    The evidence demonstrates that the schedules and Statement of Financial Affairs filed in Ms. Iqbal's bankruptcy case are materially inaccurate and were not adequately reviewed with her prior to filing. (UST Ex. 61, at 22:3.) The inaccuracy of the schedules was initially demonstrated by Mr. Husain's comments and Ms. Iqbal's testimony at her meeting of creditors, a transcript of which is in evidence as U.S. Trustee Exhibit 34(o). For instance:

    a.    Ms. Iqbal's original Schedule A reports that, on the petition date, she owned real property at 15217 Waterman Drive (UST Ex. 34(e), p. 1); this information is erroneous. (UST Ex. 34(o), at 4:18-22.)

    b.    The original Schedule B indicated that Ms. Iqbal had no bank accounts, had $200 cash at 1312 W. Argyle Street, $600 in household goods and furnishings at 1312 W. Argyle Street, $200 in wearing apparel at 1312 W. Argyle Street, and a 2004 Honda Civic (*see* UST Ex. 34(e), pp. 2-4); all of this information is inaccurate. At her meeting of creditors, Ms. Iqbal testified that she had a bank account at Republic Bank with $7 in it, had no furniture, did not own a Honda Civic, and had no familiarity with 1312 W. Argyle Street. (UST Ex. 34(o), at 6:2-8:8.)

142.    Subsequent to Ms. Iqbal's meeting of creditors, Mr. Husain filed amended Schedules A and B. (UST Ex. 34(g).) The amended Schedule A removed the 15217 Waterman

Drive property that was erroneously listed on the original Schedule, and the amended Schedule B

removed the 2004 Honda Civic that was erroneously listed on the original Schedule. (*See* id.)

The amended Schedule B persisted, however, in inaccurately representing that Ms. Iqbal had no

bank accounts, had $200 in cash at 1312 W. Argyle Street, had $600 in household goods and

furnishings at 1312 W. Argyle Street, and had $200 in wearing apparel at 1312 W. Argyle Street.

(*See* id.)

     143.    Further inaccuracies in the schedules and Statement of Financial Affairs were

revealed during Ms. Iqbal's deposition in this proceeding:

    a.    The Schedule D lists the wrong secured creditors with the wrong claim amounts.
(UST Ex. 61, at 28:9-33:3; *see also*, UST Exs. 34(l) and 34(m); *see also*, UST Ex.
36(c) (showing source of this information was schedules of Fadi Freij).)

    b.    Question 1 of the Statement of Financial Affairs, indicating that Ms. Iqbal worked
as a phone clerk, is inaccurate. Ms. Iqbal does not know what a phone clerk is and
never worked as one. (UST Ex. 61, at 35:3-20, 38:9-19.)

    c.    Ms. Iqbal further testified that she does not know why her Schedule B indicates
that she had $200 on West Argyle Street, that no one discussed jewelry with her
and that no one discussed the value of her clothing with her. (UST Ex. 61, at 23:7-
22.) Ms. Iqbal does not know what the source of the information was for her
Schedule B. (Id., at 23:23-24:8.) When asked if Mr. Husain reviewed the
Schedule with her, Ms. Iqbal explained: "Mr. Husain hardly understands Urdu,
and he told me all the bills related to 6448 North Rockwell property, and that's
about it." (Id., at 24:20-22.)

144.     The evidence indicates that Mr. Husain did not adequately review the schedules and Statement of Financial Affairs with Ms. Iqbal prior to filing those sworn documents with the Court, and that he knew, or was willfully ignorant, of the fact that these documents contained materially inaccurate information.

**VIII. Duration of Al-Haroon Husain's Practice of Signing Clients' Names to Documents**

145.     Mr. Husain has indicated that he discontinued signing clients' names to documents on their behalf after discussing the issue with a representative of the U.S. Trustee in 2012, "because, though clients had authorized the signing, and acquised [sic] to the signature at the 341 meetings, Respondent felt uncomfortable of this 'grey area.'" (Answer, ¶ 12.)

146.     The deposition testimony of Mohammad Kahn, whose case was filed October 31, 2013, indicates that he gave Mr. Husain permission to sign documents on his behalf. At trial, Mr. Husain testified that he obtained this authorization in case he "needed it," but that he didn't sign any documents. (Trial Tr., at 336:15-17.) With respect to another 2013 case, Mr. Husain testified that he received authority to "reuse" signatures from Farooq Sultan. (Trial Tr., at 296:1-297:21.) In a confused and incredible explanation, Mr. Husain informed that the authority "to reuse" Mr. Sultan's signature meant authority to sign on behalf of Mr. Sultan, not photocopy an existing signature (which Mr. Husain insists he was not aware was occurring). (*See* id.)

147.     During his deposition conducted November 6, 2014, Mr. Husain testified that he had one conversation with a representative of the U.S. Trustee's office concerning signatures, and that the conversation was with Trial Attorney Stephen Wolfe. (UST Ex. 67, at 78:19-80:3.) Mr. Husain testified that the conversation occurred after a Rule 2004 examination, and that he

thinks it was in the case of *In re Syed Faisal Hussaini*, Case No. 12-10086. (Id., at 79:7-10.) Mr.

Husain testified that the conversation consisted of:

> Steve said something to the effect that we don't like that. And I said I understand. And
> not to sign on their behalf even if they give you -- well, not sign on their behalf.

(Id., at 79:18-21.) The Rule 2004 examination of Syed Faisal Hussaini occurred August 9, 2012,

and a transcript of that examination is in evidence as U.S. Trustee Exhibit 69.

148.    The credible testimony of Mr. Wolfe, and Jennifer Toth, a Paralegal Specialist

employed by the U.S. Trustee, indicates that the conversation when Mr. Husain was confronted

about signing his clients' names to documents actually occurred on July 6, 2011, following Rule

2004 examinations of the debtors in *In re Mirza and Sakeena Baig*, Case No. 10-57570. (Trial

Tr., at 1083:5-18, 1090:9-23, 1099:10-1100:11, 1101:14-1109:9; *see also*, UST Ex. 72.)

149.    The examinations conducted in the *Baig* case revealed that the debtors' schedules

were materially inaccurate and improperly executed. (UST Ex. 72.) Mr. Husain does not dispute

having a conversation with Mr. Wolfe following the Rule 2004 examinations in the *Baig* case;

however, he asserts that the conversation did not concern signatures but rather: "Steve just told

me -- well, Steve said that we're going to move to dismiss this bankruptcy, and he suggested I

not object to it, and I said I'm not going to object to it at all." (UST Ex. 67, at 81:16-19.) The

docket shows that the *Baig* case was dismissed on July 19, 2011, on the Chapter 7 Trustee's

motion, a motion that was pending at the time of the Rule 2004 examinations. (UST Ex. 31(i).)

150.    The evidence demonstrates that Mr. Husain was first confronted about signing

documents on behalf of clients in July of 2011, not August of 2012. However, even if Mr.

Husain's testimony concerning the timing of his conversation with Mr. Wolfe was credible, the

evidence shows that he signed Debtors' names to, and filed, three declarations on November 1,

2012, in *In re Ashout and Rina Ibraheem*, Case No. 12-28290. (UST Exs. 37(f), 37(h), 37(j);

UST Ex. 42, at 15:5-13, 15:18-16:7; UST Ex. 43, at 7:21-8:10.)

### IX. Systematic Alteration of Documents to Reuse Signatures and Obtaining Clients' Signatures on Incomplete Documents

151.    Mr. Husain, or Ms. Kaghan operating under his direction and control, have altered

dates to reuse debtors' signatures, or caused debtors to sign a declaration "in blank" so that it

could be dated, used and reused for documents later filed in the case. Mr. Husain does not

contest that this has occurred, but asserts that Ms. Kaghan engaged in this practice without his

knowledge or approval. (Answer, ¶ 9.) Mr. Husain testified at his deposition that he did not learn

that Ms. Kaghan had engaged in this practice, at least with respect to the cases cited in Paragraph

9 of the Statement of Charges, until after the U.S. Trustee's Amended Motion for Sanctions was

filed on January 6, 2014. (UST Ex. 67, at 63:7-13, 68:18-69:7.) At trial, Mr. Husain changed his

testimony, and asserted that he learned of the practice during, and in the hours following, Ms.

Kaghan's August 28, 2013, deposition. (Trial Tr., at 277:7-283:17, 708:10-710:1.) The

evidentiary record strongly contradicts Mr. Husain's proclaimed ignorance, and his assertions

and testimony on the subject, are not credible.

### A. *In re Syed Faisal Hussaini*, Case No. 12-10086

152.    On August 9, 2012, a Rule 2004 examination of Syed Faisal Hussaini was

conducted. (UST Ex. 69.) Mr. Hussaini was represented at the examination by Mr. Husain. (Id.)

The examination revealed that the schedules and Statement of Financial Affairs were materially

inaccurate, and that certain documents filed in the case contained signatures that purported to be

Mr. Hussaini's, but were in fact executed by someone else. (Id.; *see also*, § VII.C, *supra*.)

153.    Eight days after the examination, on August 17, 2012, certain amended

documents were filed and accompanied by three declarations filed at Docket Nos. 34, 35, and 37,

which used the same photocopied signature. (*See* UST Ex. 33(f), 33(g), 33(h); UST Ex. 58, at 24:8-16.)

154.     During his December 9, 2014, deposition in this disciplinary proceeding, Mr. Hussaini testified that no one spoke with him about taking a photocopy of his signature to use for multiple documents and that, to his knowledge, no one had used a photocopy of his signature for documents filed in his bankruptcy case. (UST Ex. 58, at 14:14-24). Later in his deposition, after Mr. Hussaini examined the three Declarations containing a common, photocopied signature, he reiterated that he did not remember any conversation concerning photocopied signatures, but allowed that there "might" have been such a discussion. (UST Ex. 58, at 24:17-23.)

155.     During his questioning of Mr. Husainni at the December 9, 2014, deposition, following Mr. Husaini's statement that "I authorized you to sign on my behalf," Mr. Husain asked:

Q.     And did you authorize me to use your signature?

A.     For this purpose, yes.

(UST Ex. 58, at 28:4-6.) Although the wording of Mr. Husain's question is somewhat ambiguous, it appears that he was inquiring about the reused signatures filed August 17, 2012. This is notable, as Mr. Husain has maintained that he was ignorant of the practice in 2012.

156.     Mr. Hussaini testified that he is "positive" that he met with Mr. Husain to complete the documents filed August 17, 2012, and that Ms. Kaghan might have been present. (UST Ex. 58, at 25:3-23.)

**B. In re OF&A Retailers, Inc., Case No. 13-23120, and**
**Farooq Sultan and Sara Sultan, Case No. 12-42041**

157.    Mr. Husain represented OF&A Retailers, Inc. ("OF&A") in the above bankruptcy

case filed June 3, 2013. (*See* CM-ECF docket for Case No. 13-23120.)

158.    Mr. Husain represented OF&A's principal, Farooq Sultan, and his wife, Sara

Sultan, in the above personal bankruptcy case filed October 23, 2012. (UST Ex. 30(a).)

159.    In the personal bankruptcy case, the same photocopied signatures were used for

three declarations filed October 24, 2012, at Docket Nos. 5, 19, and 24. (UST Exs. 30(c), 30(g),

30(i); UST Ex. 16(a), ¶ 198; Answer, ¶ 9; UST Ex. 65, at 41:13-42:1.)

160.    In OF&A's bankruptcy case, an Amended Statement of Financial Affairs was

filed July 31, 2013, that reused Farooq Sultan's signature from the Statement of Financial Affairs

filed June 3, 2013, and changed the date recited next to the signature to indicate that it was

executed "7/31/13." (*Compare* UST Exs. 20(a) and 20(b); UST Ex. 16(a), ¶ 116; Answer, ¶ 9;

UST Ex. 65, at 24:10-26:3, Trial Tr., 933:21-934:2)

161.    In OF&A's bankruptcy case, the following declarations were filed containing the

same photocopied signature:

| Date Filed | Declarations With Common, Photocopied Signature |
| --- | --- |
| 6/24/13 | Declaration [Docket No. 18] (UST Ex. 20(c)) |
| 6/24/13 | Declaration [Docket No. 20] (UST Ex. 20(d)) |
| 6/24/13 | Declaration [Docket No. 23] (UST Ex. 20(e)) |
| 7/31/13 | Declaration [Docket No. 29] (UST Ex. 20(f)) |
| 7/31/13 | Declaration [Docket No. 31] (UST Ex. 20(g)) |
| 7/31/13 | Declaration [Docket No. 33] (UST Ex. 20(h)) |
| 7/31/13 | Declaration [Docket No. 35] (UST Ex. 20(i)) |
| 7/31/13 | Declaration [Docket No. 37] (UST Ex. 20(j)) |

(UST Ex. 16(a), ¶ 117; Answer, ¶ 9; UST Ex. 65, at 24:10-28:21.)

162.   At trial, Mr. Sultan testified that he did not recall any conversation with either Mr.

Husain or Ms. Kaghan at any time concerning permission to use a photocopy of his signature in

connection with *any* of his bankruptcies. (Trial Tr., 911:10-13; 937:22-938:3.)

163.   On December 10, 2013, Mr. Sultan, as president of OF&A, appeared for a Rule

2004 examination accompanied by Mr. Husain, the entity's bankruptcy counsel. A transcript of

that examination is in evidence as Exhibit 68. Mr. Sultan initially testified that he did not recall

whether anyone had spoken with him about changing dates on documents. (UST Ex. 68, at

39:17-24.) After being shown several documents with altered dates, Mr. Sultan was asked:

> Q.   So did the company's attorney say, would it be all right if I whited-out the date
> and changed it on a document?
>
> A.   I mean, I specifically asked Mr. Haroon if there was occasions that he has to
> submit it quickly and all that kind of a thing. You know, he can do that and I can
> sign -- come and sign later just, to save some time.

(UST Ex. 68, at 41:14-21.) Later in the examination, Mr. Sultan expanded on his understanding

with Mr. Husain with respect to signing documents:

> Q.   So did you ever give someone permission just to use your signature from prior
> documents onto new documents?
>
> A.   I mean, he--yes, I think I gave him an authority also if some signature is to be
> done for me, I mean, he can sign it.
>
> Q.   Do you know when?
>
> BY MS. SILVER:
> Q.   Not him signing your name, him using your signature that you had previously
> signed. Like, for instance, if you got this (indicating) with no date and signed it,
> did you give him permission to use this signature later maybe to date it that way?
> I mean, that's the question.
>
> A.   I think I mean if there is--it's like a plain vanilla thing and it doesn't hurt me, I
> think I did say that it could be used.
>
> BY MR. SNELL:
> Q.   Do you recall when you would have said this?

A.      No. That specific memory is not...

Q.      And what do you mean by a plain vanilla thing?

A.      I mean, any complicated which requires my -- for example, if I owed somebody
only 5,000 and he puts 50,000, that's -- that's not plain vanilla, you know, that
puts me into an additional burden of 45,000 loan. That kind of a thing. But if it is
a form which is apart of the document and all that, if there is no misinformation or
disinformation in that, yes, he could sign. I mean, he could use that.

Q.      So depending on how much money was in the document?

A.      No, no, no. Money -- how -- how serious is the subject, kind of.

BY MS. SILVER:
Q.      But you relied on him as to whether or not it was a plain vanilla or something
more complicated?

A.      He's my attorney. I have to rely on my attorney.

....

Q.      Yes. So was it your understanding that that was okay with documents filed in the
bankruptcy case?

A.      If there is no misrepresentation of facts -- I mean, I'm not a legal expert, so I don't
want to commit myself or anything, you know. It's going on record. If it is not
going to hurt anything, and it's just part of the system, yes, he was allowed to do
that.

Q.      Why did you think that was allowable?

A.      For convenience of saving time. I live far out from his office and all that. And his
timing, my timing, and all those things. That was all nothing but convenience, I
would say.

Q.      But you understand that these are sworn documents, right?

A.      No. I am not—I am not sure I understand. I have to be honest.

MS. SILVER:
        Here. This, what it says right above your signature, is I declare under penalty of
perjury. That's that word we talked about earlier; that I have read the answers contained
in the foregoing statement of financial affairs and -- it's hard to read upside-down -- and

any attachments thereto and that they are true and correct. And by signing this, you made this oath. Did you realize that when you signed the papers?

A.    Honestly, no.

(UST Ex. 68, at 43:2-45:24.)

### C. *In re Shahid and Erum Ahmed*, Case Nos. 12-31079 and 12-43056

164.    Mr. Husain filed two bankruptcy petitions on behalf of Shahid and Erum Ahmed (UST Exs. 21(a) and 22(a).)

165.    The first case was filed August 4, 2012, and dismissed on the U.S. Trustee's Motion for Failure to File Required Documents on September 5, 2012. (*See* docket for Case No. 12-31079.) The second case was filed October 30, 2012. (UST Ex. 22(a).)

166.    The Petition Mr. Husain filed initiating the second case (UST Ex. 22(a)) was not signed by Shahid or Erum Ahmed for purposes of that case. Rather, the Petition reused the Ahmeds' signatures from the Petition filed in the first case (UST Ex. 21(a)) with the corresponding dates altered. (Answer, ¶ 9; UST Ex. 65, at 28:22-35:4.)

167.    The Petition filed in the second case does not disclose the existence of the first case. (*See* UST Ex. 22(a), p. 2.)

168.    The Exhibit D to the Petition that Mr. Husain filed in the second case (UST Ex. 22(b)) reused the Mr. Ahmed's signature from the Exhibit D filed in the first case (UST Ex. 21(b)) with the corresponding date modified. (Answer, ¶ 9; UST Ex. 65, at 28:22-35:4.)

169.    On January 17, 2013, Erum Ahmed filed a Petition for Dissolution of Marriage in Cook County Circuit Court, Case No. 2013-D-230025. (UST Ex. 16(a), ¶ 126.)

170.    Mr. Ahmed was represented in the divorce proceeding by Mr. Husain. (UST Ex. 16(a), ¶ 127.)

i. Ms. Ahmed's Involvement in the Bankruptcy Cases

171.    Ms. Ahmed testified at trial. Ms. Ahmed also appeared and provided testimony at

a deposition conducted in this proceeding on December 5, 2014. A transcript of her deposition

testimony is in evidence as U.S. Trustee Exhibit 55.

172.    Ms. Ahmed testified that she did not know that her signature was reused, and did

not know that Mr. Husain filed a second bankruptcy petition on her behalf. (Trial Tr., 486:13-21;

UST Ex. 55, at 10:24-11:5.)

173.    Ms. Ahmed has no recollection of anyone speaking with her about photocopying

and reusing her signature. (Trial Tr., 482:24-483:1; UST Ex. 55, at 8:18-21.)

174.    Mr. Husain was present at Ms. Ahmed's deposition, and made the following

inquiry into the circumstances of her bankruptcy cases:

Q.    Ms. Ahmed, do you remember going -- meeting with the trustee, with me and
your ex-husband actually on this floor over in the next room?

A.    Yes, that's what I remember, yes.

Q.    And your husband was dealing strictly with me, I never communicated anything
with you, correct?

A.    Yes. I never talked to you.

Q.    Before the 341?

A.    Before, yeah.

Q.    Were you letting your husband handle the bankruptcy then?

A.    Yes.

Q.    And did your husband inform you that we were dismissing the first bankruptcy
because we didn't have certain documentation and that we were re-filing it?

A.    I didn't know anything about that.

Q.    But he didn't tell you about that, though?

A.    He didn't.

Q.    But everything was handled between me and your ex-husband?

A.    Yes.

Q.    He did give you these documents to sign though, correct?

A.    Yes.

Q.    And you went ahead and signed them?

A.    Yes, I did.

Q.    Okay. And at the 341 meeting, do you remember reviewing these documents with the trustee?

A.    Yeah. I was sitting in the office with a couple of people.

Q.    And he went through the schedules and said, [a]re these correct?

A.    Right.

Q.    And you affirmed everything?

A.    I'm sorry?

Q.    You said everything was correct; is that right?

A.    Yes, that's what I was supposed to say, yes.

(UST Ex. 55, at 15:10-17:4.)

### ii. Mr. Ahmed's Involvement in the Bankruptcy Cases

175.    Mr. Ahmed testified at trial. Mr. Ahmed also appeared and provided testimony at a deposition conducted in connection with the U.S. Trustee's Amended Motion for Sanctions in *Manavski II*. Mr. Husain was represented at Mr. Ahmed's deposition by his counsel in this proceeding, Mr. Panagoulias. Transcripts of Mr. Ahmed's deposition testimony are in evidence as U.S. Trustee Exhibits 56 and 57.

176.     Mr. Ahmed has a Bachelor's degree in accounting. (Trial Tr., 845:17-20.) Mr.

Ahmed is the co-owner of an accounting practice that does primarily corporate accounting and

tax work in Skokie, Illinois. (Trial Tr., 846:8-12; UST Ex. 57, at 26:18-27:10.) Mr. Ahmed has a

professional relationship with Mr. Husain and has referred work to him, and performed

accounting work for him in cases, including Mr. Husain's work with respect to the estate of

Urooj Khan, an individual who won the lottery and whose death was reported on in the news

media. (Trial Tr., 873:5-18; UST Ex. 57, at 31:9-33:6.)

177.     Initially, at his deposition, Mr. Ahmed testified that he had filed only one

bankruptcy case in his lifetime. (UST Ex. 57, at 23:21.) When Mr. Ahmed was shown the

Petition initiating his second bankruptcy case, he testified: "It could be, like, probably, like, a

delay in something, so Al must have asked me, you know, when he asked, like, to refile the case,

and I must have told him yes." (UST Ex. 57, at 41:23-42:2.)

178.     At trial, Mr. Ahmed's testimony evidenced an uncertainty as to whether his

signature from the Petition in his first case, was reused for his second case. During the U.S.

Trustee's direct examination, Mr. Ahmed testified:

Q.      To your knowledge, did you personally sign -- you and your wife at the time,
        personally sign all the documents that were filed in your bankruptcy case?

A.      Yes, we did.

Q.      Did anyone ever ask you about signing your name for you to documents?

A.      No.

Q.      Did anyone ever ask you about using a photocopy of your signature --

A.      No.

Q.      -- for documents?

A.      No.

(Trial Tr., at 851:3-15.)

179.    The signatures from the Petition and Exhibit D to the Petition in the Ahmeds' first

case, were photocopied and reused for those same documents in the second case. (*Compare* UST

Exs. 21(a) *with* 22(a), and 21(b) *with* 22(b).) When examining the signatures on the Petitions

(UST Exs. 21(a) and 22(a)), Mr. Ahmed testified that the signatures are the same. (Trial Tr., at

857:19-23.) When examining the signatures on the Exhibit Ds (UST Exs. 21(b) and 22(b), Mr.

Ahmed testified that they are "identical," (Trial Tr., at 859:1-2), but he was unsure whether one

is a photocopy of the other.

> Q.    Did you know that the signature was going to be photocopied?
>
> A.    Did I know the signature would be photocopied?
>
> Q.    Yes.
>
> A.    I don't remember. Maybe I signed both the documents?
>
> Q.    So you're not sure if they are photocopied then?
>
> A.    Yeah, I'm not sure if they're photocopied or I signed originally. I said I must -- I may have signed originally.

(Trial Tr., at 859:10-21.)

180.    During cross-examination, Mr. Ahmed seemed to acknowledge that he may have

consented to Mr. Husain using a photocopy of his signatures from documents in the first case

with revised dates for the second case:

> BY MR. PANAGOULIAS:
> Q.    Sure.
>         You're okay with the fact that Al used your first documents in your first bankruptcy and changed the dates on them and used them for the second bankruptcy; isn't that correct?
>
> A.    I don't --

THE COURT: I can't hear you.

MR. PANAGOULIAS: Speak up so the judge can hear you.

THE WITNESS: I was okay, as long as he explained to me that it's not going to affect my bankruptcy. So I must have said okay.

BY MR. PANAGOULIAS:
Q.      I need those first words. Did you say, I was okay with that?

A.      Yeah. As long as, you know, like my bankruptcy was in effect.

(Trial Tr., 879:16-880:6.) Later in the cross-examination, the following testimony was elicited

with respect to reusing signatures and changing dates:

BY MR. PANAGOULIAS:
Q.      In fact, Mr. Husain informed you that he was going to do that; isn't that correct?

A.      Yes.

Q.      And you were okay with that?

A.      Yes.

…

Q.      Okay. Do you remember -- oh, strike that.
        Did you give Marilyn authority to reuse your signature?

A.      I was informed that the case would be filed, so I -- yeah. I said, yes, go ahead.

(Trial Tr., at 882:13-17, 883:8-13.)

181.    On redirect examination by the U.S. Trustee, Mr. Ahmed's testimony indicated an

uncertain knowledge about the reuse of his signature.

Q.      And Mr. Panagoulias asked you about giving Mr. Husain authority to reuse your
        signature and photocopy it?

A.      He asked me, like, if I was going to file another case. So I said, okay. You know,
        he explained to me that he's not willing to – some documents were missing, and
        then we are going to file another case. So I said, okay.

Q.      Did he talk to you specifically about photocopying your signature and reusing it?

A.      I don't remember that.

Q.      Has anyone specifically spoken with you about photocopying your signature and reusing it?

A.      I don't remember.

(Trial Tr., at 887:6-20.)

182.    The handwritten dates corresponding to Mr. and Mrs. Ahmed's signatures on the Petitions and Exhibit Ds are not their handwriting, and Mr. Ahmed is not certain as to the date those documents were actually signed. (Trial Tr., at 485:9-11, 486:2-5, 852:13-23, 855:17-24, 857:15-18, 858:6-11.)

183.    The documents filed in the Ahmeds' second bankruptcy case were materially inaccurate. Examples of the inaccuracies include:

a.  The Petition omitted the existence of the first case. (UST Ex. 22(a), p. 2.)

b.  Schedule A omitted a parcel of real property at 6429 S. Carpenter St., Chicago, IL, that Mr. Ahmed owned on the petition date. (*See* UST Ex. 22(f).) On October 5, 2012, approximately three weeks prior to the filing of the second Petition, the mortgagee filed a Satisfaction of Mortgage relating to the property. (*See* UST Ex. 22(g).) The Cook County Recorder of Deed's website indicates that Mr. Ahmed remains the owner of the Carpenter Street property today. (*See* UST Ex. 22(h); *see also*, UST Ex. 16(a), ¶ 141.)

c.  Mr. Ahmed also owned a property at 6818 Ada Street, Chicago, IL on the petition date that was not disclosed on Schedule A. (*See* UST Ex. 22(e); *see also*, UST Ex. 16(a), ¶ 142; Trial Tr., 863:8-13, 865:18-866:5.)

d.  Mr. Ahmed also rented a property located at 5455 Sheridan Road, #1809,

Chicago, Illinois to a tenant named "Joe" on the petition date. (Trial Tr., at 870:2-

872:22.) The lease, rental revenue and related expenses are absent from Schedules

G, I and J. (*See* Ex. 22(c), pp. 21, 23-24.)

184.    Mr. Ahmed's testimony indicates that he does not know why the Carpenter and

Ada Street properties were omitted from Schedule A. (Trial Tr., at 862:14, 869:17.) Mr. Ahmed

testified that he had given Mr. Husain materials that would have evidenced his ownership of the

properties, including mortgage documents, tax returns and a letter concerning the Carpenter

Street property. (Trial Tr., at 849:10-23, 865:12-866:2, 868:19-869:3.) Mr. Husain's knowledge

of the Ada Street property was confirmed when, on December 6, 2012, he filed an amended

Schedule D reciting two mortgages against the Ada Street property. (UST Ex. 22(d), p. 2.) An

amended Schedule A was never filed. (*See* CM-ECF docket for Case No. 12-43056.)

185.    There is no credible evidence that Mr. Husain sufficiently reviewed the

bankruptcy documents and schedules with the Ahmeds before they were filed. Mr. Husain never

met or even spoke with Mrs. Ahmed until the meeting of creditors. (UST Ex. 16(a), ¶ 131; Trial

Tr. 480:14-481:2.) At trial, Mr. Ahmed was unable to recall for certain whether or not he had

reviewed the Schedule A prior to its filing. (Trial Tr., at 862:15-21.) Mr. Ahmed testified at trial

and at his deposition that Mr. Husain reviewed documents with him, but his testimony indicates

that the review was cursory. (Trial Tr., 850:19-851:2, 862:22-863:7; UST Ex. 57, at 50:11-15.)

186.    Mr. and Mrs. Ahmed's names are signed to the schedules – attesting to the

accuracy of the contents under penalty of perjury – but the dates next to the Ahmeds' names are

Ms. Kaghan's handwriting, and Mr. Ahmed does not know when they were actually signed.

(Trial Tr., at 860:20-22, 860:25-861:10; 978:16-20.) Ms. Kaghan testified that the schedules in

the Ahmeds' case would have been signed prior to their completion. (Trial Tr., at 978:21-979:3.)
This is consistent with Mr. Husain's routine practice of having clients sign blank documents at
the outset of the case, before the documents are completed. And is illustrative of the very real
potential for harm that Mr. Husain causes his clients with that dishonest and deceptive practice.
Mr. Husain exposed the Ahmeds to a very real prospect for a complaint objecting to their
discharges under 11 U.S.C. § 727 for false oaths in their schedules, and more.

187.    Mr. Ahmed was able to quickly recall the missing properties when questioned at
his deposition and at trial, and there is no reason to believe that he was attempting to conceal any
property. The evidence demonstrates that Mr. Husain is primarily, if not solely, at fault for the
materially inaccurate schedules. The evidence clearly and convincingly shows that Mr. Husain
did not adequately review the petitions, schedules and Statements of Financial Affairs with the
Ahmeds prior to filing those documents with the Court.

### D. In re Aaron Rodriguez, Case No. 13-26869

188.    Mr. Husain represented Aaron Rodriguez in the above bankruptcy case filed July
1, 2013. (*See* CM-ECF docket for Case No. 13-26869.)

189.    Mr. Rodriguez did not testify at trial. Mr. Rodriguez provided testimony at a
deposition conducted in this proceeding on December 3, 2014. A transcript of his deposition
testimony is in evidence as U.S. Trustee Exhibit 51.

190.    In Mr. Rodriguez's bankruptcy case, the same photocopied signature was used for
declarations filed October 8, 2013, at Docket No. 25 (UST Ex. 23(a)), and October 10, 2013, at
Docket No. 30 (UST Ex. 23(c)). (UST Ex. 16(a), ¶ 150; Answer, ¶ 9; UST Ex. 65, at 35:5-18.)

191.    The Declaration filed October 10, 2013, appears to be the same as another
declaration that was filed October 8, 2013, at Docket No. 27 (UST Ex. 23(b)), with the middle

digit of the date crudely altered from an "8" to a "10." (*See* UST Exs. 23(b) and 23(c).) At trial,

Ms. Kaghan confirmed the foregoing. (Trial Tr., at 979:4-980:12.)

192.    Mr. Rodriguez was asked during his deposition whether anyone had spoken with

him about photocopying his signature and reusing it on bankruptcy documents, and his testimony

initially indicated some uncertainty:

> A.    Did he talk to me about using my signature? You mean like for the amendments?
> The only time we had to change my stuff -- one time Marilyn called and Al is, we
> did an amendment. That's when I think my bankruptcy got pushed back, it got
> pushed back because something was wrong, and I remember then that was also
> another time I came to Al's office, and I was like what's going on here, and then
> they changed some stuff. We had to change -- like Al was there and he did it all
> and then he said that Marilyn was going to change it. I mean we all -- we were -- I
> was just trying to get the bankruptcy done, so, yeah, I was keeping the process
> moving forward by going in and seeing him and saying what are we doing. So I
> don't know if -- if that counts as changing -- using my signature, I don't know -- I
> guess, yes. What do you mean?

> Q.    To your knowledge is every time a signature on a document appears on the
> official documents filed with the bankruptcy court, is that a document that you
> had looked at and signed, or could that signature have been taken from another
> document and attached?

> A.    No. I mean, I looked at all -- I mean we looked at all the documents. That I did
> because I remember doing those with Marilyn and then Al. We looked over all the
> documents that -- doing that with both of them because they were asking me
> questions. I know I signed a bunch. Actually, I signed twice with them -- a couple
> of times actually, I know that for sure, that I would see Marilyn.

(UST Ex. 51, at 14:15-15:22.)

193.    When Mr. Rodriguez was shown the Declarations with reused signatures that

were filed in his case (UST Exs. 23(a), 23(b), and 23(c)), he recognized that his signature crossed

a printed portion of the form at the same point on each declaration, but stated that he did not

know whether the documents were photocopies. (UST Ex. 51, at 34:3-15.)

194.    Following the U.S. Trustee's questions, Mr. Panagoulias questioned Mr.

Rodriguez:

Q.    Now, Jeff asked you a couple of questions before he started -- before showing you these documents. Now you have had an opportunity to look at all of these documents. After looking at all of these documents, I want to ask you a couple of questions.

        In seeing these things in these documents, you remember going to Al's office, correct?

A.    Yes.

Q.    Now do you remember discussing with Al and/or Marilyn whether or not you gave them permission to use photocopies of your signature in filing amendments to the new documents?

A.    When we did -- when we did the re-amendments?

Q.    Yeah.

A.    Yeah.

Q.    Okay. Did you give them your permission?

A.    Marilyn. Yeah, Marilyn.

Q.    Okay. So you gave Marilyn permission to use photocopies of your signature in doing these amendments; is that correct?

A.    Yeah, I did give her permission for the amended -- because we were trying to get the amendments, push the amendment.

Q.    Okay. And before you got the amendments, you did look at the documents?

A.    Yes.

(UST Ex. 51, at 34:20-35:24.) On redirect examination, the U.S. Trustee inquired:

Q.    And one follow-up to that, do you know why your signature would be photocopied if you were in the office? Why you wouldn't have just signed it?

A.    Well, obviously, I signed it. I had to sign it, so I mean -- no, the only thing I would think of Marilyn was -- I missed something. I mean honestly it was awhile ago. But I would say I missed something, and I remember Marilyn asking me if

she can use my signature. But I mean at the end of the day I knew what it was for,
so I agreed. I just wanted to get the bankruptcy finished, to be honest.

MR. PANAGOULIAS: Regardless, it was done with your consent; is that correct?

THE WITNESS: Yes.

(Id., at 36:5-20.)

### E. In re Baligh Abutaleb, Case No. 13-30842

195.     Mr. Husain represented Baligh Abutaleb in the above bankruptcy case filed

August 1, 2013. (*See* CM-ECF docket for Case No. 13-30842.)

196.     Mr. Abutaleb testified at trial. Mr. Abutaleb also appeared and provided testimony

at a deposition conducted in this proceeding on November 17, 2014. A transcript of his

deposition testimony is in evidence as U.S. Trustee Exhibit 46.

197.     In Mr. Abutaleb's bankruptcy case, an amended Statement of Financial Affairs

was filed on October 2, 2013, that reused Mr. Abutaleb's signature from the original Statement

of Financial Affairs filed August 6, 2013, with the date modified to indicate it was executed

"10/2/13." (*Compare* UST Exs. 24(a) and 24(b); UST Ex. 16(a), ¶ 157; Answer, ¶ 9; UST Ex.

65, at 35:19-36:12.)

198.    In Mr. Abutaleb's bankruptcy case, the following declarations were filed using

the same photocopied signature:

| Date Filed | Declarations With Common, Photocopied Signature |
|------------|--------------------------------------------------|
| 10/2/13 | Declaration [Docket No. 21] (UST Ex. 24(c)) |
| 10/2/13 | Declaration [Docket No. 23] (UST Ex. 24(d)) |
| 10/2/13 | Declaration [Docket No. 25] (UST Ex. 24(e)) |
| 10/2/13 | Declaration [Docket No. 27] (UST Ex. 24(f)) |
| 10/3/13 | Declaration [Docket No. 31] (UST Ex. 24(g)) |
| 10/3/13 | Declaration [Docket No. 33] (UST Ex. 24(h)) |
| 10/8/13 | Declaration [Docket No. 40] (UST Ex. 24(i)) |
| 10/10/13 | Declaration [Docket No. 42] (UST Ex. 24(j)) |
| 10/17/13 | Declaration [Docket No. 50] (UST Ex. 24(k)) |
| 10/17/13 | Declaration [Docket No. 51] (UST Ex. 24(l)) |
| 10/24/13 | Declaration [Docket No. 55] (UST Ex. 24(m)) |
| 10/24/13 | Declaration [Docket No. 57] (UST Ex. 24(n)) |

(UST Ex. 16(a), ¶ 158; Answer, ¶ 9; UST Ex. 65, at 35:19-36:12.)

199.    At trial, Mr. Abutaleb testified that he went to Mr. Husain's office "several

times." (Trial Tr., at 818:15.) At his deposition, Mr. Abutaleb testified he went to the office

"[p]robably three times" total. (UST Ex. 46, at 41:6-8.)

200.    At his deposition, Mr. Abutaleb testified that he knew his signature would be

photocopied and reused:

> Q.    Did you ever talk to anyone or did anyone ever talk to you about photocopying
> your signature and reusing it for other documents?
>
> A.    Yes.
>
> Q.    Who spoke to you about that?
>
> A.    Mr. Al-Haroon.
>
> Q.    And was that in person or by the telephone?
>
> A.    It was in person, I believe, in the office.
>
> Q.    Was there just one conversation about reusing signatures or did it happen--
>
> A.    I believe one time, um-hum.

Q.     Do you know whether that was before or after the bankruptcy was filed?

A.     It was in the first visit that when -- because you do like kind of consultation before, and then I agree on the amount and everything, and then we go ahead and file.

(UST Ex. 46, at 10:6-24.)

201.    Mr. Abutaleb's trial testimony casts doubt on whether he truly understood that his signature was being photocopied and reused across multiple documents.

Q.     And did anybody at Mr. Husain's office or Mr. Husain talk to you about using photocopies of your signature?

A.     We -- we did photocopies there of -- you know, like, while I was in the office, you know, I would sign, and, you know -- like, for -- I don't remember actually. But we did a lot of signatures in the office and papers that I filled, and then copies that were blank.

THE COURT: You signed blank documents? Is that what you're saying, you signed blank documents?

THE WITNESS: Not blank documents. You know, I was just reading and then signing. There is --

THE COURT: Signed the documents after information had been put on them?

THE WITNESS: Correct, yeah. And then they explained to me -- I remember Marilyn, she explained to me everything what I was signing.

(Trial Tr., 820:15-821:9.)

202.    Casting further doubt on whether Mr. Abutaleb truly understood what occurred with the documents in his case, was his testimony that the handwritten dates next to his photocopied signatures are in his handwriting. (*See* Trial Tr., at 823:23-25; 832:12-22.) While Mr. Abutaleb's testimony may be sincere, the evidentiary record strongly indicates that the handwritten dates are in the hand of Ms. Kaghan, a fact she admitted in her testimony. (Trial Tr., at 981:18-986:2.)

203.     Mr. Abutaleb's confusion about the reuse of his signature was demonstrated during his deposition when he was shown the twelve different declarations using the same photocopied signature, filed on six different dates (*see*, ¶ 198, *supra*), and he testified:

A.      Yes. Yeah.

I remember all this. I remember when -- I remember when we -- we photocopied these things, me and Marilyn, I remember, in the office. So maybe I signed -- yeah, I signed -- I'm aware of these, you know. This could be like not every single time I –

MR. PANAGOULIAS: He was there when it happened.

BY THE WITNESS:
A.      I was there at the office, yeah.

BY MR. SNELL:
Q.      So when was that?

A.      When was that?

Q.      When you photocopied these at the office.

A.      Thursday the -- I don't know when.

Q.      I'm sorry. Thursday you said?

A.      I have no idea on the date.

Q.      Well, was it before you filed bankruptcy or after?

A.      I don't remember. I don't remember if it was before or after.

Q.      Well, these all have different dates.

A.      Okay.

Q.      And I think your testimony was the dates are in your handwriting.

A.      So this could be then maybe like in --

MS. SILVER: Let me ask you were you there? Were you in the office?

THE WITNESS: Yes. I remember. I remember these things. I did those things with Marilyn a hundred percent. But I don't remember before or after. I mean --

MS. SILVER: Were you in the office on October 2nd and October 3rd and October 8th and October 10th?

THE WITNESS: Yes.

MS. SILVER: So you were in the office at least four times?

THE WITNESS: Yes. Three to four times.

MS. SILVER: Did you meet with them before you filed for bankruptcy also?

THE WITNESS: Before? Yeah. I met with Mr. Al.
So it could have been, you know, like maybe four, even five times I was in his office, you know?

BY MR. SNELL:
Q.      All right. Because all these dates, October 2nd, those are all after the filing.

A.      Yeah. Yeah. So I could have -- maybe I was there like more than three or four times, you know?

Q.      Now, was there any explanation as to why, if you went to the office on each of these days, there would be a photocopy of this made with your signature on it?

A.      Uhm --

MR. PANAGOULIAS: I'm sorry. Can I have the question read back, please? Forget it. He just said he doesn't recall. That's fine. Go ahead.

THE COURT REPORTER: I didn't --

MR. PANAGOULIAS: Sorry. You didn't hear his answer.

THE COURT REPORTER: I didn't get his answer.

MR. PANAGOULIAS: Can I have the question read back, please?

(The record was read as requested.)

BY THE WITNESS:
A.      Uhm, I don't know. I don't know. All I can say -- I'm not sure if -- you know, if this needs more explanation -- is when I hire Al, I trust Al, okay? I authorize him to do my signature. I authorize him to appear in court for me. I authorize him to do these things for me, you know?

And I'm -- you know, like right now nowadays, you know, when you do a -- file bankruptcy, you know, it's just -- I just know so many, many, many papers. I cannot remember everything. I can't remember everything.

I mean, I could tell you, you know, I've been in his office three or four or five times. You know, like I cannot remember exactly how many times. I cannot remember like every document that we sit down and now, yeah, he explain two hours for me and then I understand, and I did not -- I just don't. It's so many papers, you know. It's so many papers.

(UST Ex. 46, at 46:2-49:22.)

204.    Mr. Abutaleb's trial testimony indicates that he was not aware of, and did not appreciate, the significance of documents executed under penalty of perjury. (Trial Tr., at 833:16-19; *see also* 834:11-836:10.) Mr. Abutaleb's deposition testimony makes clear that he did not understand the importance and significance of the declarations filed repeatedly, with photocopied signatures, in his case.

Q.    Do you know what that document is?

A.    Amended declaration regarding electronic filing for documents.
        I mean, you know, I just don't pay attention to these things to be honest with you.

Q.    So did you know that this was a representation under penalty of perjury that the document referenced is accurate?

A.    I don't know. I mean, I didn't read any of these things, you know?
        They explained as much as possible, and that's it. I'm telling you. I just have trust in Mr. Al, and that's about it, you know?

(UST Ex. 46, at 50:19-51:7.)

205.    Mr. Abutaleb's trial testimony indicates Ms. Kaghan reviewed many documents with him and answered his questions. (Trial Tr., at 821:5-9; 837:1-10.) This is somewhat consistent with Mr. Abutaleb's deposition testimony which indicated that Mr. Husain did not sit with him and carefully review the schedules with him prior to filing them with the Court.

Q.      These are the schedules from the bankruptcy.

A.      Oh, okay.

Q.      Have you seen these before?

A.      Yeah, I think so.

Q.      Do you know if you reviewed these before they were filed with the bankruptcy court?

A.      Yeah. I believe so, yeah.

Q.      Do you have a specific recollection of going through paperwork?

A.      Uhm, you know, I never like read through everything because, you know, I used Mr. Al Husain, and I trust him. I never like went through like and read everything.

I knew I paid like maybe the most attention to, you know, to my credit report. And I made sure like if anything that is not on the documents he provided to me, maybe I would talk to him next time, you know. Just watch out. This is, you know, stuff like that. But I wasn't going through every single page and reading through to be honest.

(UST Ex. 46, at 12:14-13:11.)

206.    Mr. Abutaleb's Schedule B recites personal property consisting of: $200 cash; "Furniture, TV Computer" valued at $600; wearing apparel valued at $200; and a 2006 BMW X5 motor vehicle. (*See* UST Ex. 24(o), pp. 2-4.) The Schedule B indicates that Mr. Abutaleb did not have a bank account on the petition date. (Id.)

207.    Mr. Abutaleb's deposition testimony indicated that he had an account at Chase Bank at the time the bankruptcy was filed. (UST Ex. 46, at 17:15-18.) At trial, Mr. Abutaleb initially confirmed that he had an account at Chase when he filed for bankruptcy, but then expressed some uncertainty. (Trial Tr., 832:23-824:10.)

208.    Mr. Abutaleb's testimony indicates that he does not actually know why an amended Statement of Financial Affairs was filed on October 2, 2013. (Trial Tr., 822:19-823:9;

UST Ex. 46, at 27:1-8.) When asked during his deposition whether anyone had spoken with him about reusing his signature from the original Statement of Financial Affairs for the amended document, Mr. Abutaleb testified:

A.     Uhm, you know, I'm telling you, for the bankruptcy, there was so many, many, many papers, and I really have all the trust for Mr. Husain, okay?

If something needed to be, you know, done for the bankruptcy, I just agreed to -- you know, kind of blindly to Mr. Husain because I know him for a long time, to take care of this.

But I'm not sure which one I filed, which one is not. You know, I told him I want to do a bankruptcy, and, I mean, he take care of the whole thing. He said sign here, sign here, and then I give him a authorized signature, and that's about it, you know.

Q.     So then this --

A.     So -- go ahead.

Q.     The amended Statement of Financial Affairs filed on October 2, 2013, a couple months after you filed bankruptcy, did you review that document before it was filed?

A.     I probably didn't. I probably didn't. And I probably -- yeah.

(UST Ex. 46, at 30:2-23.)

### F. In re Saghir Badani, Case No. 13-33835

209.    Mr. Husain represented Saghir Badani in the above bankruptcy case filed August 26, 2013. (*See* CM-ECF docket Case No. 13-33835.)

210.    Mr. Badani did not testify at trial. Mr. Badani appeared and provided testimony at a deposition conducted in this proceeding on November 17, 2014. A transcript of his deposition testimony is in evidence as U.S. Trustee Exhibit 45.

211.    In Mr. Badani's bankruptcy case, the following declarations were filed containing

the same photocopied signature:

| Date Filed | Declarations With Common, Photocopied Signature |
|---|---|
| 9/12/13 | Declaration [Docket No. 11] (UST Ex. 25(f)) |
| 9/25/13 | Declaration [Docket No. 22] (UST Ex. 25(g)) |
| 9/25/13 | Declaration [Docket No. 24] (UST Ex. 25(h)) |
| 9/25/13 | Declaration [Docket No. 26] (UST Ex. 25(i)) |
| 3/4/14 | Declaration [Docket No. 39] (UST Ex. 25(k)) |
| 3/4/14 | Declaration [Docket No. 41] (UST Ex. 25(l)) |

(UST Ex. 16(a), ¶ 169; Answer, ¶ 9; UST Ex. 65, at 36:13-37:1.)

212.    Mr. Badani testified at his deposition that he visited Mr. Husain's office two times

before the bankruptcy case was filed, and did not return to the office after the case was filed.

(UST Ex. 45, at 12:17-24.)

213.    Mr. Badani testified that he signed documents on both of his trips to Mr. Husain's

office, and added:

A.    […] And then he called me once, and I need to, you know, sign some papers, and
I couldn't. I said: You know what? Go ahead and sign them on behalf of me or
sign them and you do it. And he said: Okay. Because I know him for a long time
so...

Q.    Did anyone talk to you about photocopying your signature and reusing it?

A.    Nobody talked about that.

(UST Ex. 45, at 13:5-14.)

214.    Mr. Badani testified that the signature appearing on his schedules is his

handwriting, but that the corresponding date, "9/12/13," is not his handwriting. (UST Ex. 45, at

14:1-18.) Mr. Badani testified that he reviewed some of the schedules (UST Ex. 25(a)) before

they were filed. (Id.)

215.    Mr. Badani does not know why his schedules were filed *several weeks* after the

Petition. (UST Ex. 45, at 15:12.)

216.    Mr. Badani testified that he was familiar with the amended Schedule B filed in his

case on September 25, 2013, and testified that he had provided Mr. Husain with the values of

$200 for cash on hand, $600 for "Furniture, TV, Computer," and $200 for wearing apparel. (UST

Ex. 45, at 17:20-22, 18:3-20.) Aside from these three asset categories, the only other personal

property disclosed on amended Schedule B were two automobiles, a 2007 Toyota Camry and a

2007 Mercedes-Benz ML350. (*See* UST Ex. 25(c).) When reviewing the amended Schedule B

during the deposition, Mr. Badani denied having a bank account as of the petition date (UST Ex.

45, at 16:19-17:17.)

217.    Mr. Badani's testimony that his amended Schedule B is correct, and that he had

no bank account, is difficult to reconcile with his testimony from earlier in the deposition:

Q.    Do you remember how much you paid the attorney?

A.    I think it was $2,500.

Q.    Do you remember how you paid it?

A.    I paid him with a check.

Q.    Do you remember where the check came from?

A.    From my bank account.

Q.    What bank?

A.    Was it – I think it was from Chase or Bank of America. Either one of them.

Q.    Did you have accounts at both?

A.    I'm sorry?

Q.    Did you have accounts at both?

A.    I had. Not anymore.

(UST Ex. 45, at 10:22-11:12.)

218.     Following Mr. Badani's testimony that he did not have a bank account when

reviewing the amended Schedule B, the U.S. Trustee sought to understand how he logistically

made the payments to the secured creditors for his 2007 Toyota Camry and 2007 Mercedes-Benz

ML350 automobiles at the time of the bankruptcy filing. (UST, Ex. 45, at 19:1-4.) Before Mr.

Badani could answer this question, however, Mr. Husain's attorney, Mr. Panagoulias, interjected

with an extended speaking objection. (*See* UST Ex. 19:6-22:5.) Thereafter, the U.S. Trustee

asked Mr. Badani if he knew how many more amended schedules were filed in his bankruptcy

case and he did not. (Id., at 22:15.) Mr. Badani testified that he understood that Mr. Husain had

filed amended schedules in his case:

> Yeah. I apprised him he can file on my behalf whatever needs to be done. He was my
> attorney. That's why I got an attorney. If I knew it, I would have done it myself.

(UST Ex. 45, at 22:18-21.)

219.     Mr. Badani testified that he did not see, or remember seeing, the following

documents prior to filing:

a.       Exhibit I filed September 24, 2013 (UST Ex. 25(b));

b.       Amended Schedule D filed September 25, 2013 (UST Ex. 25(d));

c.       Amended Schedule F filed March 4, 2014 (UST Ex. 25(j));

(UST Ex. 45, at 23:12-25:3.)

220.     After showing Mr. Badani the Declarations filed in his case containing

photocopied signatures, the U.S. Trustee inquired:

> Q.     Now, do you know whether anyone photocopied your signature in this case and
> reproduced it across multiple documents?
>
> A.     I mean, some of them look like they're, you know, copies, and I authorized him to
> do that.
>
> Q.     You authorized him to do what?

A.      If he needs to use my signatures, copy them, you can do it.

Q.      Okay. So when you testified before, you were talking about photocopies and not him actually signing it for you?

A.      What do you mean?

Q.      What was your understanding as to what was going to happen -- what did you give your authorization for?

A.      If I'm not there, and if he needs to use my signatures, he can make copies of this and make my signature, provide my signature, or he can sign it.

Q.      Okay. And when you say "he," you're referring to Mr. Husain?

A.      Yes, that is correct.

Q.      And when did this communication occur? This authorization?

A.      It's when I was filing the bankruptcy.

Q.      Was it before you filed your bankruptcy or after?

A.      When I went to his office. I mean, before, of course. When I went to his office, that was before filing the bankruptcy. I authorized him.

        And after that, also, he called me, and I told him he can use these, my signatures, that's not a problem, because he's my attorney.

Q.      So were your conversations concerning your signature only with Mr. Husain or were they with anyone else, too?

A.      Anyone else? What do you mean?

Q.      Well, Ms. Kaghan, for example?

A.      Whenever I have any conversation, I have a conversation with him.

Q.      Okay. So any discussion about the authorization then, so that we're clear, occurred between you and Mr. Husain?

A.      Yes, that is correct.

Q.      Do you know what these documents are, Exhibits 6 through 11? Do you know what these documents do?

A.      These are something to file in the court.

Q.      Right. But do you understand what their significance is, exactly what they do, what they mean?

A.      This says declaration regarding electronic filing for documents.

Q.      Yeah. Do you see where it's a declaration under penalty of perjury?

A.      Okay.

Q.      Did you know that when you authorized Mr. Husain to photocopy them?

A.      Like I said, I authorized him, if he needs to use it for anything, he can use them in my case, so that -- I think this is the whole case that he's using it in, this one, so I authorized him for everything.

(UST Ex. 45, at 29:23-32:15.)

### G. In re Istiyak Patel and Azra Patel, Case No. 13-37122

221.    Mr. Husain represented Istiyak and Azra Patel in the above bankruptcy case filed September 20, 2013. (*See* CM-ECF docket for Case No. 13-37122.)

222.    Mr. and Mrs. Patel did not testify at trial. Mr. and Mrs. Patel appeared and provided testimony at depositions conducted in this proceeding on November 18, 2014. Transcripts of their deposition testimony are in evidence as U.S. Trustee Exhibits 47 and 48, respectively.

223.    In Mr. and Mrs. Patel's bankruptcy case, the same photocopied signatures were used for declarations filed November 8, 2013, at Docket Nos. 22 and 24, and November 11, 2013, at Docket No. 26. (UST Exs. 26(d), 26(e), 26(f); UST Ex. 16(a), ¶ 181; Answer, ¶ 9; UST Ex. 65, at 37:2-10.)

224.    Mr. Patel testified that he did not know that his signature was going to be

photocopied and reused. (UST Ex. 47, at 29:7-21.) When asked whether he knew that changes

had been made to the documents originally filed in his bankruptcy case, Mr. Patel explained:

> A.    Actually, yes. He called me regarding that also. And he explained that it was a
> mistake by his secretary. And that's why he changed the paperwork, and that's
> what it is.
>
> Q.    Did you have to go in and look at it before it was filed?
>
> A.    I didn't -- I trust him because he's my -- he was my attorney. So I completely trust
> with him because he knows the legal rules and regulations because I don't know
> anything about what I have to do and whatnot.

(UST Ex. 47, at 32:1-12.)

225.    Ms. Patel was asked whether Mr. Husain or anyone from his office spoke with her

about photocopying her signature, and she recollected that "there was something about

amendment, like, discussion going on, but I -- I don't, like, recall, like, photocopy, you know."

(UST Ex. 48, at 19:20-23.)

### H. In re Mohammad Khan and Saima Khalid, Case No. 13-42658

226.    Mr. Husain represented Mohammad Khan and Saima Khalid in the above

bankruptcy case filed October 31, 2013. (*See* CM-ECF docket for Case No. 13-42658.)

227.    Ms. Khalid and Mr. Kahn did not testify at trial. Ms. Khalid and Mr. Kahn

appeared for depositions in this proceeding, and transcripts of their deposition testimony are in

evidence as U.S. Trustee Exhibits 49 and 50, respectively.

228.    In Ms. Khalid's and Mr. Kahn's bankruptcy case, dates were modified and their

signatures were reused for the amended Statement of Financial Affairs filed November 14, 2013.

(*Compare* UST Exs. 27(b) and 27(c); *see also* UST Ex. 16(a), ¶ 186.)

229.    Mr. Kahn's and Ms. Khalid's photocopied signatures were used for four

declarations filed November 14, 2013, at Docket Nos. 16, 18, 20, and 31. (UST Exs. 27(d),

27(e), 27(f), 27(g); UST Ex. 16(a), ¶ 187; Answer, ¶ 9; UST Ex. 65, at 37:11-39:23.)

230.    Mr. Kahn initially indicated in his deposition testimony that he knew that his

signature would be photocopied and reused. (UST Ex. 50, at 15:11.) However, when testifying

about the source of this knowledge, Mr. Kahn indicated that Mr. Husain had called him prior to

the bankruptcy filing and informed him that he (Mr. Kahn) had forgotten to sign a document,

whereupon he told Mr. Husain he could sign the document on his behalf. (UST Ex. 50, at 15:12-

16:3.) When Mr. Kahn was shown the Declarations and amended Statement of Financial Affairs

containing photocopied signatures, he testified that he does not know whether or not they are

photocopies. (Id., at 33:3-12, 38:23-39:3.)

231.    It appears that Mr. Kahn's recollection may have been influenced by a

conversation he had with Mr. Husain prior to his deposition. After a series of objections by Mr.

Husain's attorney, Mr. Panagoulias, to questions concerning Mr. Kahn's bankruptcy schedules,

Mr. Kahn advised:

> And I thought this was only going to go for signature matter. I didn't know you
> were going to ask me so many questions like this. I don't remember so many of those,
> you know.
>
> BY MR. SNELL:
> Q.    So you thought this was just a signature matter?
>
> A.    That's what is. That's a thought, you know. It's like a --
>
> Q.    Why did you think that? What was the basis of your thought that this was a
>     signature matter?
>
> A.    When I called Mr. Husain about that, you know, that what he told me, that's a
>     signature. Remember you -- called you and asked you for the missing some
>     signatures. I said, okay, go ahead, sign it. And there was reason, so and I said
>     okay.

Q.     So when you talked to Mr. Husain, he asked if you remembered about him calling you and asking --

A.     I called him.

Q.     You called him, and he was talking to you about a conversation that happened back during your bankruptcy case about signatures?

A.     That's what he told me, that, you know, they have, like -- remember that was some papers was -- he didn't sign it, you know, and that's what -- I signed it for you, you know, and you authorized me about that. I said okay, you know. That's the only thing I knew to came in and tell you about that.

(UST Ex. 50, at 22:25-24:3.)

232.   Later in the deposition, the following exchange occurred between Mr.

Panagoulias and Mr. Kahn:

Q.     Now, you spoke of earlier that you gave Mr. Husain authority to make photocopies – strike that.

        You spoke of earlier that you gave Mr. Husain permission to use photocopies of your signature; is that correct?

A.     Exactly.

Q.     Was it Mr. Husain or was it Mr. Husain's office you gave authority to?

A.     Mr. Husain, you know. That's what I told him.

(Id., at 43:6-16.)

233.   Ms. Khalid testified that her husband, Mr. Kahn handled most of the bankruptcy

related matters with Mr. Husain and Ms. Kaghan. (UST Ex. 49, at 15:7-9; 17:7-10.) When

reviewing the Schedule B with Ms. Khalid, she was unsure of the source of the $200 cash, $600

valuation for "Furniture, TV, Computer", and $200 in wearing apparel. (Id., at 15:18-23, 17:3.)

Although the Schedule B indicates "none" on lines 5 and 7, Ms. Khalid testified that she did

have books and "artificial jewelry" at the time of filing. (Id., at 16:22-17:12.) Mr. Khan testified

that he did not recall any discussion about jewelry, and that his wife had "a couple of rings and

stuff like that." (UST Ex. 50, at 28:6-11.)

234.    Ms. Khalid's testimony indicates that she did not understand that her signature

was going to be photocopied and reused on *five* documents.

Q.      Did you ever – did anyone ever talk to you, whether Marilyn or Mr. Husain, about
        photocopying your signature for documents to reuse for other documents?

A.      Yes.

Q.      When did they talk to you about that – or who talked to you about that first?

A.      Like I said, most of the time my husband take care of that. So probably he did
        everything. Yeah.

Q.      Well, now, my question was, did anybody talk to you about photocopying your
        signature to use later in the case?

A.      Yes.

Q.      Do you know who – who did you talk to about it?

A.      Marilyn.

Q.      And was that conversation in person or over the phone?

A.      Over the phone.

Q.      Do you remember if it was after the case was filed or before?

A.      It was before.

Q.      And what did Marilyn tell you about photocopying documents? What was your
        understanding?

A.      We just forgot to sign one document. I don't remember which one was that. So we
        gave her permission to do it.

Q.      So did you understand that one document would be -- one signature would be
        photocopied and reused?

A.      Yes.

Q.      So to your knowledge, was any more than one signature photocopied and reused?

A.      I don't remember if it happened.

Q.      Do you remember what the document was?

A.      No. I'm so sorry.

(UST Ex. 49, at 10:18-12:4.)

235.    Later in the deposition, Ms. Khalid was shown several of declarations containing

photocopied signatures, and testified that she did not know whether they were photocopies or

whether she had signed her name three separate times. (UST Ex. 49, at 21:23-22:12.)

236.    During Mr. Panagoulias's questioning, Ms. Khalid's testimony was changed

slightly:

Q.      […] You did give authority to Al or his office – I'm sorry. Haroon or his office
        authority to photocopy your signature after reviewing those other documents?

A.      Yes.

Q.      You gave him authority to use your signature on a photocopy; is that correct?

A.      Right.

Q.      Earlier, you testified on one occasion. But after reviewing all these documents,
        you saw that you gave him authority more than once; isn't that correct?

A.      Yes.

(UST Ex. 49, at 24:1-13.)

### I. In re Syed M. Hussain and Affaf Baig, Case No. 13-48122

237.    Mr. Husain represented Syed Hussain and Affaf Baig in the above bankruptcy

case filed December 17, 2013. (*See* CM-ECF docket for Case No. 13-48122.)

238.    In Syed Hussain and Affaf Baig's bankruptcy case, the same photocopied

signatures were used for two declarations filed February 3, 2014, at Docket Nos. 16 and 18.

(*Compare* UST Exs. 28(a) and 28(b); Trial Tr., at 994:24-996:20; Answer, ¶ 9; UST Ex. 65, at 39:24-41:12.)

### J. In re Fareedun Ansari, Case Nos. 14-02434 and 14-17200

239.    On January 27, 2014, Mr. Husain filed a Chapter 7 petition for Fareedun Ansari (the "*Ansari I* Petition"). (UST Ex. 39(a).) Accompanying the *Ansari I* Petition was a Declaration of Electronic filing (the "*Ansari I* Declaration"). (UST Ex. 39(b).)

240.    After Mr. Ansari's first case was dismissed, on May 6, 2014, Mr. Husain filed a second Chapter 7 petition for Mr. Ansari (the "*Ansari II* Petition") that was accompanied by a Declaration of Electronic Filing (the "*Ansari II* Declaration"). (UST Exs. 40(a) and 40(b).)

241.    The *Ansari II* Petition does not report the existence of the first case. (*See* UST Ex. 40(a), p. 2.) The *Ansari II* Petition appears to be a copy of the *Ansari I* Petition, with dates added to correspond to Mr. Husain's signatures on pages 2 and 3, and a second signature and date added for Mr. Ansari on page 3. (*Compare* UST Exs. 39(a) and 40(a).)

242.    The *Ansari II* Declaration is a photocopy of the *Ansari I* Declaration, with "05/01/14" added below the existing signature. (*Compare* UST Exs. 39(b) and 40(b).)

### X. Substantive Inaccuracy of Schedules and Other Documents Filed With Court

243.    The evidence summarized above illustrates numerous instances where Mr. Husain

filed materially inaccurate (and in many instances improperly executed) schedules and other

documents on behalf of his clients. The U.S. Trustee's Exhibit 19(a) summary chart further

demonstrates that Mr. Husain is abjectly indifferent to the factual accuracy of the documents he

files with the Court.

244.    Exhibit 19(a) is a summary chart of all Schedule Bs Mr. Husain has filed since

January 1, 2011, in consumer bankruptcy cases. This chart illuminates an alarming pattern:  of

the 110 Schedule Bs that Mr. Husain has filed since January 1, 2011, 93 include the same

amounts of cash ($200), household goods ($600), and clothing ($200). Even more incredible,

106 of the 110 Schedule Bs report precisely $200.00 cash on the petition date. This pattern

demonstrates that the Schedule Bs filed by Mr. Husain are not substantively credible, and

confirms Mr. Husain's blatant disregard for accuracy in sworn documents.

245.    At trial, Mr. Husain testified that the valuations appearing in Schedule Bs

originate with his clients, and that he has never suggested values to his clients. (*See generally*,

Trial Tr., at 58:1-69:20.) Ms. Kaghan's testimony echoed this assertion. (Trial Tr., at 1016:7-12;

1018:12-1019:10; 1020:18-25.) Neither witnesses' testimony on the subject was credible. The

consistency in valuations as shown on Exhibit 19(a) is simply too anomalous to believe, and

several of the specific cases that are the subject of this proceeding (*see*, *e.g.*, Ghousia Iqbal, §

VII.H, *supra*), demonstrate that Mr. Husain used standard descriptions/valuations for personal

property listed on Schedule B, irrespective of the actual facts.

246.    Mr. Husain's disregard for the requirement of accuracy in sworn documents was

further highlighted by his testimony expressing the basic idea that a meeting of creditors exists to

serve as a constructive critique of the schedules, which are amended if the trustee objects. (*See*,

*e.g.*, Trial Tr., at 310:13-21; 712:16-713:11) In seeking to excuse the failure to include Mr.

Haider's 2005 Honda Accord on his Schedule B, Mr. Husain testified:

> There is certain reliance when we do a 341 meeting with a case trustee that they're going
> to show all the properties of the individual. If there's any objection or if the individual is
> saying something is missing, which can happen in a case, then we do an amendment.
>
> I believe in Mr. Haider's case, he didn't object to the fact that he didn't see a car there.
> Now, it might have slipped his mind and actually got misfiled in Ms. Iqbal's file. But I
> don't think there's an inadequacy here. It's just a mistake.

(Trial Tr., at 461:20-462:6.) Mr. Husain's attempt to blame the trustee is misplaced; Mr.

Husain's excuse – that the "2004 Honda Civic" erroneously recited on Ms. Iqbal's Schedule B

(UST Ex. 34(e)), is in fact the 2005 Honda Accord omitted from Mr. Haider's Schedule B (UST

Ex. 60, at 12:11) – is not credible.

247.    At multiple points in the trial, Mr. Husain sought to blame the inaccurate

documents he filed on his clients. In one instance, where inquiry was made into how he could

have filed a Schedule J showing a debtor had $3,331.75 in excess income each month without

realizing something was amiss, Mr. Husain responded:

> Again, we reviewed with him many times.
>
> Some of my clients, again, they're not the -- would not be -- well, how should I say it?
> They're not the brightest people, so we have to constantly try to review it again and again
> with them to make sure we get it right. It may not always be perfect, which is why if we
> see something wrong afterwards, we do an amendment.

(Trial Tr., at 239:11-18.) The debtor Mr. Hussain was referring to, Syed Faisal Hussaini, had no

perceptible difficulty providing pertinent information in response to the U.S. Trustee's questions

during a Rule 2004 examination and deposition. (*See* UST Exs. 58 and 69.)

248.     The evidentiary record in this proceeding clearly and convincingly demonstrates that Mr. Husain has no regard for the accuracy of sworn statements he, and his clients, make to this Court, and that he files inaccurate documents with this Court as a routine matter.

### XI. Marilyn Kaghan

249.     Ms. Kaghan's testimony at trial was generally not credible. During her direct examination, she testified that she had photocopied and reused bankruptcy clients' signatures for documents filed with the Court, and that Mr. Husain was not aware of the practice until formal proceedings were initiated against him. (Trial Tr., 956:3-958:2.)  Although Ms. Kaghan testified that she acted alone in photocopying and reusing signatures, she was unable to "recall" answers to an array of questions relating to the practice. For instance, Ms. Kaghan testified that:

a.   She did not recall how the practice started (Trial Tr., at 956:9);

b.   She did not recall when the practice started (Id., at 956:12);

c.   She did not recall how she developed the idea to start the practice (Id., at 956:19-24);

d.   She did not recall how many times signatures were reused (Id., at 956:25-957:6);

e.   She did not recall when the practice stopped (Id., at 957:9-11);

f.   She did not recall why the practice stopped (Id., at1000:10-13)

g.   She did not remember the day Mr. Husain found out about the practice (Id., at 958:3-5);

h.   She did not recall ever having a conversation with Mr. Husain about the practice (Id., at 958:6-13; 999:16-1000:4)

i.   She did not recall speaking with Syed Faisal Hussaini (Id., at 962:7-24), Farooq Sultan (Id., at 966:8), Erum Ahmed (Id., at 976:13), Shahid Ahmed (Id., at

976:16), Aaron Rodriguez (Id., at 980:15); Baligh Abutaleb (Id. at 982:19); or

Saghir Badani (Id., at 989:14), about photocopying and reusing their signatures.

Indeed, she did not recall *any* discussion between her and *any* debtor about

photocopying and reusing the debtor's signature (Trial Tr., at 993:4-7);

    j.    She was unable to say whether Farooq Sultan, Aaron Rodriguez, Istiyak Patel and

        Azra Patel knew that their signatures were being photocopied and reused (Id., at

        971:24-972:2; 980:22; 991:25-992:14.) Indeed, she could not remember *any*

        specific cases where debtors knew that their signatures were going to be

        photocopied and reused (Id., 992:18-993:2.)

250.    During cross-examination, in response to leading questions, Ms. Kaghan's

memory concerning several of the above inquiries improved, dramatically.

    a.    She specifically testified that she had Farooq Sultan's permission to reuse his

        signature (Trial Tr., at 1039:22)

    b.    She testified that Mr. Husain prohibited her from accessing the office computer

        due to her reuse of signatures (Id., at 1054:13-1055:13);

    c.    She testified that Mr. Husain had told her twice "not to submit signatures" (Id., at

        1056:8-10);

    d.    She testified that she informed each affected client that she was reusing their

        signature (Id., at 1057:4-15);

251.    On redirect examination, Ms. Kaghan feigned an inability to remember various

portions of *her own testimony from earlier in the day* (*see, e.g.,* Trial Tr., at 1062:12, 1068:11),

and was not credible on a variety of matters, including (i) the "permission" she purports to have

received from Farooq Sultan, (ii) the conversation she is certain she had with Erum Ahmed, and

(iii) the conversations she purportedly had with Mr. Husain concerning his discovery and displeasure with the photocopying and reuse of signatures. (*See* Id., pp. 1061-1077.)

252.    With respect to the purported conversations between Mr. Husain and Ms. Kaghan, it is noteworthy that she claims the first conversation occurred face-to-face in his office (*see* Trial Tr., at 1070:24-1077:7), while he claims the conversation occurred by telephone the day after her deposition. (Trial Tr., at 709:11-710:1.)

253.    Ms. Kaghan appeared for a deposition in this proceeding on December 16, 2014. A copy of Ms. Kaghan's testimony from that deposition is in evidence as U.S. Trustee Exhibit 65. On August 28, 2013, Ms. Kaghan appeared for a deposition in the *Manavski II* case; a transcript of her testimony from that deposition is in evidence as Exhibit 64.

254.    Ms. Kaghan's unreliable testimony at trial concerning the photocopying and reuse of signatures was ostensibly more certain than portions of her December 16, 2014, deposition testimony. At that deposition, Ms. Kaghan could not "recall" whether or not Mr. Husain knew she was photocopying and reusing signatures when the practice was ongoing.

Q.    And so, Ms. Kaghan, this list of cases that's listed in Paragraph 9 in the allegation, Mr. Husain's answer indicates that you had altered the dates to reuse signatures or cause the clients to sign documents in blank in these cases, and that you did it without his knowledge.

Is that true?

A.    Yes.

Q.    Mr. Husain did not know that you were altering dates and documents?

A.    I don't -- you know, I don't recall. I don't recall.

Q.    Well, his answer also says that you obtained approval from each of the clients to make the --

A.    Yeah, the –

Q.      -- modifications?

A.      We got approval from the clients, yes, to make any changes, all right?

Q.      So you recall that?

A.      I do recall that, yes, because that's huge. You know, if there is any changes, you have to have an approval.

Q.      But you don't recall whether Ms. Husain knew that this was going on?

A.      (Indicating).

Q.      You have to answer audibly.

A.      I don't recall. Correct.

(UST Ex. 65, at 23:1-24:4.) By the time Ms. Kaghan testified at trial just a few months later, her testimony was unwavering on one point – that Mr. Husain had no knowledge that she was photocopying and reusing signatures.

255.    Ms. Kaghan's testimony regarding Mr. Husain's lack of knowledge is not credible. The evidentiary record overwhelmingly demonstrates that Mr. Husain was aware of the practice throughout.

256.    The troubling nature of Ms. Kaghan's clearly inaccurate testimony is substantially compounded by the strong appearance that it is a result of influence exercised by Mr. Husain. During her August 28, 2013, deposition, Mr. Husain represented Ms. Kaghan. (*See* UST Ex. 64.) During the December 16, 2014, deposition, and at trial, Ms. Kaghan was represented by James Pittacora, a representation she testified was arranged by Mr. Husain. (Trial Tr., at 1021:1-3; UST Ex. 65, at 6:5-13.) Several other facts indicate that Mr. Husain is integrally involved in the Pittacora-Kaghan attorney-client relationship. *See*, *e.g.*, Trial Tr., at 1021:4-1023:20 (Ms. Kaghan was unaware how Mr. Pittacora was being paid and first learned, while sitting in the witness box at trial, that he was representing her pro bono); UST Ex. 65, at 18:10-24 (Ms.

Kaghan was informed of the date and time of her rescheduled deposition by Mr. Husain); *see also*, Id., at 31:9-31 (Mr. Pittacora asked for a break in the deposition to confer with Ms. Kaghan and was initially receptive to Mr. Husain's request to join them.) Notwithstanding the deceptive and rogue behavior Mr. Husain now attributes to Ms. Kaghan, Mr. Husain employed Ms. Kaghan through the beginning of the trial, and her employment was concluded when she left in February 2015 to pursue another position. (Trial Tr., at 942:20-947:5.) The foregoing circumstances concerning the Husain-Kaghan relationship, in light of the overall evidentiary record, lead to the conclusion that Mr. Husain and Ms. Kaghan have deliberately attempted to influence these proceedings through the provision of materially inaccurate testimony.

## XII. The Persistence of Al-Haroon Husain's Misconduct

257.    On May 23, 2013, the U.S. Trustee filed a Motion to Impose Sanctions Under 11 U.S.C. § 105 and Fed. R. Bankr. P. 9011 in *Manavski II* (the "Original Sanctions Motion"), citing, among other things, the alteration of documents and reuse of signatures in Hristo Manavski's second bankruptcy case. (UST Ex. 11(a).)

258.    Mr. Husain continued to file improperly executed documents after the Original Sanctions Motion, including in the following cases discussed above:

a.   *In re OF&A Retailers, Inc.*, Case No. 13-23120;

b.   *In re Aaron Rodriguez*, Case No. 13-26869;

c.   *In re Baligh Abutaleb*, Case No. 13-30842;

d.   *In re Istiyak Patel and Azra Patel*, Case No. 13-37122;

e.   *In re Mohammad Khan and Saima Khalid*, Case No. 13-42658;

f.   *In re Syed M. Hussain and Affaf Baig*, Case No. 13-48122; and

g.   *In re Saghir Badani*, Case No. 13-33835.

(Answer, ¶ 10; UST Ex. 65, at 24:10-42:1.)

259.    On January 6, 2014, the United States Trustee filed his Amended Motion to

Impose Sanctions in *Manavski II* (the "Amended Sanctions Motion") alleging, *inter alia*, that

Mr. Husain's reuse of signatures and modification of bankruptcy documents was not limited to

the *Manavski II* case, and is part of a course of conduct that persisted even after the Original

Sanctions Motion was filed. (UST Ex. 11(c).)

260.    On January 27, 2014, Mr. Husain filed his Response to the Amended Sanctions

Motion. (*See* Case No. 13-11728, Docket No. 59.) This Response was defiant in tone. The

Response made no mention of what later became two of Mr. Husain's central assertions: (1) that

Mr. Manavski was a truck driver who drove between Cook and DuPage Counties, and (2) that

Ms. Kaghan had been altering signatures without his knowledge. (*See* id.)[9]

261.    On January 29, 2014, at a status hearing on the Amended Sanctions Motion, Mr.

Husain was admonished by Judge Carol A. Doyle. The transcript of that hearing, a copy of

which is in evidence as U.S. Trustee Exhibit 70, shows that Mr. Husain was alerted to the very

real possibility of sanctions. The hearing concluded with Mr. Husain being ordered to file an

amended response that specifically admitted or denied each of the allegations in the Amended

Motion for Sanctions. (*See* UST Ex. 70.)

262.    On February 19, 2014, Mr. Husain filed his Amended Response to the U.S.

Trustee's Amended Motion for Sanctions. (UST Ex. 11(d).) In his Amended Response, Mr.

Husain first asserted that Ms. Kaghan had been reusing signatures without his knowledge (but

with clients' permission). (UST Ex. 11(d), ¶¶ 55-56.) It was also in the Amended Response that

---

[9] As a publicly available document within the Court's own records, the Response is susceptible
to judicial notice. *See Griffin v. United States*, 109 F.3d 1217, 1218 n. 1 (7th Cir.1997).

Mr. Husain first asserted that Mr. Manavski was a truck driver traveling back and forth between DuPage and Cook Counties. (Id., pp. 23-24.)

263.     On March 4, 2014, Mr. Husain filed two declarations in *In re Saghir Badani*, Case No. 13 B 33835, that contained signatures identical to those contained in declarations filed as far back as September 12, 2013. (Answer, ¶ 11.) Mr. Husain admits that this occurred, but asserts that Ms. Kaghan filed the reused signatures without his knowledge. (Id.) Mr. Husain further asserts that he had instructed Ms. Kaghan to cease and desist from reusing signatures prior to these filings, and that he "reasonably believed" she had done so. (Id.)

264.     On May 6, 2014, Mr. Husain filed the *Ansari II* Petition and *Ansari II* Declaration, reusing signatures from the corresponding documents in Mr. Ansari's prior case (albeit with, what appears to be an additional, "new" signature on the petition). (*See* UST Exs. 39(a), 39(b), 40(a) and 40(b).)

265.     On June 18, 2014, Mr. Husain was served a copy of the Statement of Charges commencing this disciplinary proceeding. Mr. Husain failed to timely answer the Statement of Charges. On August 7, 2014, Chief Judge Bruce W. Black issued an order requiring Mr. Husain to file an answer by August 15, 2014, and appear for a hearing on August 18, 2014, or the allegations would be deemed admitted and permanent suspension from practice might result. (*See* Docket No. 4.) Only after entry of the August 7, 2014, Order did Mr. Husain file his Answer.

### XIII. Al-Haroon Husain's Materially False Written Representations, Testimony and Other Attempts to Evade Responsibility During the Instant and Predecessor Proceedings

#### A. Obstruction with respect to the Hristo Manavski Cases

266.    Consistent with the deceptive and dishonest character of the underlying misconduct, Mr. Husain has sought to mislead the Court and the U.S. Trustee since the filing of the Original Sanctions Motion in *Manavski II*.

267.    Attached to his Response to the Original Motion for Sanctions, were two "affidavits," one from Hristo Manavski and the other from Marilyn Kaghan. (UST Ex. 11(b), pp. 4-7.) These "affidavits" were prepared by Mr. Husain and were substantively inaccurate. (*See* Trial Tr., at 163:13-170:15; 1010:2-1013:19; *see also*, UST Ex. 64, at 46:14-57:17.) The "affidavits" are not verified. Mr. Husain prepared and filed these "affidavits" (one of which was for a person he had never seen, met, or even directly spoken to at the time it was prepared), for the sole purpose of misleading the Court and the U.S. Trustee as to the facts and circumstances of the *Manavski II* filing.

268.    In what can fairly be interpreted as a collaborative effort to mislead, Mr. Husain represented Ms. Kaghan at her August 28, 2013, deposition where she testified to having personally met with Hristo Manavski, before wavering slightly, only to again testify that she had met him. (UST Ex. 64, at 26:16; 27:7-15; 43:10-44:165:6.) Ms. Kaghan consistently testified that Mr. Husain had met with Hristo Manavski. (UST Ex. 64, at 25:11-19; 26:21-27:3; 35:18-20.) Mr. Husain cross-examined his client, Ms. Kaghan, during the deposition, but focused his questions on reinforcing portions of her prior testimony (that nothing had changed with the schedules and that the client had approved everything), rather than correcting the materially inaccurate testimony concerning contacts with Hristo Manavski. (*See* UST Ex. 64, at 76:4-77:22; 79:19-

80:24.) At trial, Mr. Husain provided a less than convincing explanation for his failure to correct

the materially inaccurate testimony of his employee and client, Ms. Kaghan.

> Q.    Do you recall Ms. Kaghan testifying at that deposition that you had met Hristo
> Manavski?
>
> A.    Yes.
>
> Q.    So why didn't you correct it?
>
> A.    I can't speak at a deposition. She cleared it up in her second dep. She can speak
> for herself. I don't want to speak for her.
>
> Q.    I was just asking in your cross examination questions of Ms. Kaghan at that
> deposition, why you didn't clear up that?
>
> A.    Probably just slipped my mind. But, again, she cleared it up in her dep -- in her
> second dep, I'm sorry.

(Trial Tr., at 106:2-14.) More than a year passed between Ms. Kaghan's first deposition on

August 28, 2013, and her second deposition on December 16, 2014. (UST Exs. 64 and 65.)

269.    The evidence demonstrates that Mr. Husain's purported belief, as advanced in his

Answer, that Mr. Manavski resided at the Cook County Address and the DuPage County

Address when he filed the *Manavski II* Petition, is contrived. Mr. Husain knew that Mr.

Manavski resided in Bulgaria, and specifically acknowledged this fact in the Motion to Waive he

filed on December 22, 2012. (UST Ex. 10, ¶ 3.)

270.    The evidentiary record thoroughly rebukes the "truck driver" explanation that Mr.

Husain has advanced to justify filing successive cases for Mr. Manavski in DuPage County and

then Cook County. Although Mr. Manavski may have driven a truck at some point prior to

returning to Bulgaria in 2008, there is absolutely no evidence to support the assertion that he

drove the truck between Westmont and O'Hare Airport, and stayed at the Cook County Address

and DuPage County Address during the course of such trips.

a.  Ms. Manavska testified that her brother worked at an amusement park in the
Wisconsin Dells, and also worked as a truck driver for a couple of months before
returning to Bulgaria in 2008. (Trial Tr., at 609:10-610:9; 637:8-9.) Ms.
Manavska's recollection about whether she ever discussed her brother's
employment at the amusement park or anywhere else with Mr. Husain was less
than certain, but she believes she may have mentioned it. (*See* Trial Tr., at 616:11-
17; *see also* UST Ex. 63, at 11:23-12:12.)

b.  The Schedule I and Statement of Financial Affairs Mr. Husain filed in both
*Manavski I* and *Manavski II* affirmatively represent that Mr. Manavski was
unemployed at the time of, and prior to, the bankruptcy filings. (UST Exs. 4, 5, 8
and 9.)

c.  Ms. Manavska did not even move to the DuPage County Address until 2009, a
year or so *after* Mr. Manavski returned to Bulgaria and Mr. Manavski has *never
even visited* that premises. (Trial Tr., at 608:4-6; UST Ex. 63, at 18:6-15; UST Ex.
62, at 9:20-10:5.)

d.  Tellingly, Mr. Husain's "truck driver" explanation did not first appear until his
Amended Response to the Amended Motion for Sanctions (*see* UST Ex. 11(d)), a
pleading filed after the January 29, 2014, status hearing before Judge Doyle where
Mr. Husain was disabused of any illusions he harbored as to the seriousness, and
potential consequences, of his conduct. (*See* UST Ex. 70.)

In sum, the evidence demonstrates that the "truck driver" explanation Mr. Husain asserts in his
Answer and testimony is a fiction created and advanced in an attempt to escape responsibility for
his knowingly false representations in the *Manavski II* Petition.

271.    The evidence demonstrates that Mr. Husain's trial testimony concerning Mr.

Manavski's personal property – that Schedule B in *Manavski I* is representative of different

property than Schedule B in *Manavski II* – is contrived. Mr. Husain's trial testimony on this

point, is directly contradicted by Mr. Husain's representation in his Response to the Original

Motion for Sanctions wherein he stated that only dates and addresses were changed, and "[n]o

assets were removed or added." (*See* UST Ex. 11(b).)

### B. Obstruction with respect to other cases

272.    The evidentiary record clearly and convincingly demonstrates that Mr. Husain's

sworn statements professing ignorance of the practice of photocopying and reusing clients'

signatures are not credible. Mr. Husain's attempts to blame Ms. Kaghan are contrived and

wholly unsupported by the credible evidence within the record.

273.    Mr. Husain's professed ignorance as to the photocopying and reuse of signatures

seems to have first surfaced *after* the January 29, 2014, status hearing before Judge Doyle. In his

Response filed on January 27, 2014, Mr. Husain denied the allegation in Paragraph 52 of the

Amended Motion for Sanctions that he or Ms. Kaghan had "modified previously executed

bankruptcy documents to reuse the debtor's(s') signature for a new document" by stating:

> Answer: Attorney denies Trustee's statement insofar in Paragraph 52 that any signature,
> new or old, are utilized under the authority or approval of the debtor. Trustee has asked
> other clients of Attorney and said clients have verified this with Trustee. Trustee
> intentionally fails to mention to the Court.

(Response, Case No. 13-11728, Docket No. 59, ¶ 52.) In his Amended Response, filed after the

January 29, 2014, status hearing, Mr. Husain's answer to Paragraph 52 is notably different:

> Answer: Attorney admits Trustee's statement and denies in part.
>
> Attorney reviewed and approved original documents. Modifications were done by
> Kaghan in discussions with the client. Modifications were approved and authorized by

the client. Trustee has asked clients of Attorney and said clients have verified this with
Trustee. However, said procedures have ceased.

(UST Ex. 11(d), ¶ 52.) The shift in Mr. Husain's answers is even more pronounced with respect

to allegations concerning reused signatures in specific cases. In his original Response, Mr.

Husain answered Paragraph 55 of the Amended Motion for Sanctions as follows:

> Answer: Attorney denies Trustee's statement in Paragraph 55 insofar that any signature,
> new or old, are utilized under the authority or approval of the debtor. Trustee has asked
> other clients of Attorney and said clients have verified this with Trustee. Trustee
> intentionally fails to mention to the Court. In fact, in Trustee interview with OF&A
> Retailer's President, said President explicitly stated this and was surprised as to why
> Trustee was inquiring so heavily on this issue. Furthermore, said questions were given in
> a 2004 examination of OF&A Retailer that was completely separate from this Motion for
> Sanctions. Trustee gave no notice to Attorney nor OF&A Retailer that Trustee would be
> inquiring such questions.

(Response, Case No. 13-11728, Docket No. 59, ¶ 55.) In his Amended Response, Mr. Husain's

answer to the allegation changed to:

> Answer: Attorney Husain denies Trustee's statement in Paragraph 55.
>
> Kaghan had done so without Attorney's knowledge. However, Kaghan did inform client
> who authorized the modification. Client testified, under oath, that was his signature and
> that all modifications were authorized by him. (See attached Exhibit D). Attorney has
> instructed Kaghan to cease this procedure.

(UST Ex. 11(d), ¶ 55.) The fact that Mr. Husain did not begin to claim ignorance as to the reuse

of signatures and blame Ms. Kaghan for the practice until after the January 29, 2014, status

hearing, is telling. This fact, combined with the other relevant evidence (including the deposition

testimony of clients who testified that they discussed the practice *with Mr. Husain*), leads to a

finding that Mr. Husain was aware that signatures were being reused and that he has attempted to

sway this proceeding by making inaccurate factual representations to the contrary.

274.    Mr. Husain affirmatively represents in his Answer that each client whose

signature was photocopied and reused had authorized Ms. Kaghan to reuse the signature after

being advised of the "modifications," (Answer, ¶¶ 9-11), but the evidence indicates otherwise.

Mr. Husain's deposition testimony demonstrates that he did not make reasonable inquiry into this

factual representation before presenting it in his Answer (*see*, UST Ex. 67, at 56:4-68:22), and

Ms. Kaghan's testimony, wherein she was unable to recall even a single specific communication

leading to one of the purported "authorizations," illustrates the factually deficient nature of this

representation. (Trial Tr., at 992:18-993:7; UST Ex. 65, at 42:2-45:8.)

275.    In his Trial Brief filed January 23, 2015, Mr. Husain continued in his attempts to

deceive the Court with false representations of fact. The Trial Brief is signed by Mr. Husain's

counsel, Mr. Panagoulias, who shares responsibility for its contents, but it was filed by Mr.

Husain, through his own CM-ECF account. The demonstrably false representations in the

document include:

   a.   On Page 6 of the Trial Brief, the following representation is made:  "Trustee must

        disclose that all of Respondent's clients stated that they gave Respondent the

        authority to sign on their behalf when Respondent did so." In support of this

        contention, Mr. Husain cites to certain deposition transcripts. However, as Mr.

        Husain and his counsel were well aware, not all clients testified in the manner

        they represented in their Trial Brief. Instead of acknowledging the contrary

        deposition testimony of Mirza Baig and Sakeena Baig (who testified that they did

        not speak with Mr. Husain about signing their names to documents and had "no

        clue" who signed their names to the schedules and Statement of Financial

        Affairs), Mr. Husain and his counsel pretended it did not exist, and made a

        materially inaccurate representation of fact to the Court. When Mr. Husain was

        confronted with this inaccuracy at trial, he expressed no contrition or

embarrassment, and instead retorted: "So you're going to worry about the

semantic of saying all the clients who recalled did so." (Trial Tr., at 200:22-23.)

b.   On Page 12 of the Trial Brief, the following representation is made:

> Here, Trustee presents only a partial picture of the actual scenario, without
> displaying motive. Specifically, fails to state that *all of Respondent's*
> *clients who Trustee has accused Respondent of reusing said signatures,*
> *approved of the utilization.* Moreover, all clients were apprised of, and
> approved any and all modifications needed for the amendment. Finally,
> Respondent's Paralegal, Marilyn Kaghan, *took it upon herself to such*
> *things, without Respondent's knowledge.*

(emphasis added.) The Trial Brief cited to certain deposition transcripts in support

of this contention, while omitting the deposition transcripts of Istiyak Patel, Azra

Patel and Erum Ahmed, all of which contradict the assertion. (UST Exs. 47, 48,

55.) Moreover, the testimony in several of the cited transcripts, specifically

contradicted Mr. Husain's claimed ignorance of the practice. For example,

Mohammad Khan and Saghir Badani both testified at their depositions that they

spoke *with Mr. Husain* about the photocopying and reuse of their signatures. (*See*

UST Ex. 50, at 43:9-16; UST Ex. 45, at 29:23-31:19.)  Mr. Husain and his

counsel were aware of this contradictory deposition testimony – one or both of

them attended the depositions and they had copies of the transcripts – but they

pretended the testimony did not exist, and made a materially inaccurate

representation of fact to the Court. When confronted about the inaccurate

representation at trial, Mr. Husain attempted to excuse his dishonesty by stating

that the deponents were confused in their testimony so he omitted reference to it.

(Trial Tr., at 290:5-293:23.)

276.    The evidentiary record demonstrates that Mr. Husain was confronted about signing his clients' names on (purportedly) sworn documents more than a year before he now contends. Mr. Husain's testimony that this confrontation did not occur until after the Rule 2004 examination of Syed Faisal Hussaini on August 9, 2012, is contradicted by the evidentiary record. The evidence strongly suggests that this conversation – only the timing of which Mr. Husain disputes – did not occur following the Syed Faisal Hussaini examination, but rather the Mirza and Sakeena Baig examinations conducted July 6, 2011.

### XIV. Al-Haroon Husain's Failure to Accept Responsibility

277.    At the outset of trial, Mr. Husain testified that he did not believe he violated any of the Rules of Professional Conduct. During cross-examination, Mr. Husain and his counsel reviewed each allegation of the Statement of Charges and Mr. Husain explained why, in his view, each of the charges is unfounded. (Trial Tr., at 741:14-797:15.)

278.    An argument that Mr. Husain and his counsel first made at trial pertains to the Court's Administrative Procedures for Case Management/Electronic Case Filing System (the "ECF Procedures"). Mr. Husain cited a November 1, 2014, amendment to § II.C.1 of the ECF Procedures requiring, in instances where a document must be signed by someone other than an ECF Registrant (*e.g.*, a bankruptcy debtor), that a scanned copy of the non-Registrant's original signature be filed with the document. Mr. Husain testified that prior to this amendment, an attorney was only required to have a client sign one document at the outset of the case, and the attorney could thereafter use an "e-signature" for all subsequent filings requiring the client's

signature. (Trial Tr., at 468:9-469:12.) Mr. Husain testified that he did not comply with (what he

described as) the ECF Procedures because:

> I don't believe that's fair to the client. What I'm saying by that is that I like for the clients
> to know exactly what they're reviewing. As I stated before, I deal with a lot of
> immigrants. I could just easily just get one signature, and let them run through. And I
> know they probably wouldn't know the difference, but I don't want to do that.
>
> I want to make sure that they understand each and every step I'm doing because it's -- it's
> the fair thing to do. I'm not really worried about anything else. I'm just really -- want to
> make sure that they know that this is your Schedule A, this is your Schedule B, C, D, E,
> F. And I want them to acknowledge what it is.
>
> I know some of my clients, you know, they put a lot of trust in me, but I don't like that.
> Well, not that I don't like it. I appreciate it. But I want to make sure that they understand
> each and every signature -- or each and every document that they're doing.
>
> Because if they don't, I don't want them to be afraid in saying that they later came back,
> and said we didn't know what it was. I want to make sure that they understand what I'm
> doing. And the best way to do that for me is to make sure that I try my best and make
> sure that they sign everything personally, not -- I don't like using these signatures because
> if I do that, I may slip into the habit of having them -- I may slip in the habit of not
> reviewing the bankruptcies with them.

(Trial Tr., at 469:18-470:24.) In his later testimony, Mr. Husain equated the "e-signature"

process that he described to his practice of signing his clients' names to documents on their

behalf. (Id., at 767:2-10.)

     279.    Mr. Husain's explanation of the prior versions of the ECF Procedures

demonstrates that he is either (i) ignorant of their provisions, or (ii) intentionally trying to

mislead the Court with false testimony. Section II.C.1 of the ECF Procedures has *never* provided

for the practice described by Mr. Husain. (*See* UST Exs. 17(a), 17(b), 17(c) and 17(d).) Although

there was, at one point, a single declaration for the petition and documents filed *with* the petition

– a separate declaration, containing an original signature, was required for all documents

subsequently filed.[10] (*See* 17(b), § II.C.1.b; 17(c), § II.C.1.b, 17(d), § II.C.1.) As Mr. Husain and

his counsel continued with the unfounded ECF Procedures argument even after the U.S. Trustee

had provided them with copies of the earlier versions of the Procedures, and after those versions

were admitted into evidence as Exhibits 17(a)-(d), there is strong cause to believe that there was

a deliberate attempt to mislead the Court.

---

[10] Indeed, Mr. Husain signed his clients' names to declarations for documents filed after the
petition. (*See* UST Ex. 16(a), ¶ 95; UST Exs. 37(f), 37(h), and 37(j).)

## XV. Legal Conclusions

280.     This disciplinary proceeding was brought under Local Bankruptcy Rule 9029-4B. The U.S. Trustee, as the party appointed to prosecute the Statement of Charges, bears the burden of establishing the misconduct alleged by a preponderance of the evidence. L.B.R. 9029-4B(B)(11).

281.     Although proof by a preponderance standard is required by L.B.R. 9029-4B(B)(11), each count of misconduct alleged in the Statement of Charges has been proven by clear and convincing evidence.

### Count I – Violation of ABA Model Rule 3.1: Meritorious Claims and Contentions

282.     Rule 3.1 of the ABA Model Rules provides, in pertinent part:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

Comment 1 to the Rule notes that "[t]he advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure."

283.     In filing *Manavski II*, Respondent filed what amounts to a fictional bankruptcy petition. Respondent knew that Mr. Manavski resided in Bulgaria and that he was not able to return to the United States. The evidence clearly demonstrates that Respondent filed *Manavski II* using the Cook County Address, as opposed to the DuPage County Address used in *Manavski I*, not because he thought it was where Mr. Manavski resided (had accuracy been his aim, he would have listed the address of Mr. Manavski's actual residence in Plovidv, Bulgaria), but because he believed a Cook County Trustee would allow Mr. Manavski to appear for a meeting of creditors by Skype. The evidence shows that the existence of the property attributed to Mr. Manavski in Schedule B is not credible, as it is the three primary categories of personal property, with the

very same values, that appear in the vast majority of Schedule Bs that Respondent has filed since

January 1, 2011.

284.    Section 109 of the Bankruptcy Code provides:

(a) Notwithstanding any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title.

11 U.S.C. § 109.

285.    There is nothing in the evidentiary record to indicate that Mr. Manavski had his

domicile or residence in the United States (much less, Cook County) on March 22, 2013. The

meanings of, and the distinction between, the terms "residence" and "domicile" were explored in

*In re Garneau*, 127 F. 677 (7th Cir. 1904), a case involving a challenge to a petition filed under

the Bankruptcy Act of 1898:

"Domicile" is the place where one has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, he has the intention of returning, and where he exercises his political rights. There must exist in combination the fact of residence and the animus manendi. "Residence" indicates permanency of occupation as distinguished from temporary occupation, but does not include so much as "domicile," which requires an intention continued with residence. Residence has been defined to be a place where a person's habitation is fixed without any present intention of removing therefrom. It is lost by leaving the place where one has acquired a permanent home and removing to another place animo non revertendi, and is gained by remaining in such new place animo manendi.

*In re Garneau*, 127 F. at 678-679 (citations omitted). The evidentiary record, including, but not

limited to, the testimony of Ms. Manavska, establishes that Mr. Manavski had neither a residence

nor domicile in the United States during years 2012 and 2013.

286.    While it is theoretically conceivable that Mr. Manavski could have had some type

of personal property in the United States – and Ms. Manavska's testimony indicates that he left

some old items behind when he departed for Bulgaria in 2008 – the evidence is clear that, on

March 22, 2013, Mr. Manavski did not possess the personal property attributed to him on

Schedule B. The evidence is clear that Schedule B's substance is a fiction manufactured by Respondent.

287.     The disposition of the clothing, iron, inexpensive television set, and kitchen items that Mr. Manavski left at the Cook County Address is unclear. Ms. Manavska testified that she did not know whether the items remained at that premises, and that the items may have been thrown away. Mr. Husain conceded that he has never seen any of Mr. Manavski's personal property. The *only evidence* indicating the existence of *any* personal property at the Cook County Address on March 22, 2013, is the Schedule B filed in *Manavski II*, and, as previously discussed, the substance of that document is fictional.

288.     There is no credible evidence that Mr. Manavski met any of the eligibility criteria of § 109(a) during 2012 or 2013. Respondent attempted to cover over Mr. Manavski's ineligibility to be a debtor under the Bankruptcy Code by filing documents inaccurately representing that Mr. Manavski resided at the Cook County Address on the petition date. Respondent had no good faith basis in law or fact for filing the *Manavski II* Petition listing the Cook County Address, and, in doing so, violated Rule 3.1.

**Count II – Violation of ABA Model Rule 3.3: Candor Toward the Tribunal**

289.     Rule 3.3(a)(3) of the ABA Model Rules provides, in pertinent part: "A lawyer shall not knowingly…offer evidence that the lawyer knows to be false." The Rule further provides that "[i]f If a lawyer… has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." (Id.) For purposes of the Rule, "knowingly" and "knows" means actual knowledge, which may be inferred from the circumstances. Rule 1.0(f).

290.    The *Manavski II* Petition, Schedules, and Statement of Financial Affairs contain materially inaccurate information concerning Mr. Manavski's address, prior bankruptcy filings, personal property and debts. The evidence clearly and convincingly demonstrates that Respondent knew this information was inaccurate at the time he filed the documents with the Court, and, in doing so, violated Rule 3.3(a)(3).

**Count III – Violation of ABA Model Rule 3.3: Candor Toward the Tribunal**

291.    Rule 3.3(a)(1) of the ABA Model Rules provides that "A lawyer shall not knowingly… make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer…"

292.    In filing documents with the Court that purported to bear his bankruptcy clients' signatures as required under Bankruptcy Rule 1008 and 28 U.S.C. § 1746, Respondent represented to the Court that the documents had been properly executed in accordance with those requirements. As set forth above, the uncontroverted evidence demonstrates numerous instances where Respondent and/or Ms. Kaghan, operating under his sole direction and control, (i) signed documents for clients, (ii) had clients sign incomplete documents, or (iii) altered dates and reused clients' signatures.

293.    When Respondent filed documents with signatures created or obtained through one of the above methods, he presented the Court with documents that, on their face, indicated they were signed by the debtor(s) under penalty of perjury. In reality, they were not. Respondent's contention that he had "authorization" from each client with respect to each improperly executed document, even if true (and the evidence demonstrates it is not), in no way changes the patent falsity of Respondent's representations *to the Court*.

294.    Rule 1008 of the Federal Rules of Bankruptcy Procedure requires that "[a]ll

petitions, lists, schedules, statements and amendments thereto shall be verified or contain an

unsworn declaration as provided in 28 U.S.C. § 1746." Section 1746 of Title 28 of the United

Stated States Code provides:

> Wherever, under any law of the United States or under any rule, regulation, order, or
> requirement made pursuant to law, any matter is required or permitted to be supported,
> evidenced, established, or proved by the sworn declaration, verification, certificate,
> statement, oath, or affidavit, *in writing of the person making the same* (other than a
> deposition, or an oath of office, or an oath required to be taken before a specified official
> other than a notary public), such matter may, with like force and effect, be supported,
> evidenced, established, or proved by the unsworn declaration, certificate, verification, or
> statement, *in writing of such person which is subscribed by him*, as true under penalty of
> perjury, and dated, in substantially the following form:
>
> …
>
> (2) If executed within the United States, its territories, possessions, or commonwealths: "I
> declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and
> correct. Executed on (date).
> (Signature)".

28 U.S.C. § 1746 (emphasis added.)

295.    Respondent's contention that signing his clients' names to documents on their

behalf is a "grey area" (Answer, ¶ 12), is completely devoid of merit. The plain language of §

1746 requires a signature *by the person* making the declaration. Hence, under Rule 1008, all

"petitions, lists, schedules, statements and amendments thereto," must be signed by the debtor.[11]

*See In re Hurford*, 290 B.R. 299, 302 (Bankr. E.D. Mich. 2003) (holding that "Rule 1008 and 28

U.S.C. § 1746 require the debtor to personally sign the petition [and other documents]" and

finding that attorney's act of signing his client's name to documents was improper and setting

---

[11] The extremely limited instances where courts have made exceptions generally involve
members of the armed forces serving overseas who grant a power of attorney to a spouse or
family member to file a bankruptcy petition on their behalf, or a court appointed guardian with
express authority to file bankruptcy on behalf of their ward. *See In re Brown*, 163 B.R. 596, 597
(Bankr. N.D. Fla. 1993) (collecting cases).

the matter for further hearing regarding sanctions); *In re Brown*, 163 B.R. 596, 597 (Bankr. N.D.

Fla. 1993) (holding that petition to which debtor's name is signed by his spouse with general

power of attorney is a legal nullity); *see also*, *In re Wenk*, 296 B.R. 719 (Bankr. E.D. Va. 2002)

(finding attorney's conduct in filing an electronic petition which stated on its face that debtor had

signed it, under penalty of perjury, when in fact she had not, amounted to fraud); *see also, In re

Nesom*, 76 B.R. 101 (Bankr. N.D. Tex. 1987) (suspending counsel for signing documents on

behalf of his client).

296.     Respondent's other practices of reusing clients' signatures and causing clients to

sign documents prior to their completion are similarly, and unquestionably, impermissible. For

the declaration required under Bankruptcy Rule 1008 to be valid under 28 U.S.C. § 1746, it must

be subscribed by the declarant as true under penalty of perjury – an impossibility when the

signature is affixed to the document prior to the recordation of the factual representation(s) the

signature represents, under penalty of perjury, to be true. *See In re Rivera*, 342 B.R. 435 (Bankr.

D.N.J. 2006), *affd* 2007 WL 1946656 (D.N.J. 2007) (Sanctioning attorney and law firm for filing

"certifications" that utilized "on-file" signatures).

297.     Respondent's arguments concerning "authorization" from clients for improperly

executed documents ignore a most basic fact – his clients are not capable of granting him

permission to violate the Bankruptcy Rules and the United States Code.

298.     Each of Respondent's three improper execution practices – (i) signing clients'

names to documents on their behalf, (ii) causing clients to sign documents prior to the

documents' completion, and (iii) reusing clients' prior signatures for different, subsequent

documents – is a deception appearing to be a declaration under 28 U.S.C. § 1746, when in fact it

is not. In filing such documents, Respondent knowingly made false statements to the Court

regarding the execution of the documents, and violated Rule 3.3(a)(1).

**Count IV – Violation of ABA Model Rule 8.4(c): Misconduct**

299.    Rule 8.4(c) of the ABA Model Rules provides that "[i]t is professional

misconduct for a lawyer to…engage in conduct involving dishonesty, fraud, deceit or

misrepresentation."

300.    Many courts examining ethics rules similar or identical to ABA Model Rule

8.4(c) have explained that "a culpable mental state greater than negligence is necessary to

establish a prima facie violation of Rule 8.4(c). This requirement is met where the

misrepresentation is knowingly made, or where it is made with reckless ignorance of the truth or

falsity thereof." *Office of Disciplinary Counsel v. Anonymous Atty. A*, 714 A.2d 402, 407 (Pa.

1998) (collecting cases); *see also*, *In re Thomas*, 2012 IL 113035, ¶ 123, 962 N.E.2d 454, 478

(Ill. 2012) (finding violation of former Rule 8.4(a)(4)'s prohibition against conduct involving

dishonesty or misrepresentation where respondent was willfully ignorant, noting that "his belief,

even if sincere, was entirely unreasonable").

301.    Respondent committed a deceptive and dishonest act by filing the Petition,

Declaration, Schedules and Statement of Financial Affairs in *Manavski II* with dates altered and

signatures reused from the same documents filed in *Manavski I*. In filing these documents,

Respondent represented to the Court, creditors and parties in interest that the documents had

been properly executed, when, in fact, he knew they had not been. There can be no doubt that

Respondent desired that the Court believe that the documents had been properly executed, for,

had his intention been otherwise, there would have been no purpose in filing the documents. This

conduct violated Rule 8.4(c).

302.    As recounted in §§ VII-IX, *supra*, Respondent knowingly caused numerous documents to be filed that were not properly executed, with the intention that the Court would accept the documents as properly executed. The filing of these documents was deceptive and dishonest in violation of Rule 8.4(c).

**Count V – Violation of ABA Model Rule 8.4(d): Misconduct**

303.    Rule 8.4(d) of the ABA Model Rules provides that "[i]t is professional misconduct for a lawyer to…engage in conduct that is prejudicial to the administration of justice." Respondent's practices with respect to the execution of what are supposed to be sworn bankruptcy documents, is severely prejudicial to the bankruptcy system.

304.    Respondent's practices with respect to signatures misleads the Court, creditors and parties in interest into believing that required disclosures have been reviewed by his clients and affirmed under penalty of perjury. All of the improperly executed documents Respondent has presented to the Court represent, on their face, that they have been executed in conformity with Bankruptcy Rule 1008 and 28 U.S.C. § 1746, when, in fact, that is not the case.

305.    The evidence, including the testimony of Respondent's clients, clearly and convincingly demonstrates that Respondent has conveyed to clients the impression that signing their names to documents under penalty of perjury is a mere technicality that does not require personal attention. The evidence demonstrates that this impression, along with Respondent's habitual disregard for accuracy and truthfulness in the sworn bankruptcy disclosures, has led to the filing of materially inaccurate documents in numerous cases.

306.    Respondent's practice of filing improperly executed documents jeopardizes any civil or criminal enforcement action that might be brought against one of his clients for false disclosures, where the relevant document was not properly executed by the client under penalty

of perjury. Indeed, Respondent's pattern of filing materially inaccurate documents on behalf of

his clients poses a substantial, and possibly insurmountable, obstacle to determining whether a

civil or criminal enforcement action is warranted, even in a case where inaccurate disclosures are

properly executed. The evidence shows that the material inaccuracies in filings are often

Respondent's fault.

307.    The notion advanced by Respondent that his clients "take responsibility" for the

representations in deficiently executed documents when they testify at a meeting of creditors that

a signature is theirs, is badly misplaced. As a defense, Respondent is relying on the fact that his

clients have verified signatures at meetings of creditors regardless of the authenticity of the

signatures. Allowing (or, in this circumstance, setting up) clients to testify falsely is, among other

things, severely prejudicial to the administration of justice.

308.    The evidence clearly and convincingly demonstrates that Respondent has engaged

in conduct prejudicial to the administration of justice in violation of Rule 8.4(d) as alleged in the

Statement of Charges.

## XVI. Discipline

309.    The purpose of a disciplinary proceeding is "to determine the fitness of an officer

of the court to continue in that capacity and to protect the courts and the public from the official

ministration of persons unfit to practice." *In re Echeles*, 430 F.2d 347, 349-50 (7th Cir. 1970)

(citing *Ex parte Wall*, 107 U.S. 265 (1882)). "Thus the real question at issue in a disbarment

proceeding is the public interest and an attorney's right to continue to practice a profession

imbued with public trust." *In re Echeles*, 430 F.2d at 350 (citations omitted).

310.     The discipline imposed should be crafted to protect clients, the general public, the administration of justice, and the legal profession. *See*, *e.g.*, *In re Spak*, 188 Ill. 2d 53, 67-68, 719 N.E.2d 747, 755 (Ill. 1999).

311.     Local Bankruptcy Rule 9029-4B(A)(1)(b) provides that "'discipline' includes, but is not limited to temporary or permanent suspension from practice before the bankruptcy court, reprimand, censure, or such other disciplinary action as the circumstances may warrant, including but not limited to restitution of funds, satisfactory completion of educational programs, compliance with treatment programs and community service."

312.     Based on the scope and nature of the misconduct proven in this proceeding, and Respondent's continuing and unabated lack of truthfulness, the following discipline is necessary: (1) permanent suspension from practice before this Court, and (2) disgorgement of all fees collected in the cases set forth above.

### *i. Permanent Suspension*

313.     In his Trial Brief, the U.S. Trustee recommends that the Court look to American Bar Association's Standards for Imposing Lawyer Discipline (the "ABA Standards") in determining a remedy. Respondent's misconduct would fall within ABA Standard 6.11, for which disbarment is generally the appropriate remedy. Even absent the ABA Standards, permanent suspension (a remedy akin to disbarment) is necessary here because Respondent has repeatedly shown that he cannot or will not behave in an honest manner, the most basic prerequisite for a member of the bar.

314.     Respondent has demonstrated an unmitigated disregard for the truth, in the purportedly sworn documents he filed on behalf of his clients, and in his own assertions and testimony in this proceeding. When confronted with his clients' schedules and Statements of

Financial Affairs rife with errors, Respondent consistently blamed his clients for all deficiencies and insisted that they assumed responsibility for those errors and omissions when they verified their signatures at the meeting of creditors, even when Respondent had signed the clients' names to the documents. Respondent's own testimony concerning the reuse of client signatures, both in this proceeding and in other proceedings discussed herein, was inconsistent, contradicted by the testimony of other more credible witnesses, and, frankly, insusceptible to acceptance absent the complete suspension of disbelief.

315.    Respondent most certainly intended to deceive the Court with the representations in the *Manavski II* documents, and with the numerous other improperly executed documents that he filed with the Court. Had he intended for the Court to understand the infirmities of the documents, there would have been no point to filing them.

316.    Respondent was confronted concerning his deceptive and improper execution of documents in July 2011 by Stephen Wolfe, a Trial Attorney with the U.S. Trustee's Office. Respondent did not cease the practice. After he was caught by Mr. Wolfe again, in August 2012, he began to transition from signing his clients' names to documents on their behalf, to photocopying and reusing the clients' signatures. After the Original Motion for Sanctions was filed in May 2013, Respondent continued to reuse his clients' signatures. After the Amended Motion for Sanctions was filed in January of 2014, Respondent continued to reuse clients' signatures. After Judge Doyle admonished Respondent on January 27, 2014, he continued to reuse signatures. And the above were not Respondent's only deceptive practices; all along, Respondent was causing his clients to sign blank documents at the outset of the representation, as a matter of routine practice. Respondent has had multiple warnings. He has not reformed; he has only morphed to other flawed and deceptive practices.

317.    The damage Respondent caused to the legal system has been substantial. The bankruptcy system, as with every other part of the legal system, relies upon attorneys' honesty and self-regulation to properly function. Respondent has consistently betrayed this most basic premise. The direct consequences of Respondent's misconduct are quite significant:  (1) he caused his clients to believe that accuracy in bankruptcy disclosures was not important and numerous inaccurate documents resulted; (2) he jeopardized any potential criminal or civil enforcement actions that might be warranted against his clients; (3) he exposed his clients to potentially adverse actions, including, in some of the more recent cases, an attack on their bankruptcy discharges under § 727(d); (4) he caused the Court, the U.S. Trustee, and case trustees to collectively expend hundreds of hours addressing his misconduct and the materially flawed bankruptcy documents that resulted therefrom.

318.    Respondent's attempt to push **all** blame for photocopied and reused signatures on his assistant, Ms. Kaghan, is not credible. The evidentiary record provides a very strong appearance that Respondent used his influence over Ms. Kaghan to procure and/or condone her false testimony. Respondent served as her attorney at a deposition where she testified to matters that he knew were not true, and rather than use his cross-examination to correct the record, Respondent asked questions that only perpetuated her dishonesty. Respondent arranged for Ms. Kaghan's attorney in this proceeding (although he attempted to deny doing so during trial) and was apparently an intermediary for communications between Ms. Kaghan and her "counsel," informing her where and when to appear for the rescheduled deposition that her counsel arranged with the U.S. Trustee. Ms. Kaghan was not even aware how her counsel was being paid when she took the witness stand at trial. Respondent has demonstrated as far back as the factually inaccurate "affidavit" (that he prepared for Ms. Kaghan, caused her to sign, and filed with the

Court as an attachment to his Response to the Original Motion for Sanctions) that he is willing to have Ms. Kaghan testify falsely to serve his interests. Respondent's attempt to make Ms. Kaghan the "fall person" for his misconduct is reprehensible.

319.    Respondent's conduct during this proceeding serves as a powerful demonstration of the need for permanent suspension. Respondent was not truthful in his testimony and he influenced Ms. Kaghan and perhaps others to not be fully truthful in their testimony. In similar proceedings, courts have considered a respondent's cooperation and veracity during the disciplinary process as factors in determining discipline. *See In re Smith*, 168 Ill. 2d 269, 296, 659 N.E.2d 896, 908 (Ill. 1995) ("Cooperation in the disciplinary proceeding is an additional factor that this court weighs in the determination of a disciplinary sanction."); *In re Rosenberg*, 413 Ill. 567, 576, 110 N.E.2d 186, 191 (Ill. 1953) (noting that uncharged false testimony relating to matters under investigation was further demonstration of unfitness to practice law).

320.    Respondent refuses to acknowledge that *any* of his conduct identified in the Statement of Charges violates the ABA Model Rules of Professional Conduct. Respondent's inability to acknowledge any of his obvious transgressions indicates that his prospect for reform is extremely poor. Respondent has literally had years to reflect on some of the misconduct involved in this proceeding; if he cannot recognize its character at this point, then he will likely never be able to do so.

321.    The fact that Respondent has a significant bankruptcy practice (although he

testified that he ceased practicing in the field), and the fact that a permanent suspension may

significantly impact his livelihood, does not factor into the analysis in determining discipline. In

*Matter of Palmisano,* 70 F.3d 483, 486-7 (7th Cir. 1995), Judge Easterbrook noted:

> [d]isbarment is costly for an attorney, but permitting an incompetent or otherwise
> inappropriate person to practice law is costly for clients and the administration of justice.
> Courts need not sacrifice the interests of litigants to reduce the risk of erroneous
> imposition of costs on attorneys; to the contrary, the interests of litigants deserve the
> greater protection.

Respondent appears to be unwilling or unable to practice law in an ethical, competent and

forthright manner and his permanent suspension is needed to protect his clients, the general

public and the administration of justice.

### *ii. Restitution*

322.    The legal work Respondent performed in the cases that are the subject of this

proceeding was of an unacceptably poor quality. While some clients (eventually) received

bankruptcy discharges, that does not change the fundamentally deficient character of the legal

services performed. It cannot be said that the fees Respondent collected were "reasonable" in

light of the quality of the services rendered. Accordingly, the fees must be returned. *See* 11

U.S.C. § 329(b).

323.    Determination of the fees collected by Respondent is made difficult by his routine

failure to comply with 11 U.S.C. § 329(a) and Fed. R. Bankr. P. 2016. Respondent filed the

required disclosure in *only one* of the twenty-two cases at issue in this proceeding. In cases

where a Statement of Financial Affairs was filed, the fees attributed to Respondent are reported

in response to Question 9 ("SOFA 9"). The deposition testimony of some debtors casts doubts on

the accuracy of the information contained in the Statements of Financial Affairs (*e.g.*, Sakeena

Baig testified that she and her husband paid $700, and SOFA 9 reports $1,500; Aaron Rodriguez

testified that he paid $1,700 to $2,000, but SOFA 9 indicates he paid only $1,500). The

information obtained from the three sources (Rule 2016 Statement, SOFA 9, and deposition

testimony) is summarized on the following chart:

| Case No. | Case Name | Fees Reported on Rule 2016 Statement | Fees Reported in Response to Question 9 of Statement of Financial Affairs | Testimony from Debtor(s) as to Fees |
|---|---|---|---|---|
| 13-23120 | *OF&A Retailers, Inc.* | Not filed | $2,500 | N/A |
| 12-31079 | *Shahid and Erum Ahmed* | Not filed | Not filed | N/A |
| 12-43056 | *Shahid and Erum Ahmed* | Not filed | $1,500 | $1,500 (UST Ex. 57, at 71:9.) |
| 13-26869 | *Aaron Rodriguez* | Not filed | $1,500 | Between $1,700 and $2,000 (UST Ex. 51, at 11:10-15.) |
| 13-30842 | *Baligh Abutaleb* | Not filed | $1,500 | $1,700 or $1,800 (UST Ex. 46, at 8:12.) |
| 13-33835 | *Saghir Badani* | Not filed | Page missing from SOFA | $2,500 (UST Ex. 45, at 10:24.) |
| 13-37122 | *Istiyak and Azra Patel* | Not filed | $1,500 | $1,400 or $1,500 (UST Ex. 47, at 11:4-5; UST Ex. 48, at 9:20.) |
| 13-42658 | *Mohammad Khan and Saima Khalid* | Not filed | $1,500 | $1,100 or $1,300 (UST Ex. 50, at 11:7-8.) |
| 13-48122 | *Syed M. Hussain and Affaf Baig* | Not filed | $900 | N/A |
| 12-01209 | *Farooq and Sara Sultan* | Not filed | Not filed | N/A |
| 12-42041 | *Farooq and Sara Sultan* | $1,200 | Not Disclosed | N/A |
| 10-57570 | *Mirza and Sakeena Baig* | Not filed | $1,500 | $700 (UST Ex. 53, at 7:23.) |
| 12-28112 | *Kauser Banu* | Not filed | $1,500 | N/A |
| 12-10086 | *Syed Faisal Hussaini* | Not filed | $1,500 | N/A |
| 12-18911 | *Ghosia Iqbal* | Not filed | $1,500 | N/A |
| 12-17531 | *Ghulam Haider and Nazra Begum* | Not filed | $1,500 | N/A |
| 12-17865 | *Fadi Freij* | Not filed | $1,500 | N/A |
| 12-28290 | *Ashout and Rina Ibraheem* | Not filed | $1,500 | N/A |
| 12-37673 | *Ashout and Rina Ibraheem* | Not filed | $1,500 | N/A |
| 14-02434 | *Fareedum Ansari* | Not filed | Not filed | N/A |
| 14-17200 | *Fareedun Ansari* | Not filed | $1,500 | N/A |
| 12-25644 | *Ahmed and Nadya Nijem* | Not filed | $1,500 | N/A |

324.   Had Respondent complied with the Bankruptcy Code and Rules, restitution could

be readily determinable. But he didn't. To ensure that the affected clients receive the return of

their fees, Respondent will be required to return, in certified funds payable to the Debtors and

deliverable through the U.S. Trustee, the amounts appearing in the Statements of Financial

Affairs and Rule 2016 Statement that Respondent filed with the Court.

| Certified Funds Payable To: | Amount |
|---|---|
| Erum Ahmed[12] | $750 |
| Shahid Ahmed | $750 |
| Aaron Rodriguez | $1,500 |
| Baligh Abutaleb | $1,500 |
| Saghir Badani[13] | $2,500 |
| Istiyak and Azra Patel | $1,500 |
| Mohammad Khan and Saima Khalid | $1,500 |
| Syed M. Hussain and Affaf Baig | $900 |
| Farooq and Sara Sultan[14] | $3,700 |
| Mirza and Sakeena Baig | $1,500 |
| Kauser Banu | $1,500 |
| Syed Faisal Hussaini | $1,500 |
| Ghosia Iqbal | $1,500 |
| Ghulam Haider and Nazra Begum | $1,500 |
| Fadi Freij | $1,500 |
| Ashout and Rina Ibraheem | $1,500 |
| Fareedun Ansari | $1,500 |
| Ahmed and Nadya Nijem | $1,500 |

325.    Respondent will deliver the payments set forth above to the U.S. Trustee, who

will then distribute the payments to the clients with a cover letter inviting each client to contact

his office if the refund payment is not full reimbursement of all funds paid to Respondent for

bankruptcy related services. If a client thereafter contacts the U.S. Trustee with evidence that he

[12] Shahid and Erum Ahmed were divorced after their bankruptcy case. The restitution payable to each is one half of the $1,500 attorney fee paid.

[13] In the case of Saghir Badani, the Statement of Financial Affairs is missing the relevant page. The $2,500 fee is based on Mr. Badani's deposition testimony.

[14] The restitution amount payable to Farooq and Sara Sultan consists of $2,500 paid in the OF&A case and $1,200 paid in their personal case.

or she paid more than the amount refunded, the U.S. Trustee (or affected client) can bring a request for a supplemental restitution payment before the Court.

*iii. Reimbursement of U.S. Trustee's Out-Of-Pocket Expenses*

326.     The U.S. Trustee has requested that Respondent be ordered to reimburse the out-of-pocket expenses incurred in the prosecution of this disciplinary proceeding. These expenses include:  Federal Express charges, court reporting charges, and witness appearance fees. There is precedent for ordering reimbursement of expenses in proceedings of this nature. *See In re Liou*, 503 B.R. 56, 78 (Bankr. N.D. Ill. 2013) (permitting costs in L.B.R. 9029-4B proceeding based on Illinois Supreme Court Rule 773(b)). The U.S. Trustee may seek reimbursement from Respondent for his out of pocket expenses by separate application.

## XVII. Conclusion

327.     The foregoing constitute the findings of fact and conclusions of law required under L.B.R. 9029-4B(B)(12). The discipline set forth above will be imposed by separate order.


WHEREFORE, the U.S. Trustee respectfully submits the above proposed findings of fact and conclusions of law.


RESPECTFULLY SUBMITTED:

PATRICK S. LAYNG
UNITED STATES TRUSTEE

DATED: <u>March 26, 2015</u>          BY:     <u>/s/ Jeffrey S. Snell</u>
                                        Jeffrey S. Snell, Trial Attorney
                                        M. Gretchen Silver, Trial Attorney
                                        United States Department of Justice
                                        Office of the United States Trustee
                                        219 South Dearborn Street, Rm. 873
                                        Chicago, Illinois 60604
                                        (312) 886-0890