## UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

IN RE:                              )
                                    )
AL-HAROON HUSAIN,                   )        CASE NO. 14 MP 90007
                                    )
        RESPONDENT.                 )        HON. JACQUELINE P. COX

### RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

NOW COMES Respondent, THE HIMONT LAW GROUP, with its response to the United

State's Trustee's proposed findings of facts and conclusions of law:

- ● **Procedural Background**

1. In May of 2013, Trustee Jeffrey Snell filed Sanctions against Respondent.  Mr. Snell

   accused

Respondent of filing false documents with the Court because Respondent changed the date beneath

Debtor Manavski's signature for the purpose of filing a bankruptcy petition and for failing to cite

Debtor previous bankruptcy in his new bankruptcy.

2. In response to the Motion for Sanctions, Respondent stated that Debtor approved any and

   all changes to his bankruptcy filings, and that the bankruptcy documents reflected the

   debtor's intentions, and to the best of Respondent's knowledge, were accurate. In regards to

   the failure to cite the previous bankruptcy, Respondent's legal assistant stated that the

   failure was a clerical error, and that it would be amended, as is permissible according to

   applicable rules. Respondent supported his position by attaching to his Response affidavits

   from the Debtor and Respondent's legal assistant reflecting these assertions.

3. On a status date in October of 2013, before Judge Eugene Wedoff, who was covering Judge

   Doyle's court call, Judge Eugene Wedoff stated to both parties, after reviewing Respondent's

   response, that he was inclined to agree with the Respondent's position on the Motion for

   Sanctions, and deny the Trustee's Motion. Trustee Snell was dissatisfied with Respondents

explanation, and continued with the Motion for Sanctions.

4. Respondent therefore prepared for the hearing date set on or about December 12, 2013 before Judge Carol Doyle. The Trustee then, on the hearing date, requested additional time to file an amended Motion for Sanctions, which would therefore strike the first Motion filed by the Trustee.  Respondent objected.  Over the Respondent's objection, the Trustee was given additional time to file its response.

5. On January 6, 2014. Trustee filed a new, amended Motion for Sanctions against Respondent New charges were added against Respondent.  Among these charges were that Respondent: (1) signed bankruptcy documents for his clients; and (2) Respondent re-utilized his client's signature in order to file amendments. Both of these actions were alleged by the Trustee with the intent to deceive the Court. The Court ordered on February 26, 2014 for discovery to be issued by the parties.  Trustee requested depositions of Respondent, Respondent's legal assistant, and a deposition of one of Respondent's clients. At the depositions, Respondent, Respondent's legal assistant, and Respondent's clients all stated, that any signatures were done with client's approval, and any re-utilization of signatures were done by the legal assistant on her own (though with client's approval). Trustee had the opportunity to depose all of Respondent's clients which Trustee cited in Trustee's Amended Motion for Sanctions, which the Trustee claimed in its Motion that their signature was forged, but for whatever reason, chose not to do so.

6. Respondent also issued discovery to Trustee, and asked Trustee to produce, "any and all documentsthat the movement believes exists with respect to the allegations set forth in the Motion" Trustee could not produce any evidence in support of its allegations.

7. Respondent retained counsel to represent him for the second Motion for Sanctions. Counsel appeared at the Deposition of the sole Debtor deposed by the Trustee, and informed the Trustee that he intended to appear on Respondent's behalf at the Motion for Sanctions. The hearing for the second Motion for Sanctions was set for June 11, 2014.

8.    Just prior to this date, Trustee filed a complaint with Chief Bankruptcy Judge Bruce Black, requesting statement of charges be brought against Respondent. The Court entered a statement of charges based upon Trustee's complaint. which placed the Second Motion for Sanctions on hold. Not surprisingly, the statement of charges are identical to Trustee's Second Motion for Sanctions.

9.    The Trustee was given a second opportunity to do discovery.  This time, Trustee deposed all of Respondent's clients previously cited in Trustee's previous Sanctions, but that were not deposed.

10.  At the depositions, Respondent's clients confirmed they gave authority to for Respondent (Respondent's assistant) to either (1) sign their names on their behalf or (2) reutilize their signatures for the amended filings. Furthermore, no client, stated that there was any intent by Respondent to deceive them or the Court.  Respondent clients' testimony were consistent with Respondent's Response to the Statement of Charges.

11.  On June 18, 2014, this Court issued its Statement of Charges pursuant to Local Bankruptcy Rule 9029-4B(B)(4) alleging that Respondent Al-Haroon Husain (hereinafter "Mr. Husain" or "Respondent") violated Rules 3.1, 3.3(a)(1), 3.3(a)(3), 8.4(c) and 8.4(d) of the American Bar Association's Model Rules of Professional Conduct. On August 7, 2014, Mr. Husain filed his Answer, and the United States Trustee was thereafter appointed to prosecute the Statement of Charges.

12.  On October 14, 2014, following a status hearing, a Final Pretrial Order was entered [Docket No. 12]. The Final Pretrial Order contained, *inter alia*, deadlines for the parties to exchange witnesses and exhibits, and specified the potential consequences for noncompliance.

13.  Pursuant to the Final Pretrial Order, the U.S. Trustee submitted 238 hard copy and electronic exhibits, labeled 1-15 and 19(a)-73(z).  As Trustee offered all exhibits offered at the various depositions, including that which exonerates Respondent, Respondent submitted no exhibits.

14.  On January 20, 2015, a final pretrial hearing was held. At the hearing, the U.S. Trustee

offered

a copy of the Proposed Findings of Fact and Conclusions of Law he had submitted January 16,

2015, pursuant to the Final Pretrial Order, and Respondent's Answer to same, as Exhibits 16(b)

and 16(a), respectively. Respondent expressed no objection and U.S. Trustee Exhibits 16(a) and

16(b) were admitted into evidence.

15.        Trial in this matter commenced January 28, 2015, and thereafter continued over
       the course

of five days. At the outset of the trial, U.S. Trustee Exhibits 1-15 and 19(a)-73(z) were admitted

into evidence.

16.        During the course of trial, Respondent's Exhibits 1 and 2 were offered and
       admitted into

evidence, and U.S. Trustee Exhibits 17(a), 17(b), 17(c), and 17(d) were offered and admitted into

evidence.

- **Preliminary Findings**

17.        During trial, the Court heard live testimony from twelve witnesses.

       a.    Marilyn Kaghan;

       b.    Al-Haroon Husain;

       c.    Patricia Brasier;

       d.    Stephen Wolfe;

       e.    Jennifer Toth;

       f.    Mariya Manavska;

       g.    Shahid Ahmed;

       h.    Farooq Sultan;

       i.    Baligh Abutaleb;

       j.    Mirza Baig;

       k.    Sakeena Baig; and

    l.    Erum Ahmed.

In addition to live testimony, transcripts of the deposition testimony of thirteen additional witnesses were received into evidence. These individuals, all former or current clients of Mr. Husain, included:

    a.  Ashout Ibraheem;

    b.  Rina Ibraheem;

    c.  Tamara Kako;

    d.  Saghir Badani;

    e.  Istiyak Patel;

    f.  Azra Patel;

    g.  Saima Khalid;

    h.  Mohammad Khan;

    i.  Aaron Rodriguez;

- **General Findings**

18.      For the reasons detailed below, the evidentiary record in this proceeding clearly and

convincingly demonstrates, that Mr. Husain did not violate Rules 3.1, 3.3(a)(1), 3.3(a)(3),

8.4(c) and 8.4(d) as set forth in the Statement of Charges.

19.      The evidentiary record further supports a finding that Mr. Husain testified truthfully in all

matters relating to his practice. The record also supports a finding that Ms. Kaghan testified

truthfully in all matter relating to Mr. Husain's practice.

20.      The Trustee concedes that all witnesses testified credibly other that Mr. Husain and Ms.

Kaghan.  (See pg. 4).

21.      The Trustee systematically calls Mr. Husain and Ms. Kaghan untruthful when it

serves his

purpose.  He juxtaposes a memory test with a capacity for telling the truth.  This is evidenced by

the fact that each and every witness called by the Trustee did not call into issue any of the work

performed by Mr. Husain.  Moreover, the Trustee goes into great length to make Mr. Husain

appear as if he is a common thug, with no repute for the law, when in fact the only thing Mr.

Husain can by accused of is disorganization, or forgetting when things happened.  At it has been,

this Court must continue to be fair and evaluate the testimony and evidence and ask itself, "what

has the Trustee proven?, and why did the Trustee ask Judge Black for additional proceedings

when the very same matters were pending before Judge Doyle?"

- **Al-Haroon Husain's Bankruptcy Background**

22.        Mr. Husain is an attorney licensed to practice in the State of Illinois.

23.        Mr. Husain graduated with his Juris Doctor from Illinois Institute of Technology,

     Chicago-

Kent College of Law in 1999. In addition to his Juris Doctor and undergraduate degree, Mr.

Husain has completed several certificate programs, including a program in financial decision

making from the University of Chicago, a program in international relations from the University

of Rochester, a program in international legal studies from the University of Santa Clara, and a

program in international law from Chicago-Kent College of Law.

24.        Mr. Husain started practicing law as an assistant corporation counsel for the City

     of

Chicago in approximately 2000. Mr. Husain entered private practice in 2002. Mr. Husain's

practice consists mainly of bankruptcy and real estate transactions. Mr. Husain represents

Chapter 7 debtors in bankruptcy in the Northern District of Illinois.

25.        By his own estimation, Mr. Husain has filed almost 300 bankruptcy cases. (Trial

     Tr., at

433:13.) A CM-ECF search of "Al-Haroon Husain" returns 216 cases where he has made an

appearance as an attorney.

26.　　　　At all times relevant to this proceeding, Marilyn Kaghan was an employee operating under Mr. Husain's sole direction and control. (Answer, ¶ 2.) During the course of her employment, Ms. Kaghan was Mr. Husain's only employee. (Trial Tr., at 29:3-6.)

27.　　　　Ms. Kaghan began working for Mr. Husain in or around December of 2010. (UST Ex. 65,

at 67:21-23.) According to Ms. Kaghan's testimony at trial, she resigned from her position in February 2015 to pursue full-time employment elsewhere. (Trial Tr., at 943:16-24; 946:24-947:5.)

28.　　　　Prior to her position with Mr. Husain, Ms. Kaghan had never worked in a legal position.

(Trial Tr., at 947:25-948:2.) Ms. Kaghan has had no formal legal training. (Id., at 948:3-15.) Ms. Kaghan's legal training has been provided primarily, if not exclusively, by Mr. Husain. (Id., at 30:21-31:7; 948:7-15.)  Ms. Kaghan did undertake an online course while employed at Mr. Husain's office (UST Ex. 65, at 53:24-54:24)

29.　　　　Ms. Kaghan assisted Mr. Husain in the preparation of petitions and other bankruptcy documents. (UST Ex. 16(a), ¶ 6.) Ms. Kaghan also conducted client consultations and meetings. (Id.)

### V.　　　Process used by Husain to Prepare Bankruptcy Documents

30.　　　　Mr. Husain and Ms. Kaghan testified concerning the general process in place at Mr. Husain's office for the preparation and filing of bankruptcy cases. Their general testimony was consistent as to the process of how a bankruptcy was commenced.  (*See* Trial Tr., at 32:10-41:3; 54:14-57:25; 948:22-954:3.)

31.　　　　The process involved at least two meetings with the client. (*See generally*, Trial Tr., at

32:10-41:3; 948:20-949:25)

32.      At an initial meeting, Ms. Kaghan, the client, and Mr. Husain, would sit down and discuss the client's debts. (Trial Tr., at 32:10-34:19; UST Ex. 64, at 12:9-13:14.) Although the bankruptcy documents (*e.g.*, the petition, schedules, Statement of Financial Affairs, etc.) were not completed at the initial meeting, it was routine practice to obtain the client's signatures on <u>all</u> documents, including the Declaration of Electronic Filing for Documents filed after Petition. (Trial Tr., at 34:20-37:15, 948:22-949:1, 949:12-14, 958:16-959:13, 1001:17-21; UST Ex. 64, at 18:14-19, 19:7-24.).

*33.*      The trustee takes issue as to the practice of Mr. Husain having his clients execute documents ***prior to their completing and filing with the Court***, as signing same is an attestation under penalty of perjury.    (*See* Trial Tr., at 948:16-949:14; 959:8-13), while Mr. Husain testified that the practice began in 2012, and concluded sometime in the late summer of 2013. (*See* Trial Tr., at 57:2-25.) Whether the practice was in existence for one year as Mr. Husain says, or four years as Ms. Kaghan's testimony indicates, is irrelevant and a red herring.   All clients testified that they reviewed all of the documents prior to the filing of same.  The attestation becomes relevant and effective once documents are filed with the Court.  The methods as to how Mr. Husain chooses to keep records with his clients *before* they are filed with the Court are between him and his clients, and there is no evidence on the record that any of Mr. Husain's clients objected to this method.  Had the Trustee found evidence to the contrary, the Trustee would have offered it.

34.      Following the initial meeting, Ms. Kaghan would complete the bankruptcy petition, schedules and other required documents and then contact the client to schedule a subsequent meeting. (Trial Tr., at 949:15-25; UST Ex. 64, at 16:5-17:4.) At the subsequent meeting, Ms. Kaghan and Mr. Husain would review the (already signed) bankruptcy documents with the client to make sure that nothing was missed. (Trial Tr., at 949:23-25, 950:11-13; UST Ex. 64, at 6 16:16-18:2, 20: 24-21:7).   This supports Respondent's contention that the debtor reviewed the documents before they were filed with the Court.

35.        Following the subsequent meeting, Ms. Kaghan would upload the documents into

the CM/ECF System. (UST Ex. 64 at 18:3-10, 21:9-10.).

36.        Ms. Kaghan testified that during the initial meeting with the client, Mr. Husain

would discuss the client's assets (and their values) for inclusion in the bankruptcy

schedules (Trial Tr., at 1013:20-1014:25.) At this meeting, Ms. Kaghan and Mr. Husain

would take notes, and from these notes Ms. Kaghan would thereafter create bankruptcy

schedules. (Id., at 1014:14-25; UST Ex. 65, at 59:23-60-9.) Ms. Kaghan testified that she

never discussed the valuation of any personal property a client *outside of* the presence of

Mr. Husain. (Trial Tr., at 1015:8-12.)

37.        Ms. Kaghan testified that Mr. Husain reviews **all** bankruptcy documents,

including amendeddocuments, before they are filed with the Court. (Trial Tr., at 953:24-

954:3.) Mr. Husain testified that he reviews all initial schedules before they are filed, but

that he does not review amended documents prepared by Ms. Kaghan unless "it's a

complicated one…" (Trial Tr. 39:16-40:10.).

38.        The Trustee takes issue of the fact that Mr. Husain signed documents on behalf

of his clients. (See Mirza and Sakeena Baig, Case No. 10-57570, Ashout and Rina

Ibraheem, Case No. 12-28290, Answer, ¶ 12; UST Exs. 66 and 67, *passim*; UST Exs.

31(c), 31(d), 37(f), 37(h), and 37(j).), etc). When the Trustee's senior co-worker, whom

coincidently he calls credible, Steve Wolfe was asked the simple question to point to a

law in Illinois that prohibited an attorney from signing on behalf of a client, Mr. Wolfe

could not offer and law that prohibited Mr. Husain from doing so. (Trial Tr. 1116:9-

14). Mr. Wolfe did however ask Mr. Husain to stop signing on behalf of his clients, to

which Mr. Husain obliged.

39.        Around the time he ceased signing clients' names to documents on their behalf,

Mr. Husain testified that he started the practice of having his clients sign documents at

the outset of the representation, before the documents were completed. (Trial Tr., at

57:2-5; Answer, ¶ 14; UST Ex. 66, at 13:10-17.) In his Answer, Mr. Husain explained

that this practice was "to insure all signatures were authentic, and to prevent clients from

forgetting to sign [the documents]." (Answer, ¶ 14.).  As stated supra, no documents

were filed with the Court until such time as the documents were reviewed with the

clients.

40.        Following the August 9, 2012, Rule 2004 Examination in *Hussaini*, and

persisting through at least May of 2014, Ms. Kaghan, unknown to Mr. Husain,  filed

documents in seven cases where clients' signatures were photocopied and used across

multiple documents, and reused from previously filed documents with altered dates

appearing next to the preexisting signatures. (Answer, ¶¶ 9- 11; UST Ex. 40(b).) The

first such documents were filed in the *Hussaini* case on August 17, 2012. (UST Exs.

33(f), 33(g), and 33(h).).

41.        Mr. Husain admits that photocopied and reused signatures were filed, and that Ms.

Kaghan created and filed such documents without his knowledge or approval. (Answer, ¶¶ 9-

11.).

42.        The Trustee goes to great length to discredit Mr. Husain as to when he first

leaned Ms. Kaghan was reusing his client's signatures for bankruptcy filings.   He

attempts to show that Mr. Husain had knowledge of same.  Ms. Kaghan testified that she

did it without Mr. Husain knowing, even after being advised not to do so, and Mr. Husain

took responsibility for Ms. Kaghan actions at all times (See answer to charges).

Regardless, at all times, the client was aware of the process, and all gave permission to

reuse their signatures.  (UST Ex. 57, at 106:2-107:1; UST Ex. 45, at 29:23- 31:19, 33:10-

15; UST Ex. 46, at 10:6-11, 11:6-24).   Ms. Kaghan also admitted she did the same

activity without Mr. Husain's knowledge, even after being advised not to do so on several

occasions.  After Kaghan repeatedly continued the activity, she was prohibited from filing

any documents.

43.        The alleged discrepancy in Mr. Husain's own testimony concerning his

knowledge of the

reuse of signatures, coupled with the balance of the evidentiary record, leads to the conclusion

that he first became aware of Ms. Kaghan reusing signatures and altering dates after her first

deposition.

## VI. The Hristo Manavski Bankruptcy Cases

44.        Mr. Husain filed two bankruptcy cases for Hristo Manavski, (UST Ex. 16(a), ¶

13; UST Ex. 66, at 67:8-15; UST Exs. 2 and 6.)

45.        Mr. Husain was first approached to file a bankruptcy case for Mr. Manavski by

his sister,Mariya Manavska. (UST Ex. 16(a), ¶ 13; UST Ex. 66, at 64:7-8.)

46.        Mr. Husain filed a petition initiating Case No. 12-29534 ("*Manavski I*") on July

26, 2012.

(UST Ex. 6.) At the time of the filing, Mr. Husain knew Mr. Manavski was in Bulgaria and was

encountering difficulties in his attempts to obtain a visa to travel to the United States. (Trial Tr., at

75:11-15; UST Ex. 67, at 34:24-35:2; UST Ex. 63, at 14:4-13.)

47.        Mr. Husain did not believe that Mr. Manavski's absence from the United States

posed a problem with respect to a bankruptcy filing, and testified at a deposition on

November 14, 2013, about a pre-petition conversation he had with Mrs. Manavska,

where she told him:

> There's one issue, he's in Bulgaria. I said, okay, well, when is he coming back? And then
> she's, like, he's trying to. He's applying for a visa. So I'm, like, okay. Fine. She did ask us,
> can we do a bankruptcy while he's in Bulgaria? In my experiences with -- at least with I
> know trustee Lefkowitz [sic] I've done that before with people overseas and we've done
> Skype. (UST Ex. 66, at 64:14-21.)

48.        Mr. Husain did not meet or speak with Mr. Manavski prior to filing *Manavski I*.

(Trial Tr.,

at 75:21.) All of Mr. Husain's communications with Mr. Manavski were channeled through Ms.

Manavska. (Trial Tr., at 76:3; UST Ex. 63, at 13:7-14:3; UST Ex. 66, at 64:14-68:4, 67:11-68:10;

UST Ex. 11(d), ¶ 26.) During a deposition conducted November 14, 2013, Mr. Husain explained

the process that led to the filing of *Manavski I*:

> I asked [Mrs. Manavska] about him. She said he's a young guy. I think he was in his late
> 20's. He's -- I asked them what debts does he have. Is it serious? And she showed me his
> credit -- I think it was his credit report we pulled. Just a bunch of credit cards really. I
> think the whole thing maybe was 40- something thousand dollars, you know. He didn't
> really even have to file a bankruptcy considering if he doesn't come back from Bulgaria,
> what are the creditors going to do. But he's, like, no, I want to clear it up. All right. Fine.
>
> I told her it's very simple. He had a very, very simple bankruptcy. I gave her all the
> forms. I said this is all his debts. He doesn't speak that good of an English -- of English,
> anyways. I said just explain to him this. And she -- gave her the documents. We
> forwarded it on to her. I assume she forwarded it on to him. Got them back. Went over it
> again with her. It's, like, did you explain everything? Yeah. Okay. Fine. And then we just
> went ahead and filed.

(UST Ex. 66, at 65:17-66:12.)

49.     Mr. Manavski was born in Bulgaria and is a citizen of that country. (Trial Tr., at

610:22-23.)

50.     Mr. Manavski was in the United States for several years, arriving sometime on or

around 2006,

and departing in 2008. (*See* Trial Tr. 636:4 (2006 or 2007) and UST Ex. 63, at 10:11-14 (2005 or

2006).)

51.     Mr. Manavski returned to Bulgaria in 2008 and has continuously resided in his

father's apartment at 406 Kapitan Raicho, Plovdiv, Bulgaria 4000, ever since. (Trial Tr., at

606:17-607:25; UST Ex. 63, at 6:14-7:12.)Mr. Manavski has not reentered the United

States since 2008. (UST Ex. 63, at 9:24-10:5, 49:4-10.)

52.     Mr. Husain has only spoken to Mr. Manavski once, in a telephone call that

lasted 15 minutes. (UST Ex. 63, at 21:20-22:8; UST Ex. 67, at 6:3-6; Trial Tr., at

76:20.) Mrs. Manavska, who was at Mr. Husain's office and participated in the call,

believes it occurred shortly after her November 26, 2013, deposition. (Trial Tr., at

651:19-652:15; UST Ex. 63, at 13:11-22.) At his November 6, 2014, deposition, Mr.

Husain testified that the call occurred in April or May of 2014 and lasted about 5

minutes. (UST Ex. 67, at 5:16-6:6, 9:14-16.)

53.        In the *Manavski I* Petition, Mr. Husain listed Mr. Manavski's address as 128 Forest Glen Road, Wood Dale, IL 60191 (the "DuPage County Address") and his county of residence as DuPage County. (UST Ex. 6, p. 1.).

54.        The DuPage County Address is the home of Mrs. Manavska. Mrs. Manavska leases that premises and has resided there since 2009. (Trial Tr., at 605:10-18.) Mr. Manavski has never lived at – or even visited – the DuPage County Address. (Trial Tr., at 608:4-6; UST Ex. 63, at 18:6-15; UST Ex. 62, at 9:20-10:5.). Trustee fails to offer the fact that there was a communication break down with Mrs. Manavska and Mr. Husain, where Mrs. Manavska testified her brother resided wither her, and that Mr. Husain obtained Mr. Manavski's background information from Ms. Manavska (Trial Tr., at 641:10-17). And to the best of her ability, Mrs. Manavska told the truth. (Trial Tr., at 641:18-20). At some point, the siblings did reside together. (Trial Tr., at 639:1-2).

55.        Mrs. Manavska provided Mr. Husain a passport, drivers license and social security card, in addition to other documents she could not recall for preparing the documents in *Manavski I*      (Trial Tr., at 633: 15- 23). Mr. Husain then prepared the relevant documents and gave them to Mrs. Manavska, who thereafter sent them to her brother in Bulgaria. (Trial Tr., at 634:9-23.). Mrs. Manavska reviewed the documents after Mr. Husain prepared them, and did not find any errors, and sent them to her brother. (Trial Tr., at 641:10-17).

56.        After learning that Mr. Manavski was not having success in his attempts to obtain a

visa, Mr. Husain filed a Motion to Waive Appearance seeking an order requiring Trustee Helms to permit Mr. Manavski to testify at his meeting of creditors by Skype in *Manavski I*. (UST Ex. 10.) After the Motion was denied, *Manavski I* was dismissed on December 21, 2012, for Mr.

Manavski's failure to appear at a meeting of creditors. (Case No. 12-29534, Dkt. Nos. 16 and 23.)

57.         After *Manavski I* was dismissed, Mr. Husain told Mrs. Manavska that the only way

he would refile the case was if her brother had a residence in Cook County. (UST Ex. 16(a), ¶ 22;

UST Ex. 67, at 19:12-22.) Mr. Husain testified that Mrs. Manavska thereafter told him that her

brother "lives in Cook County." (UST Ex. 67, at 19:24.).

58.         On March 22, 2013, Mr. Husain filed a second bankruptcy case for Mr. Manavski, Case

No. 13-11728 ("*Manavski II*"). (UST Ex. 2.) The *Manavski II* Petition indicates that Mr.

Manavski resides in Cook County at 1285 E. Washington Street, Unit 9, Des Plaines, Illinois

60016 (the "Cook County Address"). (Id.)  Mrs. Manaska testified that her brother was able to file

in Cook County because he changed his address (Trial Tr., at 647:7-24).  She also testified that he

had personal belongings at a Des Plaines address.  (Trial Tr., at 647:25-648-6).

59.         Mr. Husain testified at his November 6, 2014, deposition, that prior to filing *Manavski*

*II*, he looked at Mr. Manavski's "background and…at what he did for a living and his status,"

and determined that "yeah, okay, this [Cook County residency] makes sense." (UST Ex. 67, at

20:6-16.) In his Answer, Mr. Husain further explained:

> Manavski, being young, single and with no significant assets (real estate, vehicle,
> etc.), would reside, on any given day, at either location, depending on where he
> had to report to work. Manavski, a truck driver, would either reside in Cook
> County when he had to start driving near O'Hare airport [sic], and would reside in
> DuPage County when he had to drive trucks originating from Westmont.

60.         Mr. Husain prepared a second set of documents and gave them to Ms. Manvska, which

she sent to her brother for execution.      (Trial Tr., at 648:8-15).

61.         The Schedule I that Mr. Husain filed in both *Manavski I* and *Manavski II*, state that Mr.

Manavski's occupation is "UNEMPLOYED." (UST Ex. 4, p. 20; UST Ex. 8, p. 20.) The Statements of Financial Affairs Mr. Husain filed in both *Manavski I* and *Manavski II* indicate, in response to Question 1, that Mr. Manavski was unemployed in 2010 and 2011. (UST Exs. 5 and 9). The fact that he was unemployed at the time of the bankruptcy filings was irrelevant, but was relevant only that he maintained these residencies when he was a truck driver, and continued to maintain the residencies after he was a truck driver.

62.      Mr. Husain used the Cook County Address in the *Manavski II* Petition because he

believed that a Cook County Chapter 7 Trustee would allow Mr. Manavski to appear for a meeting of creditors via Skype. (Answer, ¶ 7.) In his Answer, Mr. Husain indicates he "could do so because [Mr.] Manavski could adequately claim two (2) residences." (Id.) Mr. Husain further informs that he "has performed 341 meetings via Skype in the past without objection in Cook County." (Id.)

63.      At trial, Mr. Husain adequately explained his representation in the December 20, 2012, Motion to Waive, that "[t]he Debtor currently resides in Bulgaria" (UST Ex. 10, ¶ 3) and asserted that Mr. Manavski is a resident of Cook and DuPage Counties, who lives in Bulgaria.

Q.      So you say right here that he resides in Bulgaria. This is filed December 20, 2012.

A.      Yes. He's living there. I think what you're referring to is that you're saying that's his residency. No. He's residing, meaning that he's living there right now.

.      Then where is his residency, Mr. Husain?

A.      Well, he intends to come back to the United States is what I'm told, and he had two residences. One in DuPage, and one in Cook County.

Q.      But he resided in Bulgaria?

A.      He lived in Bulgaria, and he has an intention -- and he was in the United States, went back to Bulgaria and has intention of returning to the United States.

Q.      Does he have the capability of returning to the United States?

A.      He's been here before. I'm sure he can get here again.

Q.    Is he having trouble getting a Visa?

A.    Yes. Well, his sister told me he had problems getting a Visa.

Q.    But that did not change your belief that you believe he resides in Cook and
DuPage County?

A.    He's got -- in my belief, he had residency in Cook and DuPage County.

Q.    And in your belief, does he still have that residency today?

A.    If he's making an attempt to come back to the United States, which he is
according to discussions with me, yes.

(Trial Tr., at 81:11-82:17.)

64.    The Trustee did not understand the difference between resided and intent to return, hence
the reason Mr. Husain did not need to know of the last time Mr. Manavski last lived in Cook
County, so long as he still maintained property in Cook County for the purposes of establishing
residency. (UST Ex. 67, at 49:12-19.).

65.    Where Mr. Manavski last lived in Bulgaria was irrelevant for the purposes of establishing
residency in the United States, and as to the statement regarding Mr. Husain's state of mind as to
Mr. Manavski's assets, it mischaracterizes his testimony, as he relies on the representations of both
Mrs. And Mr. Manavski  (See Trustee Brief, line 59, pg. 21-22).

66.    Mr. Husain testified at trial his failure to disclose the prior case was a misnomer and not
intentional, and if allowed the ability to do so, would amended the bankruptcy to include the
previously filed bankruptcy.

67.       Page 1 of the *Manavski I* Petition and *Manavski II* Petition are distinct,
each reciting a different address and county of residence. (UST Exs. 2 and 6.) Pages 2
and 3 of the *Manavski II* Petition, however, are the *same pages* from the *Manavski I*
Petition, with the dates next to Mr. Manavski's and Mr. Husain's signatures altered to
recite a new date. (Answer, ¶ 6; UST Ex. 11(d), ¶ 14.)   Mrs. Manavska testified that she
received a second set of bankruptcy documents which she gave to Mr. Husain for the

second bankruptcy filing. (Trial Tr., at 648:8-15).    The Trustee already considered her

testimony to be credible. Respondent agrees at least with this point with the Trustee.

68.        The *Manavski II* Declaration (UST Ex. 3) is the *Manavski I* Declaration (UST

Ex.7) with

the date under Mr. Manavski's signature modified from July 23, 2012, to March  22, 2013.

(Answer, ¶ 6; UST Ex. 11(d), ¶ 15.).

69.        Accompanying the *Manavski II* Petition filed March 22, 2013, Mr. Husain

electronically

filed a complete set of schedules (the "*Manavski II* Schedules"). (UST Ex. 11(d), ¶ 16; UST Ex.

4.)

70.        The *Manavski II* Schedules are, with limited exceptions, identical to those filed  in

*Manavski I* (the "*Manavski I* Schedules"). (*Compare* UST Exs.. 4 and 8; *see also*, UST Ex.

11(d),¶ 17.) The Declaration Concerning Debtor's Schedules filed with the *Manavski II*

Schedules is the *same document* filed with the *Manavski I* Schedules with the date

changed to March 22, 2013. (*Compare* UST Exs. 4 and 8; *see also*, UST Ex. 11(d), ¶ 18.).

However, the Trustee ignores the fact that a second set of documents were sent to Mr.

Manavski by Mrs. Manavka. and that a second set of documents for Mr. Manvski  were

provided to Mr. Husain for *Manavski II*.  (Trial Tr., at 81:11-82:17).

71. Accompanying the *Manavski II* Petition filed March 22, 2013, Mr. Husain electronically

filed a Statement of Financial Affairs (the "*Manavski II* SOFA"). (UST Ex. 11(d),¶ 19;

UST Ex. 5.) The *Manavski II* SOFA had the same entries that was filed in *Manavski I*,

with the date next to Mr. Manavski's signature changed to March 22, 2013. (*Compare*

UST Exs. 5 and 9; *see also*, UST Ex. 11(d), ¶ 20.).

72. The *Manavski II* Petition, *Manavski II* Declaration, *Manavski II* Schedules and

*Manavski II* SOFA were filed electronically using Mr. Husain's CM/ECF account.

(UST Ex. 11(d), ¶ 21.).

73.      The *Manavski II* Schedule B indicates that, as of March 22, 2013, Mr. Manavski

had cash totaling $200, household goods worth $600, and wearing apparel valued at $200.

(UST Ex. 4, p. 2.) The *Manavski II* Schedule B indicates that this personal property was

located at the Cook County Address on March 22, 2013. (Id.) The *Manavski I* Schedule B

recites precisely the same ***value in*** property as of July 22, 2012 that was located at the

DuPage County Address (UST Ex. 8, p. 2.).  What Mr. Husain failed to do was take the

aggregate of the two bankruptcies and reflect them in the subsequent bankruptcy when Mr.

Husain became aware of the fact.

*74.*      At trial, Mr. Husain testified that the personal property listed on the *Manavski I*

Schedule B is distinct from the personal property listed on the *Manavski II* Schedule B.

A. That's not the same property. You're saying that this property is the exact same property in Du Page as in Cook County. The answer is no. He had two distinct properties.

Q.      Two distinct properties?

A.      Two distinct sets of properties.

Q.      You're talking about personal property?

A.      Yes.

Q.      He has this personal property listed on Schedule B on Exhibit 6, Page 2, and then he also has -- if you turn to Exhibit 4, Page 2, --

A.      Yes.

Q.      -- he also has these three categories of personal property --

A.      Yes.

Q.      -- in Cook County?

A.      Yes. Yes.

Q.      So his personal property holdings are symmetrical between Du Page and Cook County?

A.      Approximately the same. What I should have done is I should have aggregated the two in the second one. It should have been 400, 1,200, 400. But I forgot to add

18

those two up, the two properties together.

(Trial Tr., at 94:19-95:17.).

75.     Mr. Husain's trial testimony can be reconciled with a representation he made in

his June 26,

2013, Response to the Original Motion for Sanctions in *Manavski II*:

> At all times, the [*Manavski I* and *Manavski II*] filings were identical (save for the filing
> date signed). No debts were removed or added. *No assets were removed or added.*

(UST Ex. 11(b), ¶ 7) (emphasis added).

> The Trustee willfully ignores the fact that the property listed in the schedules is below
> the exemption threshold.

76.     Neither the *Manavski I* Schedule B, nor the *Manavski II* Schedule B, disclose any

personal property in Bulgaria. Mr. Husain testified that he "forgot" to ask Mr. Manavski

about any property he might own in Bulgaria, as he "was too busy concentrating on what

he had in the U.S." (Trial Tr., at 101:22-24, 127:5-7.).  As Manavski's bankruptcy is still

open and has yet to be discharged, this issue may yet be explored and thus the bankruptcy

may be amended.

77.     Mr. Husain admitted in his trial testimony that he has not seen any of the personal

property attributed to Mr. Manavski in the *Manavski I* and *Manavski II* Schedule Bs.

(Trial Tr., at 133:17-19.).  The Trustee, too has not seen any personal property attributed

to Mr. Manavski in the *Manavski I* and *Manavski II* Schedule Bs.  Moreover, an attorney

is not required to go to a client's home to see what property a client owns.

78.     Mrs. Manavska's testimony establishes that the Schedule Bs Mr. Husain filed

*Manavski*

*I* and *Manavski II* are accurate. Mrs. Manavska testified that her brother has no cash in the United

States. (Trial Tr., at 617:6-17.) The quote offered by the Trustee of Mrs. Manavska's trial

testimony that her brother left some inexpensive household items, such as an iron, kitchen pots,

clothing, and perhaps a "very cheap television" at his friends' house when he left in 2008, but she

does not know if those items are still there and she indicated that the items may have been discarded (Trial Tr., at 618:1-620:15; *see also*, UST Ex. 63, at 19:3-19.) is grossly misrepresented. The fact that Mrs. Manavska is aware of her brother's belongings so many years after the fact is evidence The items that were left behind were not left in a storage box with Mr. Manavski's name on it, but were just left at his friends' house. (Trial Tr., at 620:18-22.).

79.    What is overly shocking on the part of the Trustee is the fact that he offered into evidence, WITHOUT A SINGLE SHRED OF PROOF TO SUPPORT SAME the fact that most of the cases Mr. Husain filed, his clients have the same amount of cash on hand, the same valuation of personal property, and the same valuation for wearing apparel. What is comical is the fact that when each witness was asked these questions, each witness stated that these were the figures they provided Mr. Husain. His allegations are just that- *allegations*. Coincidently, the Trustee does not take into consideration that each of Mr. Husain's clients happen to be of a similar ethnic, religious, and social sect. They all shop and live in an area called Little India (Devon and Western) and when the Trustee was told of the demographic, he was confused. Remember, they are filing for bankruptcy, so, *they don't have a lot of money.* Trustee's argument is ignorant.

**VII Al-Haroon Husain's Practice of Signing Clients' Names to Documents on Their Behalf**

80.    The evidence shows that between 2010 and 2012, Mr. Husain signed clients' names to documents on their behalf. In his Answer, Mr. Husain does not dispute that he did this, but indicates that he "does not recall nor have sufficient knowledge to admit or deny Court's statement on specific cases." (Answer, ¶ 12.)

81.    In the instances where Mr. Husain signed clients' names to documents, there is no notation next to the signature to indicate that someone other than the client signed the document. (Answer, ¶ 13.)

82. The Trustee called Steve Wolfe as a witness at trial. Mr. Wolfe was asked a simple

question, whether he was aware of any law in Illinois that prohibited an attorney from signing on behalf of his client.  Over the Trustee's objection, the Court allowed Mr. Wolfe to answer, because the answer favored the respondent.  **Mr. Wolfe said. "no".**  (Trial Tr. 1116:9-14).  Furthermore, there is no requirement for a notation next to a signature to indicate someone other that someone other than the client signed the document. (Answer, ¶ 13.).

83.      Mr. Husain stated in his Answer that "in general" he only signed clients' names to documents on their behalf with the clients' express consent, after they had reviewed the document. (Answer, ¶ 12.).  The Trustee believes this representation is contradicted by the evidence, but the Trustee has no basis in claiming same.

### A.   *In re Mirza and Sakeena Baig*, Case No. 10-57570

84.      Mr. and Mrs. Baig testified at the trial in this proceeding. (*See generally*, Trial Tr., pp. 504-550 (Mr. Mirza Baig); Trial Tr., pp. 550-603 (Mrs. Sakeena Baig)). Mr. and Mrs. Baig appeared for depositions in this proceeding on December 5, 2014. Transcripts of their deposition testimony are in evidence as U.S. Trustee Exhibits 52 and 53.

85.      Mrs. Baig testified that it is not her signature that appears on the schedules filed in their bankruptcy case, and she does not know who signed her name to the document. (Trial Tr., at 562:25-564:2; UST Ex. 53, at 13:19-14:7; UST Ex. 31(c).)

86.      Mr. Baig testified that it is not his signature that appears on the schedules, and he does not know who signed his name to the document. (Trial Tr., at 511:11-512:14; UST Ex. 52, at 11:16-12:1; UST Ex. 31(c).)

87.      Mrs. Baig's name was also signed to the Statement of Financial Affairs, and she does not know who signed that document on her behalf. (Trial Tr., at 566:22-567:15; UST Ex. 53, at 14:10-19; UST Ex. 31(d).)

88.         Similarly, Mr. Baig does not know who signed his name to the Statement of

Financial Affairs (Trial Tr., at 515:2-22; UST Ex. 52, at 12:4-14; UST Ex. 31(d).)

89.         Mrs. Baig was not aware that anyone would be signing her name to these

bankruptcy documents. (Trial Tr., at 561:5-12; UST Ex. 53, at 11:23-12:4.)

90.         Mr. Baig was not aware that anyone would be signing his name to bankruptcy

documents. (Trial Tr., at 509:13-20; UST Ex. 52, at 9:24-10:11.) Mr. Baig testified that,

in his one and only visit to Mr. Husain's office, Mr. Husain gave him papers to sign but

did not review the substance of the documents with him. (Trial Tr., at 508:12-19; UST

Ex. 52, at 9:1-20.)

91.         The Trustee claims that the Baigs were credible in all respects (Trustee brief, line

94),

and uses their recollection of facts to discredit Mr. Husain.  The Trustee, however, ignores

virtually all of the questions asked by counsel for Husain in establishing what the Baigs

remember.

92.         Mr. Baig testified that he relied on his wife to handle financial affairs, as she is

his boss. (Trial Tr., at 508:6-9).  Mr. Baig testified that he went to Mr. Husain's office on

one occasion (Trial Tr. 524:10-13; 525: 14-16) and signed some papers, met only with

Mr. Husain, and when he went there, all of the work associated with the bankruptcy was

completed, as his wife had met with Mr. Husain on prior occasions.   (Trial Tr., at 506:

10-507-12).   Mr. Baig could offer no testimony as to who signed documents on his

behalf, and he was never asked if anyone could sign on his behalf.  (Trial Tr., at 509:17-

20).   The reason the Baigs filed for bankruptcy was because they had properties that

were going into foreclosure.  (Trial Tr. 525: 17-22).  Mr. Baig became aware, through his

wife, that by filing for bankruptcy, it stops the foreclosure process.  (Trial Tr. 526: 7-22).

Ms. Baig instructed her husband to go to Mr. Husain's office to sign bankruptcy

documents.  (Trial Tr. 527: 16-24).  After Mr. Baig signed, his wife, who was out of

town, would go to Mr. Husain's office and sign on her behalf, as she was in India.  (Trial Tr. 532:7- 534: 24).  After filing the bankruptcy, Mr. Baig realized that he wanted to have the bankruptcy dismissed.  (Trial Tr. 539: 10-14).  Mr. Baig had no complaint of any of the work done by Mr. Husain.  (Trial Tr. 549: 9-11).

93.        Mrs. Baig testified that she first met Mr. Husain at his office and inquired as to the bankruptcy process without providing him with any paperwork.  (Trial Tr. 578: 9-12).  She provided the first set of documents to Mr. Husain in November/December of 2010, consisting of the bank statements of accounts she possessed.  (Trial Tr. 580: 2-20).  According to Mrs. Baig, Mr. Husain already had a credit report at the second meeting.  (Trial Tr. 581: 20-25).  At that meeting, some paperwork was given to her for her signature.  (Trial Tr. 583: 4-5).  She claims that she never received any documents from Mr. Husain.  (Trial Tr. 583:12-14).  **Mrs. Baig testified that she signed the bankruptcy documents before her husband, directly contradicting her husband.**   (Trial Tr. 587: 7-11).  The reasons they wanted to file for bankruptcy was to obtain an immediate stay in foreclosure court.  (Trial Tr. 590: 4-6).

94.        Regardless of all their contradictions, the Trustee maintains that Mr. and Mrs. Baig are credible witnesses.

95.        Trustee Wolfe ordered a 2004 examination of the Baigs  At the examination, Mr. Baig admitted to owning a series of properties, and Mrs. Baig denied to owning the same properties.  (US Ex. 74).

96.        It  was clear that at the 2004 exam that the Baigs were not not on the same page as to what were their assets,  Trustee Wolfe requested that the bankruptcy be dismissed.  Mr. Husain strongly agreed.

97.        Respondent does not consider the Baigs to be untruthful, nut rather mistaken and confused.  They provided Mr. Husain with authority to sign on their behalf, but they just do not recall they did, as they had three homes in foreclosure and were representing

themselves in three foreclosure state cases.    More likely, the boss Mrs. Baig was doing all

the legal work, as Mr. Baig is out of town for two to three weeks in St. Louis, and returns

for a weekend. (Trial Tr. 590: 21-25), Mr. Baig travelled for two to three weeks to St.

Louis and return to Chicago for the weekend.  (Trial Tr. 544: 11-18).  Furthermore, the

Baigs were in the process of planning a wedding for their daughter.  (Trial Tr. 588: 10-15).

Its quite evident that the Baigs had more important things in their lives going on than their

bankruptcy.

### B. In re Kauser Banu, Case No. 12-28112

98.        Mr. Husain represented Kauser Banu in the above bankruptcy case filed July

18, 2012. (UST Ex. 32(a); UST Ex. 54, at 10:7.)

99.        Ms. Banu did not testify at trial. Ms. Banu appeared for a deposition in this

proceeding on December 5, 2014, and a transcript of her deposition testimony is in

evidence as U.S. Trustee Exhibit 54.

100.        Ms. Banu testified that she gave Mr. Husain authority to sign on her behalf

(UST Ex. 54, at 6:23-24, 11:13, 12:7.).   Again Trustee does not point at any law

prohibiting counsel for Banu for signing on her behalf.

101.        Ms. Banu testified that around the time of the bankruptcy filing, Mr. Husain:

called me and he said I missed two of the papers. So that's what I remember. Because the
signature where he told me to sign it, I didn't look at all of the papers. And then I said like
is there anything that I can Xerox a letter or anything, he said I can write your name, I
said go ahead.

(UST Ex. 54, at 11:13-18.)

102.        Ms. Banu testified several times that she gave Mr. Husain authority to sign **two**

documents. (UST Ex. 54, at 6:23-24, 11:13, 12:7.)  Trustee, in this case, is, per the term,

"drawing at straws" in an extreme sense.   The Trustee tries to discredit Respondent

because Ms. Kanu authorized Respondent to sign on two (2) documents, whereas

Respondent signed on four (4).    Trustee is actually expecting for Ms. Banu to recall her

exact conversation with Respondent from three (3) years prior to her deposition on the number of signature she authorized Mr. Husain to sign.   (2 v. 4). Trustee completely misses that substance of this testimony, which is Ms. Banu gave Respondent the authority to sign on her behalf, and that she had already reviewed all documents with Respondent.

103.      Trustee would rather have this argument be about two signatures versus four signatures. However, it is fair to say that Trustee, no matter how many times Ms. Banu authorized Respondent, does not believe such authorization is valid. Hence, Ms. Banu's authorization is irrelevant, according to the Trustee (of which Respondent disagrees). Again, Trustee cannot point at any case law to support his position.

104.      In regards to Respondent failing to adequately review the documents with Banu because a vehicle had been left out, such argument fails on three (3) points:  (1) there is no indication that Ms. Banu is on title of vehicle. Trustee provides no evidence to this point. (2) the fact that an item is missing on the schedule does not make the schedule fraudulent, per se. If such were the criteria, then virtually every experienced bankruptcy attorney would be guilty of fraud because virtually every experienced bankruptcy attorney has had to have made a mistake sometime in the professional career; (3) **MS. BANU TESTIFIED THAT THE CAR IN QUESTION WAS IN HER EX-HUSBANDS NAME**.  (UST EX 54 19: 5-9).  What is shocking is the fact that the trustee asked Ms. Banu this question.  The Trustee is yet again of intentionally misrepresenting facts to this Court.

   *C.    In re Syed Faisel Hussaini,* **Case No. 12-10086**

105.      In this case Trustee follows the same pattern as Banu.  Specifically, Trustee first indicates that Respondent signed on behalf of the debtor.Trustee then admits that Respondent was given authorization by his client to do so (though, again, this is irrelevant since Trustee does not believe Respondent can sign on behalf of the debtor, with or without authorization). (Trustee Conclusions of Law, p.101, Count III)

106.     Trustee then states that schedules filed were materially inaccurate (and alludes them

being *intentionally* inaccurate) or that the schedules were not properly reviewed.

107.     In this matter, Debtor's 1998 Cadillac Seville and retirement account were omitted,

(UST Ex. 69, *passim*; UST Ex. 33(c).) and Debtor retained a surplus on Schedule J after

expenses. (Id., at 69:16-23.)

108.     Not surprisingly, the Trustee fails to state the *amended schedules were filed* to

correct any inaccuracies, a fact that this Court should know.   In fact, in each and every

occasion, when an error was directed to Mr. Husain's attention, that error was properly

corrected by means of amended schedules.   **This is the purpose of amended schedules.**

109.     Just because an item is missing does not mean the schedules were not appropriately

reviewed. Moreover, does the Trustee set the standard as to what is appropriate?   The

Trustee ignores the fact that at times a client neglects to inform their attorney of certain

items, and, at other times, the attorney makes mistakes.   The Trustee has issues with a total

of a total of 13 bankruptcies filed by Mr. Husain out of 216 bankruptcies.   Taking into

consideration the amount of work placed on this matter, it is safe to claim that the Trustee

examined all of Mr. Husain's bankruptcies. (See Ex. 19(c).   Doing the mathematical

equation, the Trustee has issues with 6% of Mr. Husain's bankruptcy filings.   Reviewing a

file cannot be perfect all the time. To state that a file which contains inaccuracies was not

reviewed properly, would logically conclude that *any* attorney that needed to file

amendment schedule due to a change had not appropriately reviewed the file. Such a

conclusion is ridiculous at best.

110.     Finally, Trustee is citing allegations which Respondent was not even charged with

violating. (Trustee Conclusions of Law, p.98, Conclusions of Law).   Filing an inaccurate

schedule is not a violation; and as soon as Respondent discovered the violation it was

corrected. Therefore, any allegations towards filing inappropriate schedules or schedules

not being properly reviewed in this case should be dismissed by law.

**D. *In re Ghulam Haider and Nazra Begum*, Case No. 12-17531**

111.      The Trustee also misstates its case in Ghulam Haider and Nazra Begum.  Oddly, the

Trustee acknowledges that Respondent had the authority to sign on behalf of the Debtor

(UST Ex. 60, at 10:9-11).   Trustee then attacks Respondent in that he did not properly

review the file with the Debtors because at item was missing, specifically here a 2005

Honda Accord. (Trustees Conclusion of Law, p. 34, par.114).

112.      Again, just because an item is missing does not mean the schedules were not

appropriately reviewed. Reviewing a file cannot be perfect all the time. To state that a file

which contains inaccuracies was not reviewed properly, would logically conclude that *any*

attorney that needed to file amendment schedule due to a change had not appropriately

reviewed the file. Such a conclusion is ridiculous at best.

113.      Finally, Trustee is citing allegations which Respondent was not even charged with

violating. Filing an inaccurate schedule is not a violation; and as soon as Respondent

discovered the violation, **it was corrected**. (Trustee Conclusions of Law, p.98, Conclusions

of Law)Trustee does not offer that fact to the Court's attention, nor does the Trustee offer

the fact that the bankruptcy was approved.  Therefore, any allegations in this case should be

dismissed.

**E.  Farooq Sultan and Sara Sultan, Case Nos. 12-01209 and 12-42041**

114.      120Mr. Husain represented Farooq and Sara Sultan in the above two bankruptcy

cases.(UST Exs. 29 and 30(a).) Mr. Husain also represented several of Mr. Sultan's

businesses, including OF&A Retailers, Inc., in bankruptcy and other legal proceedings.

(Trial Tr., at 907:11- 909:2.)

115.      At the time of trial, Mr. Husain represented Mr. Sultan in foreclosure and tax

proceedings. (Trial Tr., at 908:9-12.) Mr. Sultan met Mr. Husain through Mr. Sultan's

father-in- law. (Id., 932:16-933:2.).

116.      At the time of trial, Mr. Husain represented Mr. Sultan in foreclosure and tax proceedings. (Trial Tr., at 908:9-12.) Mr. Sultan met Mr. Husain through Mr. Sultan's father-in- law. (Id., 932:16-933:2.).

117.      Mr. Husain neglected to disclose Case No. 12-01209 on Case No. 12-42041 (*See* UST Ex. 30(a), p. 2.).  This was a clerical error on Mr. Husain's part, not done with the intent to deceive the Court.

118.      The Trustee claims in paragraph 119 that  the signature of Sara Sultan appearing On the petition in Case No. 12-01209 is markedly different in appearance from the signature of Sara Sultan on the petition in case No. 12-42041. (*Compare* UST Exs. 29 and 30(a).) regardless of the fact that Mr. Sultan identified both signatures as being signed by his wife, Sara Sultan. (Trial Tr., at 913:12-14, 915:8-10.).

119.      The Trustee purports to be a handwriting expert, ergo, the Trustee assumes it can tell if a signature is authentic.  The Trustee has not offered any evidence that anyone from their office is a hand writing expert.

**F. *In re Fadi Freij*, Case No. 12-17865**

120.      Fadi Freij was neither deposed nor testified at trial.  The fact that the Trustee can make such allegations without any evidence in a deposition or testimony or any verification with the debtor whatsoever is incredible and ridiculous.

121.      The Trustee simple is asking the Court to compare documents and believe the Trustee allegations (i.e., just assume what Trustee says is true without any substantial evidence).  Such a request doesn't even meet requirements of preponderance, and should be summarily dismissed.

122.      The Trustee claims in paragraph 124 of its brief that there were multiple persons who signed on behalf of Mr. Mr. Freij, without even calling Mr.  Freij. (UST Exs. 36(a)-(g)).  This allegations is preposterous, without support and unverified, akin to a Bigfoot

siting in Millennium Park.  In no way is the Respondent taking these allegations lightly, but the fact that the Trustee suggests to offer evidence without corroboration and make conclusions to same must annoy this Court.

**G. *In re Ashout and Rina Ibraheem*, Case Nos. 12-28290 and 12-37673**

123.       Trustee continues its repetition of allegations with these cases.

124.       *Again*, debtors again state that they gave Respondent authority. Trustee does not deny this. (UST Ex.,42, at 8:4-90:24).

125.       *Again*, Trustee is then left with stating that Respondent filed inaccuracies, and, impliedly, that this should constitute a violation, even though Respondent was not charged with it. (Trustees Conclusions of Law, p. 39, par.137).

126.       *Yet again,* such a statement is ridiculous. The Trustee is compelling the Court to insinuate that a violation occurred because of inaccuracies in schedules.

127.       By the Trustee's logic, if *any attorney* filed an incorrect schedule automatically, according to the Trustee, has entered into misconduct. Never mind that amended schedules are in place to *correct* mistakes.

128.       That is logically impossible, and Trustee wishes for this Court to suspend logic and reality.

129.       The Trustee may then insinuate that because this happened in thirteen (13) cases (assuming one totals up the examples that Trustee states), there is a pattern.

130.       The Trustee, however, admits that Respondent has filed at least two hundred sixteen (216) bankruptcies. (Trustees Con. of Law, p. 5, par. 15)

131.       If that is the case, then Respondent is ninety-four percent (94%) accurate in his filings. This is hardly a "pattern" the trustee wishes to conclude.

**H. *In re Ghousia Iqbal*, Case No. 12-18911**

132.       The Trustee case is extremely weak with Ghousia Iqbal. Trustee initially

indicated that Ms. Iqbal signed *none* of her documents, even indicating that Iqbal's name was misspelled by the someone else signing on her behalf. (Petition for Disciplinary Hearings)

133.     However, at her deposition, Iqbal stated that she had signed *all* of her documents. Any misspelling was due to her diabetes making her, at times, unable to sign. (UST Ex. 61 at 20:1-4).

134.     The Trustee then goes on to state that Respondent filed inaccurate bankruptcy schedules, even though admitting Respondent attempted to correct those statements with amended schedules. (UST Ex. 34(g)).

135.     Respondent corrected all but her home address, which is exempt, and the Trustee still maintains that this was done intentionally.

136.     Trustee then concludes that the schedules were inadequately reviewed, and implies that **this** was a violation of misconduct. How or why this is a violation is not described by the Trustee, nor which rule of misconduct has been violated. In Trustee's opinion, simply filing an inaccurate schedule implies that the review was inadequate, and therefore, a violation. (Trustee's Con. of Law, p. 42, par.144).

137.     As stated before, such a conclusion can only be logically absurd.

**VIII.   Duration of Al-Haroon Husain's Practice of Signing Clients' Names to Documents.**

138.     The Trustee again raises the issue of Mr. Husain signing on behalf of his clients in line 145 of its brief, and cites the fact that Mr. Mr. Husain felt uncomfortable signing on behalf of his clients *after* being told by Trustee Steve Wolfe not to do so.  This **again is a red herring. T**he Trustee **has** provided **no** case law to show that signing on beha**lf of one's clients is illegal.**  Mr. Husain does not concede that signing on behalf of his clients amounts to an illegal activity, as Trustee Steve Wolfe was unable to offer there was any law in Illinois, whether state of federal that prohibited Mr. Husain from doing so.  The Trustee again attacks the memory of Mr. Husain in hopes to impeach him and discredit him.  The Trustee ignores the fact that at all times where Mr. Husain signed on behalf of his client, he

conceded to it.  The Trustee was aware of the fact that Mr. Husain was signing on behalf of

his clients in 2011 but the Trustee did file any actions against Mr. Husain for signing on

behalf of his clients as Mr. Wolfe did not feel Mr. Husain's actions warranted sanctions.

## IX  Systematic Alteration of Documents to Reuse Signatures and Obtaining Clients' Signatures on Incomplete Documents

139. Paragraph 151 of the Trustee's brief also grossly misstates the facts, and

mischaracterizes Mr. Husain's testimony.  Mr. Husain admitted that he became aware that

Ms. Kaghan was reusing signatures, but he was unable to recall when Ms. Kaghan first

did so. (Answer, ¶ 9.)   What is clearly on the record is that when he learned of this Ms.

Kaghan was admonished by him and told to discontinue this practice. Ms. Kaghan did this

yet again, even after being advised by Mr. Husain not to do so.  After doing this a third

time, Ms. Kaghan's computer privileges were discontinued, since she could not adhere to

the office's simple rules of not reusing client's signatures.  It should be noted that in all

cases when she did so, the clients were aware.  Regardless, Mr. Husain stated that he

assumed full responsibility for her conduct.  (Trial Tr. 1056:11-13).

### A.  In re Syed Faisal Hussaini, Case No. 12-10086

140.      The Trustee is again overstating his case in paragraphs 152-156, in that

Mr.Hussaini admitted to giving Mr. Husain's office authority to reuse his signature

when needed, as he was unavailable to sign two to three documents.  (UST Ex. 58, at

28:4-6.).  The Trustee conveniently ignored that the deponent was aware of the fact that

he was appearing for his deposition to answer questions whether he gave Mr. Husain

authority to sign on his behalf or to reuse his signature.  The Trustee suggests that Mr.

Husain was aware of the practice before it had occurred.  This statement is erroneous.

At the taking of the deposition, is was apparent that the event had transpired, and thus

irrelevant, since Mr. Husain has taken responsibility for Ms. Kaghan's actions.

141.      In this instance, Trustee is playing a "gotcha" game with Respondent, implying that,

based on Respondent's questions to the debtor, Respondent knew of Kaghan photocopying the

debtor's signature.

142.      Such a game, in Respondent's opinion, is comical.  There is no purpose served in

being dishonest with the Court, as the Court can readily see through a fabrication.

143.      Trustee must present evidence, either through debtor testimony or written evidence,

that Kaghan utilized debtors' signatures under the direction of Respondent.  Not only has the

Trustee failed to do so, but instead futilely attempts insinuate that Respondent, by asking  a

question, which Trustee *admits is vague,* is somehow a smoking gun that demonstrates that

Respondent knew and ordered Kaghan to photocopy Debtors' signatures. (Trustee's Conclusions of

law, p. 45, par. 155).

144.      Such a conclusion, like before, is absurd. What *is clear* is Respondent's and

        Kaghan's testimony which state that Respondent did not know, and that Mrs. Kaghan did so

        without Respondent's knowledge. Upon learning what Mrs. Kaghan did Respondent told

        Mrs. Kaghan to cease and desist, and then twice more before denying her access to filing.

        (Trial Tr. 1003:7-13).

145.      Respondent, as stated in testimony, takes responsibility for the actions of his

office.   (Trial Tr. 1056:11-13).

### B. In re OF&A Retailers, Inc., Case No. 13-23120, and *Farooq Sultan and Sara Sultan*, Case No. 12-42041

146.      Mr. Sultan was clearly mistaken when he testified at trial.

147.      At trial, Mr. Sultan testified that he did not recall any conversation with either Mr.

Husain or Ms. Kaghan at any time concerning permission to use a photocopy of his signature in

connection with *any* of his bankruptcies. (Trial Tr., 911:10-13; 937:22-938:3.).

113.      During his 2004 examination, (UST Ex. 68, at 41:14-21.) Mr. Sultan expanded on

his understanding with Mr. Husain with respect to signing documents:

Q.    So did you ever give someone permission just to use your signature from prior documents onto new documents?

A.    I mean, he--yes, I think I gave him an authority also if some signature is to be done for me, I mean, he can sign it.

148.    Ms. Silver, Trustee, provided a letter signed by Mr. Sultan giving Mr. Husain authority to act on his behalf.  (Trial Tr. 960: 1- 961: 22).

149.    Mr. Sultan believed that all of the documents filed in conjunction to his bankruptcy were signed by him, when Mr. Husain and Ms. Kaghan  have already stated on record that some are in fact photo copies.

150.    Mr. Husain represented Mr. Sultan on 6 different bankruptcies, in addition to other legal matters.

151.    These inconsistencies *may* demonstrate that Mr. Sultan is incredible, but definitely demonstrate that he is inconsistent and confused as to what authority he gave Mr. Husain.

### C. In re Shahid and Erum Ahmed, Case Nos. 12-31079 and 12-43056

152.    The Trustee ignores the fact that Mrs. Ahmed was provided documents to review that were prepared by Mr. Husain through her husband, Mr. Ahmed, and that she allowed her husband to handle the bankruptcy.  (Trial Tr. 490: 1- 24).   She was. given the opportunity to review all of her bankruptcy documents, she had no issue with the bankruptcy, and she was happy it was over.  (Trial Tr. 494: 4-24).   Moreover, in her culture, "the husband takes care of all things financial", and she was o.k. with her husband with handling the bankruptcy.   (Trial Tr. 495: 9- 25).

153.    The Trustee also ignores the fact that Mr. Ahmed was aware of the fact that his first bankruptcy needed to be dismissed as he failed to provide Mr. Husain with relevant documents that were essential in completing the bankruptcy, and that Mr. Ahmed was approved the decision. (Trial Tr. 878: 9-21).   The Trustee also ignores the fact that Mr. Ahmed was aware of the fact Mr. Husain reused some of the documents in refiling the

second bankruptcy for Mr. Ahmed, so long as his bankruptcy was not effected. (Trial Tr. 879: 16; 880:6).   Mr. Ahmed did not have any complaint with respect to the work performed by Mr. Husain. (Trial Tr. 881: 6-12).   He had no issue of the fact that dates on his document were changed. (Trial Tr. 882: 8-10).   The Trustee made great issue that Mr. Husain was quite disorganized and neglected to include various information in the bankruptcy, yet no creditors came back to attack the bankruptcy. (Trial Tr. 885: 12-17).

154.     What is quite comical, when asked on cross examination by Respondent's counsel if Mr. Ahmed gave [Ms. Kaghan ] authority to reuse his signature, The Trustee objected, alleging that it was "beyond the scope of direct"  (Trial Tr. 882: 23-24).  It is comical because not only did Mr. Ahmed give Mr. Husain authority to so (Trial Tr. 882: 10-13), but in objecting, Mr. Husain would not be able to refute the Trustee's allegations.

155.     At the end of Mr. Ahmed's testimony, the Trustee, being frustrated with Mr.Ahmed's answers, warned him of the fact of filing documents under, "penalty of perjury",  trying to intimidate and bully the witness, where the witness admitted that he could not recall whether he had a conversation with Mr. Husain regarding anything relating to penalty of perjury.  (Trial Tr. 887: 21-888: 21).  When asked on re-cross, the witness agreed that just because he could not recall a conversation does not mean it did not happen.  (Trial Tr. 890: 8-14). Of course, the Trustee objected, with no legal basis. (Trial Tr. 889:10).  In its brief, the Trustee conveniently ignores this fact and offers to this Court that Mr. Ahmed in fact did not know his signatures were being reused.   This is significant in that this demonstrates the Trustee is being *intentionally deceptive*, by providing the Court with only a partial picture of what the evidence showed, a pattern that has been consistent throughout this matter.

**D. *In re* Aaron Rodriguez, Case No. 13-26869**

156.     Why the Trustee even mentions this Case is beyond comprehension (Trustee Conclusion of  Law, p. 57, par.188). The Trustee did not even reach a conclusion.  Trustee

simply reiterates excerpts from the debtor's deposition, which clearly indicates that Debtor

gave Kaghan authorization to use his signature.

157.    What is Trustee attempting to prove in this case is unknown. However, what the

Trustee does offer is Respondent's testimony and Kaghan's testimony. Specifically, that

Respondent was unaware of Kaghan's photocopying Debtor's signatures (albeit with

Debtor's permission). (UST Ex. 51 at 34:20-35:24).

158.    Regardless, as Respondent has stated, Respondent takes responsibility for all actions

coming out of his office (and continues to do so). However, none of these actions were done with

the intention to deceive the Court.

### E. In re Baligh Abutaleb, Case No. 13-30842

159.    The first matter of this case is Kaghan photocopying signatures for the Debtor

with Debtor's authorization. However, in this particular matter the situation is even more

transparent with the Debtor.  Debtor, in this instance, testified, both at deposition and at trial, that

he and Kaghan photocopied his signatures together. (Trial Tr. 820:15-821:9).  The Trustee goes to

great length to demonstrate to the Court that the Debtor did not have anyone speak to him about

reusing his signature, and intentionally withholds testimony from this Court:

> Q:    Now, was there any explanation as to why, if you went to the office on each of these
> days, there would be a photocopy of made with your signature on it?

> A:    Uhm, I don't know. I don't know. All I can say – I'm not sure if – you know, if this
> needs more explanation – is when I hire Al, I trust Al, okay? **I authorize him to do
> my signature**. I authorize him to appear in court for me. I **authorize him to do these
> for me, you know?**

> (UST Ex. 46 56:8-57:9).

160.    The Trustee asked the question, but apparently just did not like the answer.  If

the Trustee thinks the answer was vague at the deposition of the debtor by its poor questioning, it

was definitely clarified at trial.

161.    The other contention of Mr. Abutaleb's  case is again, whether Respondent

properly reviewed this case with Debtor. Trustee, as before, states that this case was not properly reviewed. However, the same responses apply here.  To begin with, the Debtor's case was reviewed. From Debtor's testimony, mostly with Ms. Kaghan, but also with Respondent (Trial Tr., at 821:5-9; 837:1-10). Respondent did his ample best to review all items with Mr. Abutaleb. Though it is appreciative to the Respondent that Debtor (whom Respondent has known for 12 years) puts much faith in Respondent, Respondent cannot be held responsible if Debtor acknowledges everything at his review and then says "he wasn't going through every single page and reading through". (UST Ex.46, at 12:14-13:11).

162.    Such a thing is understandable. Debtor and Respondent review the file.  Respondent believes that Debtor understands all items because Debtor acknowledges as such. However, Debtor is actually glossing over his items and relies on the Respondent. Respondent cannot be held liable for this. Respondent simply isn't a mind reader (even though he respects Debtor for believing in Respondent's honesty). Next, *again*, any mistakes were corrected through amended documents, *as the bankruptcy procedure allows*, and was done here.

163.    Finally, *again*, Trustee is stating that the bankruptcy review was inadequate. Respondent disagrees, but assuming Trustee is right, Trustee never stated that such an item was misconduct by the Respondent. In fact, Trustee never states such a violation in any of his five (5) he alleges against Respondent (Trustee Conclusions of Law, p. 98). To bring this accusation in as a "backdoor" count is disingenuous, and forces, unfairly, Respondent to chase after another target when Trustee knows that his original accusations do not pass muster.

### F. *In re* Saghir Badani, Case No. 13-33835

164.    This case is more of the same baseless claim that the Trustee alleges against Mr. Husain.  As per the office custom, Mr. Badani was contacted by Ms. Kaghan  and asked if he could come into the office because there were amended schedules that needed to be signed by him, which were necessitated after a 341 creditors meeting.  Mr. Badani complained that he could not

come to the office because of a back condition, and Ms. Kaghan , without Mr. Husain's knowledge, suggested that she could reuse his signature from a previous document if she obtained his authority. Mr. Badani stated that either Mr. Husain or Ms. Kaghan  could photocopy his signature.   (UST Ex.45, at 33:4-15).  This is entirely consistent with the testimony on record, both that Ms. Kaghan sought permission to photocopy signatures, and Mr. Husain was unaware.  (See Trial Tr. 1042:12-1045:3 and Trial Tr. 1056:20-22, respectively).

165.    The Trustee intentionally ignores this evidence, willfully placing Mr. Husain into harms way.  It is shocking that the Trustee continues to try to infer mal intent on the part of Mr. Husain, while intentionally not being truthful with this Court.

**G. In re Istiyak Patel and Azra Patel, Case No. 13-37122**

166.    In this case Mr. Patel recalls signing every document in his bankruptcy, and he believes none of the documents are photocopies.  (UST Ex. 47 at 28:21-29:6).  This is not the case.  Respondent admits that the items claimed by the Trustee as to the Patels in Case No. 13-37122 are photocopies, copies with their consent my Ms. Kaghan , without Mr. Husain's knowledge.

167.    Trustee then admits that Mrs. Patel simply does not  recall the conversation; and that the Debtor's allowed Respondent (or Respondent's office) to amend his bankruptcy. (US Ex. 48, at 19:20-23).

168.    The fact that Debtors are inconsistent is not unusual. Trustee fails to mention that Debtors are in elderly couple in their 70's, and could not understand the signature option at the end of the deposition (i.e., whether to waive or to reserve) and needed it to be read to them several times by both attorneys.

**H. In re Mohammed Khan and Saima Khalid,  Case No. 13-42658**

169.    Trustee's argument that Mr. Khan was influenced by Respondent is not surprising, as Trustee has gone to great lengths to harass Mr. Husain immigrant clients who are unfamiliar with the American judiciary system.  Mr. Khan contacted Mr. Husain because he

thought he was being deported.-. that his immigration status was in jeopardy. Respondent simply

calmed Mr. Khan, and stated the subpoena was for a deposition for a matter that related to Mr.

Husain, not directly related to him.  When pressed by Debtor Khan, Mr. Husain told Mr. Khan the

Trustee would ask him about his involvement in his bankruptcy.  The Trustee attempts to claim this

as being some sort of witness tampering, when in fact only this was said.

170.      Mr. Khan was aware that his signatures would be reused.  (UST Ex. 49, at

15:7-11).

171.      On paragraph 234 on Trustees Conclusions of law, The Court must look at

how the Trustee chose to depose Khalid, or rather test her memory.  What is relevant is what is

asked of the witness after this line of questioning.

Q:      Well now, my question was, did anybody talk to you about photocopying

your signature to use later in the case?

A:      Yes

Q:      Do you who—who did you talk about to about it?

A:      Marilyn.

Q.      And was that conversation in person or over the phone?

A.      Over the phone.

Q.      Do you remember if it was after the case was filed?

A.      It was before.

Q.      And what did Marilyn tell you about photocopying documents? What was

your understanding?

A.      We just forgot to sign one document.  We gave her permission to do it.

Q.      So did you understand one document one document would be—one

signature would be reused?

A:      I don't remember if it happened.

Q:      Do you remember what document that was?

38

A:     No.  I'm so sorry.

172.     Now this is the first point the Trustee shows the witness any exhibits any

exhibits before asking her any questions.

Q;     I'll provide you what I've marked as exhibit 1, which is the schedules that

were filed docket number ten in your bankruptcy case.  Have you ever seen

these documents—this document before?

173.     Mrs. Khalid's testimony changed only after she was given the opportunity to

review the documents in her bankruptcy.  This is a suspect manner in order to discredit a witness.

174.     Nevertheless, Mrs. Khalid's testimony is entirely consistent with the

testimony on record, in that Ms. Kaghan  sought permission to photocopy signatures, and Mr.

Husain was unaware.  (See Trial Tr. 1042:12-1045:3 and Trial Tr. 1056:20-22, respectively).

### I. *In Re* Fareedun Ansari, Case No. 14-02434 and 14-17200.

175.     In this case, neither Mr. Hussain nor Affaf Baig were deposed nor testified.

176.     Trustee makes assumptions without any basis and attempts to passes them as

fact without verification.

177.     The portion of argument should be ignored by the Court for lack of evidence.

### J. *In Re* Fareedun Ansari, Case No. 14-02434 and 14-17200

178.     Again, in this Case, Debtor was neither deposed nor given opportunity to

testify. Trustee simply wants this Court to acknowledge items based on verifications.

179.     Respondent, in this case, admits the following: (1) Respondent forgot to add

the previous case; (2) Respondent reviewed said matter with Debtor; (3) the first case was

dismissed because more items were needed to finalized the filing, which were not provided to

Respondent until a later time, after the dismissal; (3) Kaghan erred by having Ansari date "5/1/14"

to the previous declaration. Kaghan believed Ansari had signed a new declaration and simply

forgot to add the date; (4) Respondent takes responsibility for the actions that come out of his

office.

Ansari did review both files and approve them, and there was no attempt to deceive the Court.

### X.    Alleged Substantive Inaccuracy of Schedules and Other Documents Filed With Court

180.    Mr. Husain does not dispute the fact he filed documents that were inaccurate with

the Court

in neglecting to include information when it was not provided by the debtor, or forgetting to

include information by the client on the schedules, or incorrectly place items on the wrong

person's schedules.  What is disputed is that Mr. Husain had any intent to defraud the Court.

181.    The trustee acts much like the Spanish inquisition in charging Mr. Husain.  He

takes issue with his testimony concerning the entries of Schedule B's (Trial Tr. 58:1-

69:20).  What is clear from the record is that all of the witnesses whom were deposed or

who testified at trial, if  their Schedule B reflected $200 in cash on hand, $600 in personal

property, and $200 in clothing, each of then stated that they provided that figure, or where

simply not asked that question.

182.    The first witness which was asked about during the cross examination of

Mr.Husain as to Schedule B Kaisar Banu.  (Trial Tr. 351;24-353:24, Ex. 54, pg. 16, line

5).  Ms. Banu provided testimony as to the value of her furniture, and she testified that she

came up the figure of $600.00.  Mrs. Banu was never asked how much cash on hand she

had at the time her bankruptcy was filed, nor was she asked what was the value of her

clothes at the time her bankruptcy was filed (Trial Tr. 353: 12-17).  Regardless of this, the

Trustees ignores this fact, when they purposefully fail to offer the lack of supporting

evidence.

183.    The next witness the Trustees chose to ignore was Ashout Ibraheem.  (Ex. 42).  Mr.

Ibraheem was never asked by the trustee as to how much cash he had at the time of the

filing of his bankruptcy, he was never asked how much cash on hand he had at the time her bankruptcy was filed, nor was he asked what was the value of her clothes at the time her bankruptcy was filed.  (Trial Tr. 354: 6-14; Ex. 42).  The Trustees had the opportunity to ask those questions to the witnesses, in the first motion for sanctions before Judge Doyle, but did not depose her, and during her deposition in this matter, and did not.  Regardless of this, the Trustees ignores this fact, when they purposefully fail to offer the lack of supporting evidence.

184.    Aaron Rodriguez was next witness the Trustees chose to ignore.  (Trial Tr. 356:6, Ex. 51)  Mr. Rodrigues, surprisingly, *was* asked by the Trustee, and stated that he had $200 in cash on hand (Trial Tr. 356: 10; Ex. 51, pg. 18, line 17) $600 in personal property, (Trial Tr. 357:7, Ex. 51, pg. 19, line 7) and $200 in clothing. (Trial Tr. 358:6, Ex. 51, pg. 20, line 10).   The Trustees had the opportunity to ask those questions to the witnesses, and apparently, the Trustee was displeased with Mr. Rodriguez' answer.  This may offer an explanation as to why they chose not to offer it to the Court's attention.  Nevertheless, it does not support the Trustee's argument, and hence should have been offered by the Trustee.

185.    The next witness the Trustees chose to ignore was Saghir Badani (Trial Tr. 358: 24-25, Ex. 45).  Mr. Badani testified that he had $200 in cash on hand (Trial Tr. 359:12-14, Ex. 45, pg. 16, line 17).   With respect to the property he possessed at the time of the bankruptcy filing, the evidence revealed that Mr. Badani had $600.  (Trial Tr. 359:21 – 360: 4;  Ex. 45. Pg 17, line 18).  Mr. Badani testified as to $200 in personal clothing. (Trial Tr. 360: 18- 25; Ex. Pg. 18 line 12).   Again, the Trustee does not offer these facts into evidence that the witness substantiated the figures as provided to Mr. Husain.

186.    At the Deposition of Mrs. Manavska, sister of the debtor Manavski, she testified that her brother had $200 when he filed for bankruptcy.  (Trial Tr. 362: 5-9; Ex. 62 Pg. 24, line 25).  There were no questions as to the value of the property by the Trustee.  .  (Trial

Tr. 365: 19-24; Ex. 62 Pg. 25, line 10).   Mrs. Baig testified that she had $200.  (Trial Tr. 369:7, Ex. 53, pg. 21, line 11), with no questions asked by the Trustee as to the value of the clothing or personal property of Mrs. Baig.  Istiyak Patel testified that he had $200 of cash on hand, $ 600 in personal property, and $200 in clothing.  (Trial Tr. 370:10-372:3; Ex 47, 16:9-17:5).

187.      Respondent can continue to cite the remaining witnesses that the Trustee neglected to include.   The point is definitely made.   As stated supra, Mr. Husain's clientele is primarily from Devon and Western, and originates from the sage general area of Asia. The fact that they have the same amount of money and assets is not surprising- they are filing  for  bankruptcy!!!    Has  any  creditor  came  forward  to  challenge  any  of  the bankruptcies filed by Mr. Husain? No.  This is just another red herring used to discredit Mr. Husain.  **What is even more telling is that none of the counts against Respondent involve Schedule B**.

188.      Trustee again attempts to confuse the issue by claiming that Mr. Husain does not accept responsibility for the omissions in the filings.    Directing the Court's attention to Line Number 246 in Trustee's brief, Trustee suggests that Husain is attempting to shift his error onto the Trustee.  This is done just to inflame the Court.  Also, the suggestion that Mr. Husain is avoiding to take responsibility is yet another attempt by the Trustee to discredit Mr. Husain.  Reading the next two lines reveals that Mr. Husain admits to the error, and does not blame the Trustee as the Trustee suggests.  (Trial Tr., at 461:20-462:9.).

189.      With respect to the inaccuracies of the documents offered by Mr. Hussaini, and the fact that he was able to testify without any "perceptible difficulty" as the trusty claims in paragraph 247, the Trustee ignores the fact that Husain admitted that Mr. Hussaini had problems associated with his bankruptcy, and by the time the 2004 exam was completed, the bankruptcy was approved.  Paragraph 247 is only offered to discredit Mr. Husain.

190.    The evidence clearly demonstrates that Mr. Husain did not file perfect

bankruptcies, but there is nothing to suggest that he did file anything with an intent to deceive the

Court as the Trustee claims

## XI.                                    **Marilyn Kaghan**

191.    The testimony of Ms. Kaghan was generally credible.   The Trustee again confuses

memory with credibility- just because Ms. Kaghan cannot recall specific dates when

events occurred, and what happened during specific bankruptcies does not necessarily

make her incredible. Ms. Kaghan assisted Mr. Husain with dozens of bankruptcies, and the

Trustee is asking her to recall what was done in each bankruptcy.  It can be certain that if

asked, the Trustee could not recall what he ate foe lunch, and what condiment was placed

on each sandwich, if any, each day during that same period.

192.    Ms. Kaghan  appeared for two depositions, one originally represented by Mr.

Husain, and a second, represented by Mr. Pittacora.  (Trial Tr. 1028: 3-7).  As was the case

with all witnesses, the Trustee ignored the testimony offered when asked questions by

counsel for Husain and her counsel.  She testified that she had photocopied and reused

bankruptcy clients' signatures for documents filed with the Court, and that Mr. Husain was

not aware of the practice until formal proceedings were initiated against him. (Trial Tr.,

956:3-958:2.).  Ms. Kaghan also testified in pertinent part:

   a.   Mr. Husain was not aware of her redating signature pages. (Trial Tr. 1029:7-9).

   b.   To the best of her recollection, the first instance of redating signature pages was when

      charges were brought against Mr. Husain.   (Trial Tr. 1029:21-23).

   c.   After Mr. Husain became aware of her changing dates on documents, he discussed

      this with her.  (Trial Tr. 1029:24-25).

   d.   At all times when she redated signature page, it was done at the request of the client

      or with the client's permission (Trial Tr. 1030:5-10).

   e.   Permission from the client was obtained via various methods, but mostly phone calls.

(Trial Tr. 1030: 12-17).

f.   She could not recall any specific instances when she changed dates. (Trial Tr. 1034: 9-21).

g.   With her memory refreshed, she recalled reusing signatures with new dates for Mr. Sultan with his permission. (Trial Tr. 1034: 9-1039-22).

h.   At no time did she ever observe Mr. Husain signing client's names at initial meetings. (Trial Tr. 1039:5-7).

i.   No individual complained of the reuse of their signature to her. (Trial Tr. 1042:12-17).

j.   If Ms. Kaghan did not have her client's consent, and additional signatures were required, she would not reuse their signature. (Trial Tr. 1042:12-1045:3).

k.   Unlike Trustee Snell, Ms. Kaghan concedes that she is not a handwriting expert and cannot distinguish as to what is a photocopy and what is an actual signature. (Trial Tr. 1048:19-24).

l.   It was Ms. Kaghan 's job to make certain that all signatures were obtained from the clients. (Trial Tr. 1053:7-13).

m.   Ms. Kaghan concedes that at some point she was prohibited from using the computer. for bankruptcies reusing signatures.    (Trial Tr. 1054:13-16).

n.   Mr. Husain had spoken to Ms. Kaghan twice for submitting reused signatures. (Trial Tr. 1056:8-10).

o.   To her knowledge, Mr. Husain did not know of her conduct. (Trial Tr. 1056:20-22).

p.   Mr. Husain did not terminate Ms. Kaghan even after he learned that she was reusing signatures without his knowledge.

q.   Mr. Husain took responsibility for the acts of Ms  Kaghan and Ms. Kaghan  was aware of it at trial. (Trial Tr. 1056:11-13).

193.        It is undisputed that the pattern of reusing signatures continued for a repeated

period, and signatures were reused, as the Trustee claims, **for a total of seven (7) bankruptcies, out of over 200 files** by Mr. Husain.   Respondent concedes that only four (4) bankruptcies contained reused signatures.  This accounts that the Trustee had no issue with either 97% or 98% of Mr. Husain's bankruptcies.  Does this establish a pattern?  Intent to defraud?  It is clear from the record, with the fact that the Trustee had three opportunities to do discovery (the first motion for sanctions, the second motion for sanctions, and the matter before this Court, which mirrors the matter that was before Judge Doyle) and the amount of discovery done by the Trustee (19 depositions, 74 exhibits, and the need to call in a paralegal to verify a conversation of a Trustee for admonishing an attorney) the Trustee would have a smoking gun to prove one of the ethical violations.  They do not even have an angry former client of Mr. Husain.   All they have is reusing of signatures, something which he admits happened on his watch, he took responsibility for, but still is called a liar by the Trustee because the Trustee wants to have the Court believe that Mr. Husain was aware of the conduct of Ms. Kaghan before she was admonished.

XII.            **The Alleged Persistence of Al-Haroon Husain's Misconduct, as the Trustee claims**

194.        Paragraphs 257-265 of Trustees brief is yet again a sequence of red herrings.  To begin with, Trustee presupposes that which it attempts to prove in that Trustee claims that items listed a- g are improperly executed documents.  The Trustee gets to decide what is a properly executed document. This is yet again an attempt by the Trustee to play Judge. Trustee would have this Court believe that Husain is a horrible drafter of documents, yet all of his bankruptcies have gotten approved (other than the Baigs, who chose not to have It approved).   Great detail was already spent supra that the Baigs were able to avoid a deficiency judgment with their short sales, hence they did not need to file bankruptcy. Additionally, Trustee relies on Aaron Rodriguez, who not only affirmed the amounts in Schedule B, which Trustee conveniently ignored, and affirmed that Ms. Kaghan could reuse his signature.  Where is the wrongdoing if the client is aware of the conduct?  In fact, of the clients supported the actions of Mr. Husain.

195.    What is even more egregious is that the Trustee references the prior actions

filed by its office.  Two motions for sanctions to get to where they are today.  In four (4) or seven

(7) of the bankruptcies (which is 2 or 3 percent).  Respondent concedes to four (4) whereas the

Trustee claims seven (7) Mr. Husain made errors in six (6) to seven (7) of the bankruptcies he filed,

and the Trustee has brought same to the Court's attention.  All those bankruptcies were approved.

Moreover, none of the clients have voiced any objections.  No creditor has came forward and

complained.  Yet this warrants a charge on the part of the Trustee?

### XIII.    Al-Haroon Husain's Alleged Materially False Written Representations, Testimony and Other Claimed Attempts to Evade Responsibility During the Instant and Predecessor Proceedings

196.    Section XIII of Trustee's complaint is titled, "Al-Haroon Husain's Materially False

Written Representations, Testimony and Other Attempts to Evade Responsibility During

the Instant and Predecessor Proceedings".  This is ridiculous.  If the Court recalls, when

we began this matter, Mr. Husain assumed full responsibility for the actions of Ms.

Kaghan , admitted that he was not perfect, and in no way is he the best lawyer.  Mr.

Husain forgot to include certain items in the schedules of some of his clients.  What he

still maintains to this date, and what the Trustee has yet to prove, even to a

preponderance of the evidence, is any of the allegations listed infra.  Each one will be

explored with detail.

### A.   Alleged Obstruction with respect to the Hristo Manavski Cases

197.    Trustee alleges that Husain attempted to deceive the Court by filing two affidavits

with this Court, nor not prepared by him, and were not verified.  That is a flat out

misrepresentation to the Court.  Both Mr. Manavski and Ms. Kaghan verified their

affidavits.  Mr. Manavski forgot to sign the signature line, but did sign the 1-109,

verification.  The Trustee just does not believe either him nor Ms. Kaghan .

198.    Attacking Ms. Kaghan whether she met Mr. Manavski is just petty and accusing her

of being "materially inaccurate" is just petty. (See Trustee's brief, paragraphs 268-269).

She is an office employee, not a sophisticated person, and she was testifying as to her

memory of whom Mr. Husain met, when Mr. Husain already testified on record that he

had not met Mr. Manavski prior to filing either of his bankruptcies.    To attack her

credibility on this basis is akin to calling her short or dumb (i.e, ridiculous).

199.    The Trustee ignores the fact that the addresses provided for Manavski's bankruptcy

were provided by Mrs. Manavska, and verified by Mr. Manavski.  (See supra).  There is

no other evidence to the contrary.  If there was any other evidence to the contrary, the

Trustee would have offered it.  The Trustee just does not believe Mrs. Manavka's or Mr.

Husain's testimony.

200.    The evidence that Mr. Manvske was a truck driver, coupled with the fact that

Mr.Husain was given a CDL drivers license (one needed in order to be a truck driver)

justifies the assertion that Mrs. Manavska stated to Mr. Husain that Mr. Manvska resided

in Des Plaines in addition DuPage County for the purposes of filing a bankruptcy.  (See

supra).  There is no other evidence to the contrary If there was any other evidence to the

contrary, the Trustee would have offered it.  The Trustee just does not believe Mrs.

Manavka's or Mr. Husain's testimony.

201.    Calling the evidence of Mr. Manavski's personal; peoperty in Des Plaines

"contrived" is slanderous, to Mrs. Manavski, Ms. Kaghan , and to Mr. Husain.  (See

Trustee Brief line 271)  Did the Trustee do any further investigation to prove there was no

property at the Des Plains address?  Absolutely not.  Because it the Trustee did, the Court

would have heard of it.    The burden of proof is on the Trustee.  All the Court has to rely

upon is the testimony of Mrs. Manavski, Ms. Kaghan , and to Mr. Husain. The Court cannot

consider the rhetoric of the Trustee as evidence .

### B.  Alleged Obstruction with respect to other cases

202.    In Paragraphs 272-276 again is a personal attack on Mr. Husain.  Trustee claims

that Mr. Husain was aware of the practice of photocopying and reusing clients' signatures. Trustee has no evidence to support this claim, and in fact, all evidence points to the contrary.

203.	Mrs. Kaghan has already admitted that Mr. Husain was not aware of her re-dating signature pages. (Trial Tr. 1029:7-9). To the best of her recollection, the first instance of re-dating signature pages was when charges were brought against Mr. Husain. (Trial Tr. 1029:21-23). After Mr. Husain became aware of her changing dates on documents, he discussed this with her. (Trial Tr. 1029:24-25). At all times when she re-dated signature page, it was done at the request of the client or with the client's permission (Trial Tr. 1030:5-10). Permission from the client was obtained via various methods, but mostly phone calls. (Trial Tr. 1030: 12-17). She could not recall any specific instances when she changed dates. (Trial Tr. 1034: 9-21). With her memory refreshed, she recalled reusing signatures with new dates for Mr. Sultan with his permission . (Trial Tr. 1034: 9-1039-22). At no time did she ever observe Mr. Husain signing client's names at initial meetings. (Trial Tr. 1039:5-7). No individual complained of the reuse of their signature to her. (Trial Tr. 1042:12-17). If Ms. Kaghan did not have her client's consent, and additional signatures were required, she would not reuse their signature. (Trial Tr. 1042:12-1045:3). It was Ms. Kaghan 's job to make certain that all signatures were obtained from the clients. (Trial Tr. 1053:7-13). Ms. Kaghan concedes that at some point she was prohibited from using the computer. for bankruptcies reusing signatures. (Trial Tr. 1054:13-16). Mr. Husain had spoken to Ms. Kaghan twice for submitting reused signatures. (Trial Tr. 1056:8-10). To her knowledge, Mr. Husain did not know of her conduct. (Trial Tr. 1056:20-22). Mr. Husain did not terminate Ms. Kaghan even after he learned that she was reusing signatures without his knowledge. (Trial Tr. 1003:7-13). Mr. Husain took responsibility for the acts of Ms. Kaghan , and Ms. Kaghan was aware of it at trial. (Trial Tr. 1056:11-13).

48

204.       Trustee's claim in Paragraph 237-276 is egregious and inflammatory, as Trustee

fails to offer to the Court that by the time Husain had filed his January 29, 2014 response,

he had confirmed with Ms. Kaghan  and/or clients that the clients had given her authority

to reuse their signature.   Yet another misstatement by the trustee. Also, begging the

Court's indulgence, **Mr. Husain takes responsibility for the acts that came out of his**

**office.**       He denies that he had had knowledge, or that he did anything willfully or

knowingly.  If he is as loathsome as the Trustee would like you to believe, than Mr. Husain

would have not taken responsibility for his employee's acts.

## XIV Al-Haroon Husain's Alleged Failure to Accept Responsibility

**A. Trustee Demands an Admission.**

205.       Trustee states that Respondent is failing to accept responsibility because he did not

believehe violated the Rules of Professional Conduct. (Trustee Con. of Law, p. 95, par

277).  Such a statement contorts Respondent to face a no-win situation. If Respondent states

that he violated the misconduct then he is taking responsibility, but will then be found liable

by the Court through this admission. However, if Respondent does not state that he violated

the rules of misconduct, then according to Trustee, Respondent is failing to accept

responsibility, and should be found liable.

206.       Trustee creates this statement with the underlying assumption that Trustee is the

trier of factand law. Trustee is not, and Respondent will not play Trustee's game. The Court

is the trier of fact and law. It shall make such decisions on whether or not Respondent's

actions qualify as misconduct, not the Trustee.

207.       The only thing Respondent can do is present the facts of the case, which Respondent

has done. Respondent has brought, and still maintains through the evidence, the following:

(1) Regarding signing on behalf of clients, Respondent obtained authority from his clients.

Upon the Trustee's office stating to Respondent not to sign on behalf of clients at all,

Respondent ceased in 2012; (2) Regarding reusing signatures, Respondent's legal assistant

Kaghan did so without Respondent's knowledge, though with the permission of the client. Upon Respondent discovering Kaghan's procedures he ordered Kaghan to cease. Kaghan inadvertently did it twice more, and Respondent canceled Kaghan's access privileges. Contrary to the Trustee's unfounded allegations, Respondent takes responsibility for his legal assistant's actions; (3) Regarding Manavski, Respondent states that Manavski had a right to file in Cook County. Respondent based this conclusion upon (a) discussion with Manavski's family, (b) the fact that, pursuant to section 109, Manavski had property at the Cook County address, and (c) pursuant to the Domicile rule, Manavski intended to return to the United States (the Court should note here that if Manavski had not intended to return to the United States there would be no reason for him to file a bankruptcy).

208.    This summation is the essence of Respondent's response. In addition, coupled with this is Trustee's own senior attorney, Steven Wolfe, admitting that he does not know of any rule which Respondent has violated. (at least in regards to the signature issue) (Tr. Transcript, p. 1116, line 9-14) (Note Mr. Wolfe goes on to state his personal opinion of what he would do, but he does state, from the outset, that he does not know of any law prohibiting an attorney from signing on behalf of his client. Given that Mr. Wolfe is a senior attorney in the Trustee's with over two (2) decades of experience, his statement that he is not aware of any prohibition gives credence to the notion that Respondent did not violate any rules regarding signing on his client's behalf with direction). Based on the evidence, it seems that for Trustee to demand that Respondent admit wrongdoing simply because Trustee wants it, even though experienced members of his office do not see a violation (in some of the charges) smacks of intimidation by the Trustee to secure a win regardless of whether Respondent is innocent or not.

**B. Respondent's Explanation of E-signature**

209.    Trustee next states that Respondent was intentionally misleading the Court with his description of e-signatures (Trustee Con. of Law, p. 96, par. 279). Such an accusation is completely

false and an affront to the Court itself. The Court is well aware of its own procedures. Any attempt

by anyone to try to "mislead" the Court on its own procedures is insulting and futile.

210.    Respondent states that, prior to December 1, 2014, an attorney could simply have

filed an

entire bankruptcy case by having the client sign the declaration, and then file the bankruptcy

documents with the petition. Any further submission of documents must be submitted with a

separate declaration.

211.    Trustee, in essence, ***agrees with Respondent***. (Trustees Con. of Law, p. 96, par.

279). Yet Trustee state that Respondent is intentionally trying to deceive the Court.

(Interestingly, the Trustee avoids stating at what "point" this type of practice was changed

by the Court. The change occurred in December/2014, i.e., very recently, and not in the far

past.)

212.    What Respondent states in Trustee's Con. of Law, p. 96, par. 278, is that, though

this method was legal, Respondent did not wish to perform it. There were several reasons

for Respondent not to participate in this procedure, all of which concerned the wellbeing of

Respondent's clients. They are as follows:


213.    **Potential Lack of Review.** As Respondent *and* Trustee both agree, the procedure

was that the debtor would sign one declaration document. Debtor's counsel, with that one

signature, could then file the declaration, petition, and schedules, and all other necessary

documents simultaneously, and state that one signature extended to all documents filed.

(Trustees Con. of Law, p. 96, par. 279). Such a procedure did *nothing* to prevent an attorney

from simply having the debtor sign one declaration, and drafting and submitting the

remainder documents without review by the debtor. Moreover, there is **no way** for the

Court to verify that debtor reviewed all bankruptcy documents with their attorney. It would

simply have to rely on the filing attorney assuring the Court that the debtor reviewed all

documents.

214.      **Debtor to be at the potential Manipulation of Counsel.** Because the debtor would

only sign the declaration page, debtor would be at the mercy of debtor's counsel as to what

debtor's schedule would state; and because most debtors lack the sophistication to

determine what should be placed in each particular schedule, statement of financial affairs,

and other documents, debtor can easily be manipulated by counsels who wish to do a

"skeletal" job of the schedules, and move on to other bankruptcies, thereby potentially

exposing debtor to liability to unlisted creditors. And, as the Court knows, an unlisted

creditor who is not informed of the debtor's bankruptcy does not have their debt discharged,

and can potentially go after debtor after the bankruptcy concludes.

215.      **Creation of More 'Bankruptcy Mills."** The lack of additional requirements needed

by attorneys to complete a debtors bankruptcy allows attorneys to do more bankruptcies in

shorter periods. This aids in the creation of so-called "Bankruptcy Mills", which are law

firms that produce bankruptcies on a mass scale. Though not an illegal method, mass

production of bankruptcy filings inevitably leads to a lack of quality in bankruptcy filings,

and will cause an increase in the amount of bankruptcies being denied or coming under

scrutiny through a 2004 examination. Debtors, as a result of this, will have to spend more

time and effort in order to have their bankrupcties discharged, causing significant harm to

them.

216.      **Greater Chance of Error.** With greater "Bankruptcy Mills" created, there is also an

increased chance for error throughout the schedules of debtors. Specifically, attorneys will not

review the files with the debtor due to the fact that there will be more files to process. This lack of

review will cause greater error because there will likely be assets or debts for certain debtors that

are unusual or uncommon. These debtors will then have improper bankruptcies which can be

invalidated or successfully challenged by creditors.  Trustee that Respondent himself has filed

bankruptcies with errors, so how can this be any different. Though Trustee would be correct with

Respondent's errors (as would be if pointed to any experienced bankruptcy attorneys) the scenario Respondent is demonstrating shows attorneys being out and out reckless with clients files. Respondent merely filed mistakes that were generally corrected upon discovery. They are not the same.

217.     Respondent wished for his clients to know what was being stated in their bankruptcy. Indeed, even the Bankruptcy Court seems to have taken note of this, and changed the procedures to reflect what Respondent was always doing. (Trial Tr., at 469:18-470:24).   By doing the above, Respondent was going beyond what was required. The Trustee should be acknowledging Respondent's actions, not admonishing them.

## XV.                    Legal Conclusions

218.     Although the Trustee is required to prove all allegations to a preponderance of the evidence, the Trustee maintains that it has satisfied its burden by a clear and convincing standard.  (Trustees Conclusions of Law, par.281).  Such insolence requires that the Trustee should be held to that standard.  If the Trustee believes that it has met that burden, then it should be held to it.  In any case, its another red herring or hyperbole which can be found everywhere in Trustee's Conclusions of Law.

### Count I – Alleged Violation of ABA Model Rule 3.1: Meritorious Claims and Contentions

219.              Rule 3.1 of the ABA Model Rules provides, in pertinent part:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

Comment 1 to the Rule notes that "[t]he advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure."

220.     According to allegation 1, given the preponderance of the evidence standard, Respondent must demonstrate to the Court that Respondent had a basis in law **and** fact that was not frivolous in order to prevail.  This requires the Respondent to provide (1) evidence

and (2) law in support of same.  Not only has Respondent met its burden to a preponderance of the evidence standard in defeating the Trustee's claim, but Trustee has not offered any evidence or law to the contrary.

221.    Trustee begins its argument by asserting that Respondent knew that Manavski *resided in Bulgaria and was not able to return to the United States*,  (See Conclusions in law, para. 284).    The evidence on Record showed that Mr. Manavski *wants* to return to the United States through the testimony of Respondent and Mrs. Manvska   (See Trial Tr. 411: 17-412-10 and 610:15-21, respectively) and by the bankruptcy filings of Manvski I and Manvski II.  (i.e., why would Mr. Manavski not want to have a bankruptcy filed and have his debts exonerated in the United Stated in he did not intend to return to the United States?)   The Trustee has offered no evidence to the contrary to suggest that Mr. Manavski did not intend to return to the United States (i.e., change his domicile).  Whether or not Mr. Manavska can or cannot return to the United States is irrelevant is irrelevant and a question for a different court, the only thing that is relevant, and what the Trustee wants to confuse the Court of, is his desire to return to the United States.

222.    Trustee cites *In re Garneau* a case from 1904, which quotes the Bankruptcy act of 1898, and still relevant today, although from over 100 years ago.  It is quite surprising that Trustee does quote it.  In   *Garneau,* the Court was asked to determine whether the debtor's residence/domicile was that of St. Louis or East St Louis for the purpose of filing bankruptcy.

> "Domicile" is the place where one has his true, fixed, permanent home, and principal establishment, and to which, whenever he is absent, **he has the intention of returning**, and where he exercises his political rights. There must exist in combination the fact of residence and the animus manendi. "Residence" indicates permanency of occupation as distinguished from temporary occupation, but does not include so much as "domicile," which requires an intention continued with residence. Residence has been defined to be a place where a person's habitation is fixed **without any present intention of removing therefrom**. It is lost by leaving the place where one has acquired a permanent home and removing to another place animo non revertendi, and is gained by remaining in such new place animo manendi.

*In re Garneau*, 127 F. at 678-679 (citations omitted).  What *Garneau* does not say, and the

Trustee wants this Court to mistakenly believe, is that the debtor was precluded from filing a bankruptcy by virtue of his domicile. The evidentiary record, including, but not limited to, the testimony of Ms. Manavska and the Respondent, establishes that Mr. Manavski had domicile in the United States during years 2012 and 2013, by the evidence on record, and Trustee's own admission. Trustee even concedes that personal property was at the Des Plaines address. (See paragraph 254 of Trustee's Conclusions of Law). What the Trustee further ignores, not surprisingly, is the testimony of Mrs. Manavska, where she testifies that her brother changed his address to that of Des Plaines, Cook County, for the purpose of receiving mail, ergo residency.

> Q.    Okay.   Even though the bankruptcy got
>        dismissed in DuPage, your brother still wanted to
>        have a bankruptcy done; is that correct?
>
> A.    Yes.
>
> Q.    Okay.   What did you tell Al?
>
> A.    My brother told me to try again.
>
> Q.    Okay.   Where did Al try again at?
>
> A.    Where?
>
> Q.    Yeah.
>
> A.    What do you mean "where"?
>
> Q.    Do you know where Al tried to have a
>        bankruptcy?
>
> A.    In this here.
>
> Q.    Where is "this here"?
>
> A.    In downtown Chicago.
>
> Q.    Okay.   Do you realize that Al first
>        tried to do it down in Des Plaines -- or I'm sorry --
>        in DuPage County where you live?
>
> A.    Yes.
>
> Q.    Okay.   And then he tried to do it
>        here in Cook County?

（Trial Tr. 646:4-647:13）

高

| | | |
|---|---|---|
| A. | Okay. | |
| Q. | Do you understand that? | |
| A. | Okay.   I understand.   So what? | |
| Q. | Okay. | |
| A. | I don't understand. | |
| Q. | Okay.   All right.   Do you know why he was able to file it in Cook County? | |
| A. | My brother changed the address. | |
| Q. | Okay.   Why did your brother change the address? | |
| A. | Because he wants to – it's his business first.   It's not my business.   And he just decided to receive his mail and everything from -- to his friends' apartment. | |

(Trial Tr. 646:4-647:13).

223.     The testimony is quite clear.  The debtor, already having a domicile by having personal property, established a residence for his intended return to the United States by changing his address to Cook county.   Next, the record shows that Respondent prepared a second set of documents for Mr. Manavski and provided the documents to Mrs. Manvska to tender to her brother.  (Trial Tr. 658:25-658:4) That is clearly an intention to establish a residence, if not even to maintain a domicile.    The fact is Mr. Manavski never intended to change his domicile, as the Trustee suggests, and established residency.   The four elements of change of a domicile are: (1) physical abandonment of the first domicile, (2)[i]ntention not to return, (3) physical presence in the new domicile, and (4) intent to make that his domicile; and in order to effect a change of domicile the old domicile must be abandoned, without an intention to return to it, and a new domicile acquired in another jurisdiction with the intention of making it a permanent home.  *Koerber v. Apollo Golf, Inc.,* No. 93 C 711, 1993 WL 39630, at *1 (N.D.Ill. Feb.16, 1993) (Shadur, J.) (citations omitted).  The only evidence on record it the fact that Mr. Manavski intends on returning

to the United States. The Trustee cannot rebut this. There is no record that Mr. Manavski is employed outside of the United States. In fact, he is tendering to his 87 year old grandmother. (Trial Tr. 656:4-11).

224.     Lastly, if Cook County is not a proper venue for a bankruptcy for Mr. Manavski, then Respondent asks Trustee where can he file? Is Mr. Manavski prohibited from filing a bankruptcy because he is not physically present in the United States?

225.     The other argument the Trustee relies on is additional hyperbole. The Trustee attacks Schedule B, and maintains that Respondent was required to go and look for Mr. Manavski's property. (See para. 288 of Trustees Conclusions of Law). Nowhere in the bankruptcy code is an attorney required to go to a debtor's home and inspect their possessions. Trustee ignores the facts and evidence on record, and is only the unsupported opinion of the Trustee. Respondent took the information from Mrs. Manavska to prepare a second set of documents that were tendered to Mrs. Manavska which were thereafter forwarded to her brother, Mr. Manavski, and that Mr. Manavski and no reason to lie to her or to Respondent. (Trial Tr. 658:24-659:10). What does the Trustee offer in response? *"There is no credible evidence that Mr. Manavski met any of the eligibility criteria of § 109(a) during 2012 or 2013"*. (See paragraph 289 of Trustee's Conclusions of Law). What the Trustee is basically saying is that Mr. Manavski, Ms. Manavska both lied, Respondent knew that they lied, and he is a co-conspirator. Nonsense. The basis in law for filing the bankruptcy was Mr. Manavski satisfying Section 109 of the code, thus satisfying the meritorious claim requirement.

**Count II – Violation of ABA Model Rule 3.3: Candor Toward the Tribunal.**

226.     Rule 3.3(a)(3) of the ABA Model Rules provides, in pertinent part: "A lawyer shall not knowingly…offer evidence that the lawyer knows to be false." The Rule further provides that "[i]f If a lawyer… has offered material evidence and the lawyer comes to know of its falsity, the

lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."

(Id.) For purposes of the Rule, "knowingly" and "knows" means actual knowledge, which may be

inferred from the circumstances. Rule 1.0(f).

227.     The Trustee claims *Manavski II* Petition, Schedules, and Statement of Financial

Affairs contain materially inaccurate information concerning Mr. Manavski's address, prior

bankruptcy filings, personal property and debts. The evidence clearly and convincingly

demonstrates that Respondent knew this information was inaccurate at the time he filed the

documents with the Court, and, in doing so, violated Rule 3.3(a)(3).     What the Trustee does not

do is offer any evidence in support of same. The Court has to look at the entire record as told by

Mrs. Manavska at trial to get a sense of what happened, and this is exactly what the Trustee wants

the Court to ignore.

228.     Mrs. Manvska testified that she resided at 128 Forest Glen, Road, Wood Dale

Illinois, located in DuPage County.   (Trial Tr. 605:10-12).   At all times she told the truth,

but there may have been a misunderstanding between Respondent and Mrs. Manavska as to

the information conveyed.   (Trial Tr. 639:23-640:2).   Mrs. Manavka was aware that

Respondent had to rely on her to obtain information to complete the bankruptcy for Mr.

Manavski.  (Trial Tr. 639:13-19).  Mrs. Manvska went to Respondent's office on several

occasions to complete Mr. Manavski's bankruptcy.  (Trial Tr. 640:5-8).  A drivers license,

passport, social security card were among the documents provided. (Trial Tr.  633 15-17).

After the documents were prepared, she read them. (Trial Tr. 640:13-15).   All the

information Respondent obtained was from Mrs. Manavska.  (Trial Tr. 641:10-17).  After

Respondent got the information, he drafted the bankruptcy documents.  (Trial Tr. 641:21-

24).  Thereafter, she reviewed the documents.  (Trial Tr. 641:25-642-3).  She did not think

that there was anything wrong with the documents.  (Trial Tr. 642:14-16).  She did testify

that her brother never resided at her house (Trial Tr. 608:4-6), but she reviewed all of the

documents in the first bankruptcy and sent them to Mr. Manavski, who found everything to

be proper and correct. (Trial Tr. 634:21-635:11; 642:24-643:3).  Thereafter the bankruptcy documents were signed and emailed to Mrs. Manavska, and then given to Respondent. (Trial Tr. 643:22-24).

229.        After Manavski I  was dismissed, Respondent was asked to try to file another bankruptcy in Cook County.  According to Mrs. Manavski, her brother changed his address to the Des Plaines address.  (Trial Tr. 647:7-13).  The address was changed after the DuPage bankruptcy was denied.  (Trial Tr. 649:3-5).  Another set of documents for a bankruptcy was prepared for Manavski II and were provided to Mrs. Manavska, and sent to Mr. Manavski.  (Trial Tr. 647:16-18).  At all times [to her knowledge] her brother was telling the truth (Trial Tr. 655:11-12). Before Brother left, lived in Des Plaines: (Trial Tr. 638:2-5). Clothes kept at Des Plaines . (Trial Tr. 621:6-20).   Just as in Manavski I, Respondent had to rely on her to obtain information to complete the bankruptcy for Mr. Manavski.  (Trial Tr. 639:13-19).

230.        As to the schedules, since the bankruptcy is still open, Manavski II can still be amended to reflect the assets that were in Manavski I.  Respondent's omission was not intentional, and moreover, as stated above, both Mrs. Manavska and Mr. Manavski reviewed the documents before they were filed, and it was reasonable for Mr. Husain to rely on their information.  Courts do have standards in determining if an attorney makes a reasonable inquiry in determining the basis of the case. A court must use "an objective standard to determine whether a particular inquiry was reasonable, based upon the circumstances that existed at the time the pleading was filed." (*Cmarko,* 208 Ill.App.3d at 445,153 Ill.Dec. 394, 567 N.E.2d 352.) This standard is met when the relevant legal paper has a "reasonable basis in fact." *Tarkowski v. County of Lake* (7th Cir.1985), 775 F.2d 173, 176. To prove its case the Trustee has not demonstrated that Respondent acted willfully.  Trustee, at best, may have proved as Respondent made a mistake, but has not proven that he acted intentionally.

**Count III – Alleged Violation of ABA Model Rule 3.3: Candor Toward the Tribunal.**

231.    Rule 3.3(a)(1) of the ABA Model Rules provides that "A lawyer shall not knowingly… make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer…"

232.    The Trustee claims that in filing documents with the Court that purported to bear his bankruptcy clients' signatures as required under Bankruptcy Rule 1008 and 28 U.S.C. § 1746, Respondent represented to the Court that the documents had been properly executed in accordance with those requirements. As set forth above, the uncontroverted evidence demonstrates numerous instances where Respondent and/or Ms. Kaghan, operating under his sole direction and control, (i) signed documents for clients, (ii) had clients sign incomplete documents, or (iii) altered dates and reused clients' signatures.

233.    Trustee's argument is again hyperbole, intended to inflame the Court and make Respondent appear as reprehensible as, well, the Trustee.    To begin with, to support its argument, the Trustee cites Rule 1008 of the Federal Rules of Bankruptcy Procedure and the verification portion section 28 U.S.C. § 1746.  Here Trustee ignores the testimony of its own witness, Trustee Steven Wolfe.  Mr. Wolfe was asked a simple question, whether he was aware of any law in Illinois that prohibited an attorney from signing on behalf of his client. Over the Trustee's objection, the Court allowed Mr. Wolfe to answer, because the answer favored the respondent.  Mr. Wolfe said. "no".  (Trial Tr. 1116:9-14).

234.    Moreover, it is not as if Respondent signed the petition to the bankruptcy. Nowhere in the record was it established that Husain signed on behalf of his clients for a petition (though Trustee attempts to do so with several clients, none was actually shown to be true. Ghousia Iqbal (whom the Trustee alleges that Respondent signed all her documents, stated she signed her own documents (UST. Ex. 61, p.21); Kanu Bauser, who Exhibits all reflect the same handwriting as her petition (UST. Ex.33A-D); Ghulam Haider (UST Ex. 60, p. 10:12-19) and Nazra Begum (UST Ex. 59, p. 11: 16-18) (both

60

verify); Syed Faisal Hussaini (UST. Ex.58, p.15:8 -16:7) (verifies); Mirza Baig

(Tr.Trans, p. 504:11-19) (verifies); Sakeena Baig (Tr. Trans, p.559:5-23) (verifies).

Ashout Ibraheem deposition, with his limited English and having his daughter translate,

states that Respondent may have signed, but Respondent, in testimony refutes this (Tr.

Tran. p. 43:14-19). In addition, Rina Ibraheem, Ashout's wife, states that she signed her

name to same petition cited by the Trustee (UST. Ex.43, p. 6:8-16) (verifies)). When

clients forgot to sign some of the documents, they were contacted by Respondent, they

were asked to come into the office to complete the documents.  On the rare exceptions

when they could not come into the office, they instructed Mr. Husain to sign on their

behalf.  The most important factor that the Trustee did not demonstrate was that all

clients who recalled giving authority had no issue with it, and those who did not recall

whether they gave authority simply were indifferent.  What the Trustee is trying to

suggest is that Respondent attempted to defraud the Court by committing a forgery.

This implies intent to deceive.  Trustee has not demonstrated this.

235.     The Trustee also misstates the law. The Trustee claims that an attorney cannot

sign on behalf of his client.  As stated by Mr. Wolfe, there is no law in Illinois, be it state

or federal, prohibiting this.  There is, however, certain documents that an attorney cannot

sign, namely a petition.  All of the case law cited by  the Trustee supports this.  *In re

Hurford*, 290 B.R. 299, 302 (Bankr. E.D. Mich. 2003), stands for the proposition that an

attorney cannot personally sign the petition.  The Trustee inserts, "and other documents"

in its brief because (1)  *Hurford* is limited to only petitions; (2) Trustee is aware that

Respondent did not ever sign a petition on behalf of his client; and (3) the Trustee cannot

prevail on the merits and has to rely on hyperbole.  *In re Brown*, 163 B.R. 596, 597

(Bankr. N.D. Fla. 1993), also cited by the Trustee, again involved a spouse signing a

petition on behalf of the other spouse.  *In re Wenk*, 296 B.R. 719 (Bankr. E.D. Va. 2002)

involved an attorney filing a bankruptcy for a party the attorney did not represent, and

because the attorney filed an unsigned petition for bankruptcy without having the party's

consent, he committed fraud.  (Bankr.  *In re Rivera*, 342 B.R. 435 (D.N.J. 2007) involved

sanctioning attorney and law firm for filing certifications that utilized on-file signatures in

affidavits without having knowledge and belief to the materials they were attesting to.

That was clearly not the case in the case at bar.  Respondent had actual knowledge of the

documents he signed on behalf of his clients, as same was previously discussed with them

prior to filing stage.  Regardless, Trustee still maintains Respondent's conduct amounts to

forgery, as Respondent purports to someone who he is not.

236.        An essential element of forgery is an intent to defraud. (Ill. Rev. Stat. 1987, ch. 38,

par. 17-3(a); see *In re Levy* (1987), 115 Ill.2d 395, 399. The Court has ruled on prior

occasions what amounts to a forgery.  In a practical sense, a false or altered document

must serve a deceptive purpose. An example would be if a bankruptcy schedule

intentionally failed to display significant assets or disclosed debts that were false. One

such instance is *In re Bellows-Fairchild*, 322 BR 675 - Bankr. Court, D. Oregon 2005. In

that matter, the Defendant Attorney failed to disclose his own loan from his clients to the

Defendant Attorney on the schedules, and, <u>once</u> <u>known</u>, refused to transfer funds back to

the Trustee for distribution. In that matter, Defendant Attorney knowingly omitted a

crucial debt owed to the bankruptcy estate, and *after knowing it*, *still refused to return the*

*funds*. The purpose of this action by the Defendant's attorney was to obtain the benefits of

the bankruptcy court, without having to undergo the bankruptcy court's obligations**.**

237.        In the present matter, there was no such activity. There is no gain or deception that

the clients have by authorizing Respondent to sign on their behalf. The reasons that were

given by Respondent's clients were more of necessity-in that they forgot to sign on their

behalf, and after obtaining their consent, Respondent effectively corrected the technical

defect.  All debtors were satisfied with their representation.  No creditor was harmed, no

bankruptcy was challenged, and all those who wished to have their bankruptcies

completed (other than Manavski, which still may be completed) had them completed.

238.     As to the reuse of the signatures and changing dates on the documents, all of the clients gave their consent.  Not a witness came forward and said, "I objected to how Respondent represented me in my bankruptcy?     The Trustee fails to state that *all of Respondent's clients* who Trustee has accused Respondent of reusing said signatures, approved of the utilization. Moreover, all clients were apprised of, and approved any and all modifications needed for the amendment. Finally, Respondent's Paralegal, Marilyn Kaghan, took it upon herself to such things, without Respondent's knowledge.  As stated supra,  Respondent assumes responsibility for the actions of Kaghan, as the work product came out of his office.  In end however, Respondent's office actions of obtaining approval by all clients reflects Respondent's motive that there was no intent to deceive the Court.

239.     Lastly, there is no false statement of ***material fact***.  Respondent would concede that had he signed a petition, then, he would be libel.  The law that has been cited by the Trustee has revealed that the debtor has to sign the petition.  That has been the case on every bankruptcy filed by Respondent.  Prior to December 2014, the only document the debtor needed to sign in a bankruptcy was a declaration, and thereafter, an attorney could conceivably e-file all of the other documents without having his clients look at anything. That is no longer the case.  Debtors must sign all documents, akin to the 212 of 216 bankruptcies prepared by Respondent.  Again, there were only 4 bankruptcies regarding signatures that the Trustee took issue with.  Moreover, all bankruptcies other than the Baigs and Manavki were approved.  The Baigs did not want to continue with their bankruptcy, and it was struck at the 2004 examination, when Mr. Wolfe determined that they were both incredible, as neither one of them could agree to what they owned as to what was listed on their statement of financial affairs.  .(See Ex. 74).  The fact that the date of a document was changed is not a material fact, as it does not per se render the bankruptcy void.     Because of this, Trustee's allegations are unfounded and this count

must be dismissed.

## Count IV – Alleged Violation of ABA Model Rule 8.4(c): Misconduct

240.     Rule 8.4(c) of the ABA Model Rules provides that "[i]t is professional misconduct for a lawyer to…engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

241.     Trustee claims Respondent committed a deceptive and dishonest act by filing the Petition, Declaration, Schedules and Statement of Financial Affairs in *Manavski II* with dates altered and signatures reused from the same documents filed in *Manavski I*.  The Trustee is arguing hyperbole again, and basically form over substance.  If. Mr. Manavski was to appear in Chicago for his bankruptcy, there is no reason the Trustee could provide that would keep him from completing his bankruptcy in Chicago.   All of his debt on his credit report was unsecured.  That is undisputed.  The likelihood of a credit card company challenging the debt is slim.   At the 341 meeting, Mr. Manavski would    affirm his signature, as we have the testimony of his sister authenticating his signature on two sets of documents and that of Respondent who compared his signature to the credit card debt he accumulated would be exonerated.

242.     The evidence on record clearly establishes that all the information Respondent obtained was from Mrs. Manvska.  (Trial Tr. 641:10-17).  After Respondent got the information, he drafted the bankruptcy documents.  (Trial Tr. 641:21-24).  Thereafter, she reviewed the documents.  (Trial Tr. 641:25-642-3).  She did not think that there was anything wrong with the documents.  (Trial Tr. 642:14-16).  She did testify that her brother never resided at her house (Trial Tr. 608:4-6), but she reviewed all of the documents in the first bankruptcy and sent them to Mr. Manavski, who found everything to be proper and correct.  (Trial Tr. 634:21-635:11; 642:24-643:3).    After they were signed, the bankruptcy documents were emailed to Mrs. Manavska, and then given to

Respondent.  (Trial Tr. 643:22-24).

243.　　　After Manavski I was dismissed, Respondent was asked to try to file another bankruptcy in Cook County.  According to Mrs. Manavski, her brother changed his address to the Des Plaines address.  (Trial Tr. 647:7-13).  The address was changed after the DuPage bankruptcy was denied.  (Trial Tr. 649:3-5).  Another set of documents for a bankruptcy was prepared for Manavski II and were provided to Mrs. Manavska, and sent to Mr. Manavski.  (Trial Tr. 647:16-18).  At all times [to her knowledge] her brother was telling the truth (Trial Tr. 655:11-12). Before Brother left, lived in Des Plaines: (Trial Tr. 638:2-5). Clothes kept at Des Plaines . (Trial Tr. 621:6-20).   Just as in Manavski I, Respondent had to rely on her to obtain information to complete the bankruptcy for Mr. Manvski.  (Trial Tr. 639:13-19).

244.　　　All of the information with the respect to the bankruptcy was provided by Mrs. Manavska, and Mr. Manavski, which included Schedule B.  Respondent forgot to include the DuPage Schedule B to reflect the additional assets located in Des Plaines for Manavski II.  If given an opportunity to do so, Respondent would amended Schedule B to reflect all property held by Manaski in DuPage and Cook.  Since Respondent reasonably relied on the representations of his client and his client's sister, there is no violation of Rule 8.4. According to the testimony, there were new documents provided to Respondent.  The date is relevant only as much as to the debtor, when the intent to file for bankruptcy, the manifestation becomes an act.  If changing the date is authorized by the attorney, and is the manifestation of the client's intent, then the Client's wishes are being met.   Therefore, the Trustee has not met its burden amd this count should be dismissed.

## Count V – Alleged Violation of ABA Model Rule 8.4(d): Misconduct

245.　　　Rule 8.4(d) of the ABA Model Rules provides that "[i]t is professional misconduct for a lawyer to…engage in conduct that is prejudicial to the administration of justice."

246.        Many courts examining ethics rules similar or identical to ABA Model Rule

8.4(c) have explained that "a culpable mental state greater than negligence is necessary to

establish a prima facie violation of Rule 8.4(c). This requirement is met where the

misrepresentation is knowingly made, or where it is made with reckless ignorance of the

truth or falsity thereof." *Office of Disciplinary Counsel v. Anonymous Atty. A*, 714 A.2d

402, 407 (Pa. 1998) (collecting cases); *see also*, *In re Thomas*, 2012 IL 113035, ¶ 123,

962 N.E.2d 454, 478 (Ill. 2012) (finding violation of former Rule 8.4(a)(4)'s prohibition

against conduct involving dishonesty or misrepresentation where respondent was willfully

ignorant, noting that "his belief, even if sincere, was entirely unreasonable")

247.        The Trustee claims: (1) Respondent committed a deceptive and dishonest act by

filing the Petition, Declaration, Schedules and Statement of Financial Affairs in *Manavski

II* with dates altered and signatures reused from the same documents filed in *Manavski I*.

(2) In filing these documents, Respondent allegedly represented to the Court, creditors

and parties in interest that the documents had been properly executed, when, in fact, he

knew they had not been. (3) There can be no doubt that Respondent desired that the Court

[to] believe that the documents had been properly executed, for, had his intention been

otherwise, there would have been no purpose in filing the documents. This conduct

violated Rule 8.4(c).

248.        The evidence on record reveals that new set of documents were sent to Mr.

Manavski after the first bankruptcy.  (Trial Tr. 647:16-18).  Mrs. Manavka was aware that

Respondent had to rely on her to obtain information to complete the bankruptcy for Mr.

Manvski.  (Trial Tr. 639:13-19).  There is no evidence to the contrary that Mr. Manavski

received and reviewed the documents in Manavski II, as all the evidence on record is the

testimony of Mrs. Manavska, who the Trustee as already deemed credible, and he did

intend to have a bankruptcy filed.  Moreover, it is without question that Mr. Manavski

signed all of the bankruptcy documents, but the only thing that is at issue with the Trustee is

whether Mr. Manavski s changed the date on his bankruptcy filing.  Mrs. Kaghan already

testified that she changed the date on the filing.  Respondent has taken responsibility for all

of Ms. Kaghan's conduct.

249.     A closer examination of 8.4 must be looked at for the Court to determine whether

there has been a violation as the Trustee suggests.  The Trustee cites *Office of Disciplinary

Counsel v. Anonymous Atty. A*, 714 A.2d 402, 407 (Pa. 1998) for a basis of the culpable

mental state- This requirement is met where the misrepresentation is knowingly made, or

where it is made with reckless ignorance of the truth or falsity thereof.  In *Office,* the

Anonymous prosecutor failed to disclose a written confession of the defendant to the

defense and introduced it as an exhibit during its rebutal thus grounds for discipline.  Id.

This implies an affirmative act with the intent of deception on the part of the actor-

knowing culpability.  Ms. Kaghan changed the date of the document to reflect the filing

date, which was also the same date it was filed with the Court.  She was not trying to hide it

from a creditor, not trying to deceive the Court, and not trying to pull a "fast one" on the

Trustee's office.  She just thought that since the documents were being filed that day, they

should be dated for that day.  Trustee had the opportunity to delve into the intent of Ms.

Kaghan in changing the dates, but no wuestions as to the why were asked.

250.     Had Manavski II had the same date as Manavski I, there would be no issue.  Had

Manavski II did not have a date on it, there would be no issue.  The creditors are not

effected by changing the date of the document. Their unsecured debt is still just that,

unsecured.  The Court is not affected either, as it is Mr. Manavski who manifested the intent

to file for bankruptcy, executed the pertinent documents, and satisfied the domicile

requirement, as stated supra.  Mr. Manavski is not a person of great means, so there are no

persons of interest in his bankruptcy, other than the Trustee.   Nobody, therefore has been

harmed in any way.  Trustee has failed to demonstrate the requisite intent on the part of

Respondent or his employee and for that matter any alleged harm to the alleged grieved

parties, and therefore this count must be summarily dismissed.

## XVI. Discipline

1.  The Trustee has requested a permanent suspension from this Court and restitution to former satisfied clients.  The Trustee's suggestion is absurd.    All parties that have been disbarred from this Court have engaged in conduct so reprehensible it  does not even compare to the accusations of those of the Respondent.  For example  In Liou, Respondent created creditors  for clients  and he billed his clients  for prior bankruptcies which were rolled into the fees of the new bankruptcies. He was disbarred.    In the cases cited by  the Trustee,  In Fairchild,  the  attorney  borrowed  money from  clients, and when  he  was told to return the funds, he refused to do so.  This resulted in a 5 year suspension.    In re Wenk, the attorney appeared for a client who  did not retain him, and he was suspended for an undisclosed period. Moreover, in all cases cited by the Trustee where the Attorney signed on behalf of the client *none* of the attorneys had authorization to do so by the client. Here, Respondent had permission from his clients to sign or utilize their signatures (even those who did not recall were indifferent to Respondent signing or utilizing their names). In addition, *all* clients were satisfied with their bankruptcies, and all that wanted a discharge were discharged.

Based upon Trustee's lack of citation for a comparable case with client, and the fact that even senior members of the Trustee's office know of no rules (in regards to signing of clients) that Respondent violated, it is difficult to imagine how Respondent's case could arise to the Trustee's request.

In the end, Respondent does take responsibility of the documents that come out of his office, and Respondent recognizes that, improperly filing a bankruptcy is not allowed (though Respondent does not Manavski is not the proper example) signing on behalf of one's clients (regardless of authorization) is disparaged by the Court (which is why Respondent ceased doing so in 2012, per the Trustee's direction), reusing client's signature is disparaged by the Court (which is why Respondent ordered his assistant to cease doing the practice once Respondent discovered it). It

is with this last issue (reusing signatures) that Respondent takes particular note because, though Respondent did order his office to cease this practice, his office continued to do so. Respondent does recognize he must take enhanced steps to block this thing from happening again.

As such, Respondent is willing to undergo a class in operating a law practice, inclusive of ethics and bankruptcy. As this Court is aware, if the Court is to impose any sanctions then this matter shall be reported to the Attorney Registration and Disciplinary Commission, and Respondent shall be subject to further potential discipline there.

## XVII. Conclusion

WHEREFORE, Respondent respectfully submits the above proposed findings of fact and conclusions of law.

RESPECTFULLY SUBMITTED:
/s/ Al-Haroon B. Husain
Al-Haroon B. Husain
Respondent                                    DATED: April 28, 2015
15 N. Northwest Hwy
Park Ridge, Illinois 60068
(847) 939-5210